

Federal Register

**Wednesday,
December 14, 2005**

# Part IV

# Department of Agriculture

## Agricultural Marketing Service

7 CFR Parts 1124 and 1131
Milk in the Pacific Northwest and
Arizona-Las Vegas Marketing
Areas; Final Decision on Proposed Amendments to
Marketing Agreement and to Orders;
Proposed Rule



EXHIBIT
A
tabbies

## DEPARTMENT OF AGRICULTURE

### Agricultural Marketing Service

### 7 CFR Parts 1124 and 1131

[Docket No. AO–368–A32, AO–271–A37; DA–03–04B]

### Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Proposed rule.

**SUMMARY:** This document is the final decision proposing to adopt changes to provisions of the producer-handler definitions of the Pacific Northwest and Arizona-Las Vegas orders as contained in a Recommended Decision published in the **Federal Register** on April 13, 2005. This document is subject to approval by producers.

**FOR FURTHER INFORMATION CONTACT:** Jack Rower, Marketing Specialist or Gino Tosi, Associate Deputy Administrator for Order Formulation and Enforcement, USDA/AMS/Dairy Programs, Order Formulation and Enforcement Branch, STOP 0231-Room 2971, 1400 Independence Avenue SW., Washington, DC 20250–0231, (202) 720–2357 or (202) 690–1366, e-mail addresses: *jack.rower@usda.gov* or *gino.tosi@usda.gov.*

**SUPPLEMENTARY INFORMATION:** This administrative action is governed by the provisions of Sections 556 and 557 of Title 5 of the United States Code and, therefore, is excluded from the requirements of Executive Order 12866.

The amendments to the rules proposed herein have been reviewed under Executive Order 12988, Civil Justice Reform. They are not intended to have a retroactive effect. If adopted, the proposed amendments would not preempt any state or local laws, regulations, or policies, unless they present an irreconcilable conflict with this rule.

The Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), provides that administrative proceedings must be exhausted before parties may file suit in court. Under Section 608c(15)(A) of the Act, any handler subject to an order may request modification or exemption from such order by filing with the Secretary a petition stating that the order, any provision of the order, or any obligation imposed in connection with the order is not in accordance with the law. A

handler is afforded the opportunity for a hearing on the petition. After a hearing, the Secretary would rule on the petition. The Act provides that the district court of the United States in any district in which the handler is an inhabitant, or has its principal place of business, has jurisdiction in equity to review the Secretary's ruling on the petition, provided a bill in equity is filed not later than 20 days after the date of the entry of the ruling.

### Regulatory Flexibility Act and Paperwork Reduction Act

In accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), the Agricultural Marketing Service has considered the economic impact of this action on small entities and has certified that this final decision will not have a significant economic impact on a substantial number of small entities. For the purpose of the Regulatory Flexibility Act, a dairy farm is considered a "small business" if it has an annual gross revenue of less than $750,000, and a dairy products manufacturer is a "small business" if it has fewer than 500 employees. For the purposes of determining which dairy farms are "small businesses," the $750,000 per year criterion was used to establish a milk marketing guideline of 500,000 pounds per month. Although this guideline does not factor in additional monies that may be received by dairy producers, it should be an inclusive standard for most "small" dairy farmers. For purposes of determining a handler's size, if the plant is part of a larger company operating multiple plants that collectively exceed the 500 employee limit, the plant will be considered a large business even if the local plant has fewer than 500 employees.

Producer-handlers are defined as dairy farmers that process only their own milk production. These entities must be dairy farmers as a pre-condition to operating processing plants as producer-handlers. The size of the dairy farm determines the production level of the operation and is the controlling factor in the capacity of the processing plant and possible sales volume associated with the producer-handler entity. Determining whether a producer-handler is considered small or large business must depend on its capacity as a dairy farm where a producer-handler with annual gross revenue in excess of $750,000 is considered a large business.

The amendments would place entities currently considered to be producer-handlers under the Pacific Northwest or the Arizona-Las Vegas orders on the same terms as all other fully regulated handlers provided they meet the criteria

for being subject to the pooling and pricing provisions of the two orders. Entities currently defined as producer-handlers under the terms of these orders will be subject to the pooling and pricing provisions of the orders if their route disposition of fluid milk products is more than 3-million pounds per month.

Producer-handlers with route disposition of less than 3-million pounds during the month will not be subject to the pooling and pricing provisions of the orders. To the extent that current producer-handlers for each order have route disposition of fluid milk products outside of the marketing areas, such route disposition will be subject to an order's pooling and pricing provisions if total in-area route disposition causes them to become fully regulated.

Assuming that some current producer-handlers will have route disposition of fluid milk products of more than 3-million pounds during the month, such producer-handlers will be regulated subject to the pooling and pricing provisions of the orders like other handlers. Such producer-handlers will account to the pool for their uses of milk at the applicable minimum class prices and pay the difference between their use-value and the blend price of the order to the order's producer-settlement fund.

While this may cause an economic impact on those entities with more than 3-million pounds of route sales who currently are considered producer-handlers by the two orders, the impact is offset by the benefit to other small businesses. With respect to dairy farmers whose milk is pooled on the two marketing orders, such dairy farmers who have not heretofore shared in the additional revenue that accrues from the marketwide pooling of Class I sales by producer-handlers will share in such revenue. This will have a positive impact on 486 small dairy farmers in the Pacific Northwest and Arizona-Las Vegas marketing areas. Additionally, all handlers who dispose of more than 3-million pounds of fluid milk products per month will pay at least the announced Federal order Class I price for such use. This will have a positive impact on 18 small regulated handlers.

To the extent that current producer-handlers in the Pacific Northwest and the Arizona-Las Vegas orders become subject to the pooling and pricing provisions, such will be determined in their capacity as handlers. Such entities will no longer have restrictions applicable to their business operations that were conditions for producer-handler status and exemption from the

pooling and pricing provisions of the two orders. In general, this includes being able to buy or acquire any quantity of milk from dairy farmers or other handlers instead of being limited by the current constraints of the two orders. Additionally, the burden of balancing their milk production is relieved. Milk production in excess of what is needed to satisfy their Class I route disposition needs will receive the minimum price protection established under the terms of the two orders. The burden of balancing milk supplies will be borne by all producers and handlers who are pooled and regulated under the terms of the two orders.

During September 2003, the Pacific Northwest had 16 pool distributing plants, 1 pool supply plant, 3 cooperative pool manufacturing plants, 7 partially regulated distributing plants, 8 producer-handler plants and 2 exempt plants. Of the 27 regulated handlers, 16 or 59 percent were considered large businesses. Of the 691 dairy farmers whose milk was pooled on the order, 223 or 32 percent were considered large businesses. If these amendatory actions are not undertaken, 68 percent of the dairy farmers (468) in the Pacific Northwest order who are small businesses will continue to be adversely affected by the operations of large producer-handlers.

For the Arizona-Las Vegas order, during September 2003 there were 3 pool distributing plants, 1 cooperative pool manufacturing plant, 18 partially regulated distributing plants, 2 producer-handler plants and 3 exempt plants (including an exempt plant located in Clark County Nevada) operated by 22 handlers. Of these plants, 15 or 68 percent were considered large businesses. Of the 106 dairy farmers whose milk was pooled on the order, 88 or 83 percent were considered large businesses. If these amendatory actions are not undertaken, 17 percent of the dairy farmers in the Arizona-Las Vegas order who are small businesses will continue to be adversely affected by large producer-handler operations.

In their capacity as producers, 7 producer-handlers would be considered as large producers as their annual marketing exceeds 6-million pounds of milk. Record evidence indicates that for the Pacific Northwest marketing order at the time of the hearing, four producer-handlers would potentially become subject to the pooling and pricing provisions of the order because of route disposition of more than 3-million pounds per month within the marketing area. For the Arizona-Las Vegas order, one producer-handler would be considered a large producer because its

annual marketing exceeds 6-million pounds of milk and potentially subject to the pooling and pricing provisions of the order because of route disposition exceeding 3-million pounds per month.

A review of reporting requirements was completed under the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35). It was determined that these proposed amendments would have minimal impact on reporting, recordkeeping, or other compliance requirements for entities currently considered producer-handlers under the Pacific Northwest and the Arizona-Las Vegas marketing orders because they would remain identical to the current requirements applicable to all other regulated handlers who are currently subject to the pooling and pricing provisions of the two orders. No new forms are proposed and no additional reporting requirements would be necessary.

This notice does not require additional information collection that requires clearance by the Office of Management and Budget (OMB) beyond currently approved information collection. The primary sources of data used to complete the forms are routinely used in most business transactions. Forms require only a minimal amount of information which can be supplied without data processing equipment or a trained statistical staff. Thus, the information collection and reporting burden is relatively small. Requiring the same reports for all handlers does not significantly disadvantage any handler that is smaller than the industry average.

*Prior documents in this proceeding:*

Notice of Hearing: Issued July 31, 2003; published August 6, 2003 (68 FR 46505).

Correction to Notice of Hearing: Issued August 20, 2003; published August 26, 2003 (68 FR 51202).

Notice of Reconvened Hearing: Issued October 27, 2003; published October 31, 2003 (68 FR 62027).

Notice of Reconvened Hearing: Issued December 18, 2003; published December 29, 2003 (68 FR 74874).

Recommended Decision: Issued April 7, 2005; published April 13, 2005 (70 FR 19636).

**Preliminary Statement**

A public hearing held on proposed amendments to the marketing agreement and order regulating the handling of milk in the Pacific Northwest and Arizona-Las Vegas marketing areas. The hearing was held pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), and the applicable

rules of practice and procedure governing the formulation of marketing agreements and marketing orders (7 CFR Part 900), at Tempe, Arizona, beginning on September 23, 2003; reconvened, and continuing at Seattle, Washington, on November 17, 2003; and reconvened and concluding at Alexandria, Virginia, on January 23, 2004, pursuant to a notice of hearing issued July 31, 2003, and a correction to the notice issued August 23, 2003; and notices of reconvened hearings issued October 27, 2003, and December 18, 2003.

Upon the basis of the evidence introduced at the hearing and the record thereof, the Administrator, on April 7, 2005, issued a Recommended Decision containing notice of the opportunity to file written exceptions thereto.

The material issues, findings, conclusions, and rulings of the Recommended Decision are hereby approved and adopted and set forth herein. The material issue on the record of hearing relate to:

1. The regulatory status of producer-handlers.

**Findings and Conclusions**

The following findings and conclusions on the material issues are based on evidence presented at the hearing and the record thereof:

*1. The Regulatory Status of Producer-Handlers*

Amendments to the producer-handler definitions of the Pacific Northwest and the Arizona-Las Vegas milk marketing orders are adopted. This decision will result in all producer-handlers with in-area route disposition of more than 3-million pounds of fluid milk products per month being subject to the pooling and pricing provisions of the applicable order. This action will cause some current producer-handlers to become subject to the pooling and pricing provisions of the orders.

Currently, the Pacific Northwest and the Arizona-Las Vegas milk marketing orders provide separate but similar definitions that describe and define a special category of handler known as producer-handlers. While there are specific differences in how each order defines and describes producer-handlers, both orders—as do all Federal milk marketing orders—exempt producer-handlers from the pooling and pricing provisions of the orders.

Exemption from the pooling and pricing provisions of the orders essentially means that the minimum class prices established under the orders that handlers must pay for milk are not applicable to producer-handlers and producer-handlers receive no minimum

price protection for surplus milk disposed of within either order's marketing area. Producer-handlers enjoy keeping the entire value of their milk production disposed of as fluid milk products in the marketing area to themselves and do not share this value with other dairy farmers whose milk is pooled on either of the two orders.

However, producer-handlers are subject to strict definitions and limitations in their business practices. Both orders limit the ability of producer-handlers to buy or acquire milk that may be needed from dairy farmers or other handlers. Additionally, producer-handlers bear the entire burden of balancing their own milk production. Milk production in excess of what is needed to satisfy their Class I route disposition needs will receive whatever price they are able to obtain. Such milk does not receive the minimum price protection of the order.

It is the exemption from the pooling and pricing provisions of the Pacific Northwest and Arizona-Las Vegas orders that is the central issue of this proceeding. While producer-handlers are exempt from the pooling and pricing provisions of the two orders, they are "regulated" to the extent that producer-handlers submit reports to the Market Administrator who monitors producer-handler operations to ensure that such entities are in compliance with the conditions for such regulatory status. For the purposes of brevity and convenience, this decision will refer to those handlers who are subject to the pooling and pricing provisions of the orders as "fully regulated handlers" in contrast to producer-handlers.

### Overview of the Proposals

This proceeding considered three proposals seeking the application of each order's pooling and pricing provisions, or full regulation, of producer-handlers when their route disposition of fluid milk products in the marketing area exceeded 3-million pounds per month. These proposals were published in the hearing notice as Proposals 1, 2 and 3. Proposal 1 is applicable to the Pacific Northwest milk marketing order. Proposal 3 is applicable to the Arizona-Las Vegas milk marketing order. Proposal 2, applicable to only the Pacific Northwest order, is identical to Proposal 1 but also seeks to limit a producer-handler from distributing fluid milk products to a wholesale customer who is served by a fully regulated or partially regulated distributing plant in the same-sized package with a similar label during the month. In this regard, Proposal 2 would make the producer-handler definition

for the Pacific Northwest order more like the current Arizona-Las Vegas order.

A fourth proposal, published in the hearing notice as Proposal 4, seeking to prevent the simultaneous pooling of the same milk on the Arizona-Las Vegas milk marketing order and on a state-operated order that provides for marketwide pooling, (commonly referred to a "double-dipping") was addressed in a separate final rule that was issued November 18, 2005 (70 FR 70991) and will become effective on January 1, 2006.

### Summary of Testimony

Proposal 3 received testimony by a witness appearing on behalf of United Dairymen of Arizona (UDA). UDA is a dairy cooperative supplying approximately 88 percent of the milk in the Arizona-Las Vegas milk marketing order (Order 131). The UDA witness testified in support of establishing a 3-million pound limit in route disposition of fluid milk products for producer-handlers in the marketing area, which, if exceeded, would cause the producer-handler to become subject to the pooling and pricing provisions of the order. The witness was of the opinion that the current producer-handler definition contradicts the overall purposes of the Federal milk order program to establish uniform prices among all handlers and the marketwide sharing of revenue among all producers who supply the market.

The UDA witness asserted that Sarah Farms is the largest producer-handler in the Order 131 marketing area and avoids the classified pricing and pooling requirements applicable to all other handlers. The witness characterized this as the operation of an individual handler pool within a marketwide pool. The witness stated that UDA is aware that historically Federal orders have exempted producer-handler operations from the pricing and pooling provisions of orders because they were small and had little impact in the marketplace. The witness contrasted this historical perspective with Sarah Farms, recognized as the largest producer-handler in Order 131, by citing a trade journal article that ranked Sarah Farms as the second largest U.S. dairy farm with 13,000 cows in 1995.

The witness testified that UDA estimates Sarah Farms' Class I sales within the Order 131 marketing area are about 12 million pounds per month. Because of Sarah Farms' exemption from the pooling and pricing provisions of the order, the witness estimated a loss in revenue to producers who pool milk on the order at about $11,586,589 over

the period of January 2000 through July 2003, or about a 10–14 cents per hundredweight (cwt) impact on the order's blend price. In addition, the witness estimated lost revenue of about $3 million, or about a 10-cent per cwt lower blend price for the period of September 1997 through January 1999.

A second witness appearing on behalf of UDA also testified in support of Proposal 3. This witness explained that the proposed 3-million pound route disposition limit on producer-handlers was partly based on provisions of the Fluid Milk Promotion Act which requires an assessment for the promotion of fluid milk when a handler's sales are greater than 3-million pounds per month. The witness said that producer-handlers who have the ability to enjoy this level of route disposition should not be exempted from pooling and pricing provisions and that their continued exemption poses a serious threat to orderly marketing and the operation of the Federal milk order program.

The second UDA witness claimed that in December 1994, Sarah Farms was considered an insignificant factor within the Order 131 marketing area because their monthly raw milk production was less than 5 million pounds, of which less than 1.3 million pounds of Class I products were distributed within the marketing area. Relying on Market Administrator statistics, the witness added that by 1996, UDA estimated that Sarah Farms' monthly Class I route disposition had increased to more than 6 million pounds. The witness also testified that from late 1998 until this proceeding, Sarah Farms had been one of only two producer-handlers selling Class I products in the marketing area. Relying on Market Administrator statistics, the witness estimated that Sarah Farms' Class I route sales within Order 131 had increased from about 7 million pounds per month to as much as 15 million pounds per month by 2002.

A witness appearing on behalf of the Kroger Company (Kroger), a fully regulated handler under the Pacific Northwest milk marketing order (Order 124) and Order 131, testified in support of Proposals 1, 2, and 3. The witness said that changes in marketing conditions in both orders necessitate changes in how the orders define producer-handlers. In the opinion of the witness, producer-handlers enjoy a competitive sales advantage by being exempted from the pooling and pricing provisions of both orders. The witness explained that producer-handlers have a sales advantage because they have the flexibility to set their internal raw milk

price at a level well below the announced Federal order minimum Class I price that fully regulated handlers must pay.

The Kroger witness also testified that regulated handlers in Orders 124 and 131 have been forced to respond to competitive situations with producer-handlers in supplying retail grocery outlets. This was due in part to the competitive sales advantage producer-handlers have in being able to lower their price to retailers while still maintaining an adequate profit margin, the witness explained. The witness said that Kroger's retail outlets could not do this competitively without eroding their profit margins. Because of these competitive situations, the witness concluded that producer-handlers exceeding more than 3 million pounds per month in Class I sales was a reasonable estimate of when producer-handlers are in direct competition with fully regulated handlers and should therefore receive the same regulatory treatment. The same regulatory treatment of producer-handlers as fully regulated handlers above this threshold would, according to the witness, re-establish equity among handlers competing for Class I sales in these two marketing areas.

The Kroger witness was of the opinion that the volume of producer-handler route disposition was a key aspect of the disorderly marketing conditions in Orders 124 and 131. However, the witness indicated that a producer-handler's processing plant size alone was not necessarily an accurate indicator of processing plant efficiency. The witness testified that smaller plants can be very competitive. In this regard, the witness said that Kroger's largest plant was not its most efficient bottling plant.

A witness appearing on behalf of Western United Dairymen (WUD), the largest dairy farmer association in California representing approximately 1,100 of California's 2,000 dairy farmers, testified in support of Proposals 1 and 3. The witness expressed the opinion that a primary reason for the exemption of producer-handlers from the pricing and pooling provisions of Orders 124 and 131 had been because these entities were customarily small businesses that operate self-sufficiently and do not have a significant impact in the marketplace. The WUD witness testified that the regulatory exemption for producer-handlers has been largely unchanged in the Federal order system for more than 50 years. The witness explained that there had been no significant demonstration of unfair advantages accruing to producer-handlers because

they are responsible for balancing their fluid milk needs and cannot transfer balancing costs to other pooled market participants.

The WUD witness also testified that some producer-handlers were becoming much larger than fully regulated fluid processors in Orders 124 and 131. The witness was of the opinion that large producer-handlers were effectively taking greater and greater shares of the Class I market in both orders and caused pooled milk to be forced into lower-valued manufacturing uses. According to the witness, these outcomes are having a direct negative impact on handlers and producers in both orders and are generating instability in the Federal milk marketing order system.

The WUD witness asserted that when producer-handler sales growth threatened the sales of fully regulated handlers under California's State-wide regulatory system, the State acted to maintain and protect their pooling and pricing system by placing a limit on the volumes of sales producer-handlers could have within the State before becoming fully regulated. The witness was of the opinion that the Federal order program also needs to act by adopting the proposed amendments to similarly limit the sales volume of producer-handlers.

A witness appearing on behalf of the Alliance of Western Milk Producers (Alliance), an organization representing California cooperatives, also testified in support of Proposals 1, 2, and 3. The witness indicated that how the Federal order program deals with the producer-handler issue is of interest to California dairy farmers because changes in Orders 124 and 131, which border California, will have a direct impact on the State's milk marketing and regulatory program. The witness was of the opinion that producer-handlers have a tremendous competitive advantage in the marketplace because they are not subject to minimum pricing and are thereby able to avoid a pooling obligation to share their Class I revenue with all pooled market participants. The witness asserted that unless some limitation is put on the route sales volume of producer-handlers, it may encourage new producer-handlers to enter the market and further erode the equitable pricing principles relied on by the Federal milk order program.

A witness appearing on behalf of Northwest Dairy Association (NDA) testified in support of Proposals 1 and 2. The witness provided a business example demonstrating how producer-handlers enjoy a pricing and marketing advantage by being exempt from the pooling and pricing provisions of Order

124. Relating past business experiences as a fully regulated handler known as Sunshine Dairy, the witness explained how business was lost to a producer-handler competitor. The witness attributed this loss of business to the competitive sales advantage enjoyed by producer-handlers resulting from their exemption from the pooling and pricing provisions of the order.

The NDA witness testified that as a fully regulated handler known as Sunshine Dairy they had also lost a small customer who, at that time, was buying about 25,000 gallons of milk per week. The witness said that this customer grew to constitute more than 10 percent of its fluid milk sales volume. According to the witness, even though they had provided great service and products, they lost the account because the customer could save hundreds of thousands of dollars a year by procuring milk from a producer-handler. According to the witness, Sunshine Dairy lost this account because the producer-handler was able to price its milk at a level below the minimum Federal order Class I price. The witness also testified that the producer-handler subsequently lost this account to a fully regulated handler that was of national scope.

The NDA witness expressed the opinion that the goal of the Federal Order system is to maintain order in the market. In this regard, the witness testified that handlers should not be exempt from the pooling and pricing provisions of an order because they own their cows and produce their own milk supply when other handlers are not exempted. The witness stressed that such an exemption is unfair, noting that the vast majority of dairy farmers should not receive smaller paychecks for the same product as producer-handlers because they lack a processing plant.

A witness appearing on behalf of Maverick Milk Producers Association (Maverick), a cooperative of dairy farmers located in Arizona that markets its milk in California and Arizona, testified in support of Proposal 3. The witness testified that all handlers who market their milk in Order 131 should be subject to the pooling and pricing provisions of the order, including producer-handlers. The witness inferred from Market Administrator statistics that the largest producer-handler in Order 131, Sarah Farms, had cost Maverick members in excess of $1.2 million in revenue since 1999 because Sarah Farms had not been subject to the pooling and pricing provisions of the order. The witness testified that the estimated loss of revenue to the Order 131 pool was based on an assumption

that Sarah Farms produced about 18 million pounds of milk per month that would have been pooled as Class I milk.

A former executive and co-owner of Vitamilk, an independent handler no longer operating as a going concern, formerly located in Seattle, Washington, appeared on behalf of Dairy Farmers of America (DFA) and testified in support of Proposals 1 and 2. This DFA witness testified that in seeking alternative markets for its milk products, Vitamilk began to compete with producer-handlers for school milk supply contracts through one of its wholesale distributors. However, their bid attempts were unsuccessful, the witness testified, because the school district sought fixed-price contracts for packaged fluid milk which they could not supply in competition with a producer-handler. While conceding that Vitamilk was inexperienced in bidding for school-lunch business, the witness asserted that the fixed price contract offered by the producer-handler was below the combined value of the Federal order Class I price plus Vitamilk's cost allocations to marketing, processing, distribution, overhead, distributor profit, and risk.

This DFA witness explained that Vitamilk tried to retain other customers by lowering their prices in an effort to keep and gain sales volume even though the price represented no contribution to covering their indirect costs. The witness testified that prices offered by a local producer-handler were 11 to 12 cents per gallon below Vitamilk's best net price to distributors. According to the witness, even though Vitamilk's customers reported satisfaction with the company's service and other non-price attributes, the producer-handler's ability to provide fluid milk products at a lower cost resulted in the loss of customer accounts. The witness asserted that the loss of accounts was caused largely by the producer-handler's inability to price Class I products below what a fully regulated Class I handler could price its products. In addition, the witness testified that in 2003 Vitamilk even attempted to sell its Class I products at prices below breakeven and was still unable to find a price whereby it could successfully recapture business lost to a producer-handler.

A witness appearing on behalf of Shamrock Foods Company (Shamrock), a fully regulated handler located in Arizona and Colorado, testified in support of Proposal 3. The witness maintained that Shamrock is at a competitive disadvantage with producer-handlers because Shamrock is required to pay the Federal order Class I price for milk while producer-handlers

are exempt from the pricing and pooling provisions of Order 131. According to the witness, the price of Class I products offered to wholesale customers by producer-handlers can be lower than what Shamrock can offer profitably and that Sarah Farms, a producer-handler of the order, has been able to raid their customer base. Furthermore, the witness said that Shamrock's ability to maintain its policy of equitable pricing among its customers, be able to hold its prices fairly constant to maintain customer loyalty, and avoid bidding against itself for its own customers is undermined because of the producer-handler pricing advantage over fully regulated handlers. The witness said Shamrock is unable to quickly adjust their business practices to meet such competition because of their size and because of different regulatory treatment.

The Shamrock witness was of the opinion that the producer-handler exemption from minimum pricing and pooling provisions threatens the economic viability of Order 131. For example, the witness explained that major customers such as Safeway, Kroger, Wal-Mart and strong independents like Costco, Bashas and Sam's Club buy milk on a wholesale basis to resell to retail consumers. The witness noted that these customers seek the opportunity to buy milk at prices similar to those offered by the producer-handler—at prices below the Federal order Class I price. The witness testified that if Proposal 3 or some other restriction limiting route disposition volume is not adopted, either there will have to be an expansion of producer-handler supplies by expanding their farms or existing fully regulated handlers will need to reorganize their business practices to develop their own-farm production and become a producer-handler to remain competitive.

The Shamrock witness offered testimony regarding market research they routinely conduct through on-going surveys of retail grocery stores in Order 131. The witness explained that Shamrock salespersons do this to gather market intelligence on their competitors. According to the witness, Shamrock's marketing research indicated that prices for bottled fluid milk offered by Sarah Farms was typically 6 to 8 cents a gallon below their price—equating to about 48 to 64 cents on a per cwt basis. The witness testified that their market research also revealed that Sarah Farms' production and route disposition had grown from approximately 8 million pounds in 1998 to nearly 17.2 million pounds by 2003.

The Shamrock witness concluded that a sales volume limitation of 3 million pounds per month for producer-handlers was reasonable because a 3 million pound limit would represent about three percent of the total Class I sales in the Order 131 marketing area. In addition, the witness testified that a plant which processes 3 million pounds per month is an indicator of a very efficient plant operation. From these views, the witness concluded that a producer-handler with route disposition in excess of 3 million pounds per month is able to fully exploit economies of size and should therefore be treated the same as fully regulated handlers.

The Shamrock Foods witness conceded that there are additional challenges faced by producer-handlers in terms of managing milk supplies and disposing of surplus milk that fully regulated handlers do not face. The witness also acknowledged that there are costs associated with managing marketing risk, including the disposal of surplus milk production. However, the witness was of the opinion that these costs are more than covered by the competitive advantages that exist by being exempt from the pooling and pricing provisions of the order. One example the witness provided was that a producer-handler can balance its supply by selling fluid milk products into an unregulated area such as California.

A witness appearing on behalf of Shamrock Farms, which is affiliated with Shamrock Foods, testified in support of Proposal 3. Shamrock Farms milks 6,500 cows and is located in Maricopa County, Arizona. The witness testified that Shamrock Farms has always been a pooled producer on Order 131 and its predecessor order. The witness asserted that Sarah Farms operates dairy farms with approximately 10,000 to 12,000 milking cows. While the witness conceded the lack of hard data to confirm this assertion, the witness arrived at this estimate of farm size by counting the number of milk tankers per day that delivered to the Sarah Farms' plant in Yuma, Arizona.

A consultant witness appearing on behalf of Dairy Farmers of America (DFA), proponents of Proposals 1, 2, and 3, had prepared a study that analyzed and compared the value of raw milk to a large producer-handler with the cost of milk to fully regulated handlers and described the economic impact of competition between these two business entities. The study conducted by this witness was based on a proprietary database of 150 milk processing plants owned by businesses for which this witness' company performed accounting

and other consulting services. According to the witness, 20 plants were selected as being representative of the costs for 6 different size classes of bottling plants. The witness explained that the plant cost data was adjusted by applying regional consumer price index (CPI) factors as published by the U.S. Department of Labor. According to the witness, this method of adjusting data, the selection of relevant plants, the analytic methods employed in conducting the study, and the interpretation of the study results were all based on Generally Accepted Accounting Principles (GAAP).

The DFA consultant witness acknowledged that while the study of plant costs was based on actual plant data acquired from fully regulated handlers, the study did not include data from plants located in either the Pacific Northwest or the Arizona-Las Vegas marketing areas. The witness also acknowledged that the data for the smallest plants in the study were taken from producer-handler plants located in western Pennsylvania, an area not regulated by a Federal milk marketing order. The witness also explained that the study's actual data could not be offered for inspection and examination in this proceeding because individual plant cost and related information were proprietary, adding that this also explained why the data used in the study were averaged. The witness further testified that the selection of appropriate plants for inclusion in the study from all of the plants in the witness' proprietary database was based on professional judgment and experience.

The DFA consultant witness explained that the analysis of the data derived for the Northwest or the Arizona-Las Vegas marketing areas suggests that as plant volumes increase per unit processing costs decrease and that the highest per unit processing costs are found at the smallest plant sizes. At large plant sizes, the witness contrasted, a processor, regardless of regulatory status, can increase milk processing volume at a nominal additional per unit cost.

Relating an additional example of the study's findings, the DFA consultant witness testified that, other things being equal, a hypothetical plant bottling 3 million pounds of milk per month in 2-gallon pack containers would have per unit processing costs that were significantly higher than a plant producing 20 million pounds of milk per month in the same size container packs. In addition, the witness testified that the study suggests that where a large producer-handler and a handler

subject to the pooling and pricing provisions of an order compete for route sales, the producer-handler will always have a price advantage which could be as large as the difference between the Federal order Class I price and the order's blend price. The witness also said that the examination across all types of retail outlets reveals that a producer-handler will always have a price advantage in competing with fully regulated handlers.

The consultant witness for DFA provided a comparative cost analysis of servicing a warehouse store account by a fully regulated fluid milk plant and a large producer-handler using actual retail prices for 2-percent milk in Phoenix, Arizona, during January through June 2003. The witness testified that based on the study's data and assumptions, a large producer-handler can service such an account and return a substantial above-market premium over the producer blend price. However, the study reveals that the handler paying the Class I price for its raw milk supply will have little or no margin, the witness contrasted. The producer-handler's raw milk cost advantage, the witness said, allows it to service these stores profitably at a price that cannot be matched by a fully regulated handler. The witness concluded that producer-handlers are in a position to acquire any account they choose to service by offering a price which the regulated plant cannot meet.

In other testimony, the DFA consultant witness provided a pro-forma income statement for a regulated handler in Order 124 developed using certain assumptions about costs, prices and income. The witness demonstrated through an analysis of the pro-forma income statement that a large producer-handler would be able to successfully compete with fully regulated handlers if regulated. The witness concluded from this analysis that a successful producer-handler would be economically viable even if it were subject to the order's pooling and pricing provisions.

The DFA consultant witness testified that the cost data used in the study's pro-forma income statement example was generated using statistical methods based on one month's representative data for similar sized regulated handlers and assumed that producer-handlers and regulated handlers employed union labor and operated within collective bargaining agreements. The witness testified that based on own business experience, the characterization of labor costs would be representative of large fully regulated handler operations in the Pacific Northwest or the Arizona-Las Vegas marketing areas. In contrast, the

witness indicated no direct knowledge of the costs of labor employed by producer-handlers in Orders 124 or 131. The witness did conclude that use of non-union labor by producer-handlers would provide them with a clear cost advantage over similar or larger size fully regulated handlers that typically employed unionized labor.

The DFA consultant witness was of the professional opinion that current Federal order regulations provide producer-handlers with a significant cost advantage that cannot be matched by fully regulated handlers that are subject to pooling and pricing regulations. If the proposal to place a 3 million pound per month volume limit on producer-handlers route disposition is adopted, it will eliminate what the witness described as an unfair economic advantage for large producer-handlers while serving to protect a more modest pricing advantage for small producer-handlers.

In additional testimony, the consultant witness for DFA acknowledged the difficulty in reconciling the 150,000 pound per month route disposition limit established for exempt plants with the proposed 3 million pound per month limit for producer-handlers. According to the witness, the difference in these two limits are for two distinctly different entities and can be rationalized by the Department by acknowledging a value commensurate with milk production risks incurred by a producer-handler that are not incurred by handlers who buy milk from dairy farmers. A handler who buys milk from dairy farmers does not incur the production risks associated with operating a farm enterprise, the witness said. In this regard, the witness acknowledged that the study focused only on plant processing costs and not on the cost of producing milk in the farm enterprise function of a producer-handler.

A witness representing Dean Foods (Dean) testified in support of proposals establishing a volume limit on producer-handler route disposition. The witness testified that while Dean Foods does not operate bottling plants in either Orders 124 or 131, they do operate fluid milk plants in many States regulated by Federal milk marketing orders and in areas not subject to Federal milk order regulation. The witness testified that where Dean faces competition from plants that do not pay regulated minimum prices, Dean is affected. The witness stressed that milk bottling plants need to have equitable raw milk costs for the Federal milk order system to remain valid.

The Dean witness said that competitiveness and efficiency are not necessarily a function of processing plant size. On this theme, the witness provided an example where a small, fully regulated milk bottler in Bryan, Texas, successfully bid to supply a Texas state prison against a much larger Dean plant. The witness testified that the Bryan plant had processing capacity of less than 3 million pounds per month but was more efficient than the Dean plant and that because of its management structure, it could adjust more quickly to changing market conditions.

A witness appearing on behalf of the National Milk Producers Federation (NMPF) testified in support of Proposals 1 and 3. The witness was of the opinion that productivity increases resulting from technological advances and the growth of dairy farms enable large producers to capture sufficient economies of scale in processing own-farm milk and thereby compete effectively with established, fully regulated handlers. In light of this, the witness testified that such producers can disrupt the orderly marketing of milk in a market, adding that dairy farmers "turned producer-handlers" could grow across a market causing even greater disruption to orderly marketing in other Federal milk marketing orders.

The witness asserted that NMPF's own analysis, and a plant study by Cornell University revealed that larger fluid milk bottling plants have exhibited decreasing processing costs on a per gallon basis as the size of processing facilities increase. The witness explained that as the scale of processing plants increase, average processing costs tend to remain fairly constant, with the lowest per unit cost levels being exhibited over a relatively wide range of processing capacities. The witness testified that the lower per unit processing cost advantages of larger plant sizes tend to be greatest for very large processing plants rather than among smaller plants. The witness said that significant cost and other competitive advantages attributed to economies of scale in fluid milk processing become evident at about the 3-million pound per month processing level.

According to the NMPF witness, the exemption of producer-handlers from the pooling and pricing provisions of Orders 124 and 131 allows producer-handlers to effectively pay the equivalent of the blend price for milk at their plants, a price lower than the Class I price that fully regulated competitors pay. The witness testified that by using

the economic concept of "transfer pricing," the maximum price that a producer-handler "pays" for transferring milk from its farm production enterprise to its processing enterprise can be estimated even though the producer-handler does not actually sell raw milk to itself. According to the witness, transfer pricing in the context of the producer-handler issue, predicts that the price of milk assigned to milk from the producer-handler farm enterprise essentially becomes the price at which milk could be sold to a regulated handler—the Federal order blend price. Accordingly, the witness asserted that a producer-handler's advantage in raw milk procurement for processing, as compared to fully regulated handlers, would be the difference between the Federal order Class I price and the order's blend price.

The NMPF witness testified that their analysis reinforces the findings of the consultant witness for DFA regarding the magnitude of the pricing advantage producers-handlers enjoy over handlers who are subject to the pooling and pricing provisions of a Federal order. While noting that the DFA consultant witness' study used aggregated data that does result in a significant loss of information for analytical purposes, the witness stressed that even with this limitation it nevertheless remains the best data available to rely upon.

The NMPF witness was of the opinion that the producer-handler exemption from an order's pooling and pricing provisions also creates inequity among producers because it reduces the amount of milk pooled as a Class I use of milk, which in turn, lowers the total revenue of the marketwide pool to be shared among pooled producers. According to the witness, this threatens orderly marketing. The witness related that farms with over 3 million pounds of monthly production represent about 15 percent of the U.S. milk supply and may represent some 40 percent of U.S. fluid milk sales. According to the witness, the steadily increasing number of farms with this magnitude of monthly milk production suggests that large producers could exploit the producer-handler provision and thus further erode equity to both producers and handlers across the entire Federal milk marketing order system.

The NMPF witness stated that the 3 million pound per month route disposition limit proposed for producer-handlers as part of Proposals 1 and 3 is also consistent with the promotion assessment exemption of the Fluid Milk Promotion Program. According to the witness, the promotion exemption limit set by Congress was based on the impact

that a handler had in a marketing area. Below 3 million pounds per month route disposition, the witness said, the impact of an individual handler is negligible and therefore rationalizes why smaller handlers are exempt from fluid milk promotion assessments.

A witness appearing on behalf of DFA testified in support of Proposals 1, 2, and 3. The witness viewed the exemption of producer-handlers from the pooling and pricing provisions of Federal orders as a loophole that threatens the economic viability of the Federal milk order system and the economic well-being of pooled producers. This witness, like the NMPF witness, testified that a growing interest by large dairy farmers in becoming producer-handlers is a major factor in DFA's interest in seeking to amend the producer-handler definition in the Pacific Northwest or the Arizona-Las Vegas orders. The witness testified that the exemption from the pooling and pricing provisions of these orders provides producer-handlers with a competitive advantage over fully regulated handlers by effectively permitting producer-handlers to purchase milk at an internal price at or below the Federal order blend price while fully regulated handlers must pay the usually higher Class I price for milk. According to this DFA witness, the difference between the Class I price and the Federal order blend price represents a significant windfall generated solely by the regulatory exemptions accorded to producer-handlers.

The DFA witness summarized that the proposed 3 million pound per month limitation on route disposition is based on four considerations. According to the witness, the proposed limit is: (1) Consistent with the minimum volume of milk sales that triggers the fluid milk promotion assessment for handlers; (2) the level at which producer-handlers achieve competitive equity with fully regulated handlers in terms of plant processing efficiency; (3) the level of route disposition that has a significant impact on the pool value of milk; and (4) the level of route disposition that has a significant impact on the order's pooled producers and fully regulated handlers. The witness indicated that if a producer-handler's volume is sufficient to reduce a pool's value by a penny (1 cent) per hundredweight it is significant and is of sufficient magnitude to warrant ending producer-handler exemption from the pooling and pricing provisions of the orders. The witness also concluded from the study conducted by the consultant witness for DFA that when a producer-handler reaches a 3 million pound per month

distribution level, not only does the producer-handler reach similar plant processing cost efficiencies but it is also of sufficient size to service a considerable number of retail outlets on a competitive par with fully regulated handlers. According to the witness, continuing the exemption from an order's pooling and pricing provisions beyond the 3 million pound sales volume level causes serious market disruptions.

The DFA witness also testified that the exemption of producer-handlers from the pooling and pricing provisions of the orders is encouraging large producers to consider becoming producer-handlers in both Orders 124 and 131 and in other Federal order marketing areas. As an example, the witness testified that some retail outlets now seek packaged fluid milk supplies from producer-handlers in an effort to obtain lower cost milk supplies. The witness was of the opinion that without a limit on route disposition volume, producer-handlers will displace pooled producers and fully regulated handlers as the dominant suppliers of fluid milk not only in the Pacific Northwest and Arizona-Las Vegas marketing areas, but ultimately throughout all other Federal milk marketing areas. The witness cautioned that the potential for the growth of producer-handlers gives rise to considering lowering Class I milk prices as a means to counter the competitive price advantage that producer-handlers are afforded by regulatory exemption from pooling and pricing provisions.

The DFA witness testified that the current producer-handler definition creates market disorder because it disrupts the flow of Class I milk from pooled producers to regulated handlers. In addition, the witness testified that pooled producers effectively subsidize the balancing costs of producer-handlers. In the opinion of the witness, these outcomes are destabilizing and are producing disorder in both the Pacific Northwest and Arizona-Las Vegas marketing areas. In further explanation of these points, the witness expressed concern about the loss of Class I revenue that would otherwise accrue to pooled producers. As an example, relying on Market Administrator data in making professional inferences, the witness testified that the largest producer-handler in the Order 131 marketing area, Sarah Farms, had monthly route disposition in the range of 12.1 to 19.1 million pounds. According to the witness, the value of the sales revenue lost to the Order 131 pool by not subjecting Sarah Farms to the pooling and pricing provisions of the order

averaged some $317,000 per month, or the equivalent of 12.5 cents per cwt.

The DFA witness testified that the producer-handler price advantage over fully regulated handlers provides a powerful incentive for customers to purchase milk from producer-handlers rather than fully regulated handlers. The witness testified that producer-handlers have as much as a 15-cent per gallon advantage over fully regulated handlers in Order 131. According to the witness, the advantage is based on the difference between the Order 131 Class I price and the order's blend price which ranged from 15.9 to as much as 18.3 cents per gallon during the period of January 2000 through July 2003.

The DFA witness related that wholesale milk buyers base procurement decisions on tenths and even hundredths of a cent differences in the price per gallon, indicating that price differences of more than 15 cents per gallon overwhelmingly favors the producer-handler in head-to-head price competition. The witness testified that lower-priced packaged fluid milk products from producer-handlers is used by wholesale buyers of milk as leverage in daily price negotiations with fully regulated handlers and is a form of disorderly marketing. Such market disorder, the witness said, causes all processors to receive lower prices for their packaged fluid milk products.

The DFA witness also expressed the opinion that the plant costs faced by a large producer-handler are similar to those faced by fully regulated handlers even though the witness had no direct knowledge of individual producer-handler businesses in Order 124 or 131. While agreeing with the characterization that producer-handlers are a single and seamless milk production and processing enterprise, the witness asserted that higher balancing and operational costs attributable to producer-handler operations are not significantly different than those associated with fully regulated handlers of the same processing plant size. The witness further asserted that the producer-handler price advantage combined with the ability to increase production volume at negligible additional costs per unit exaggerates the advantage to a point where a producer-handler can increase market share nearly at will.

Through a series of examples depicting scenarios of different plant sizes, the DFA witness testified that producer-handlers with 80 and 90 percent Class I utilization could operate profitably in spite of higher balancing costs associated with operating as a producer-handler. The witness

explained that a large producer-handler experiencing increasing returns to its operation could continue to grow in size until it controlled a substantial share of the Class I market. The witness testified that a producer-handler with route disposition of 3 million pounds per month could supply a small regional grocery chain but likely would not be able to diversify its marketing risk with sales to other customers.

According to the DFA witness, if producer-handlers are allowed to gain Class I sales without restraint, fully regulated handlers and pooled producers would likely come to view Federal milk marketing orders as ineffective. According to the witness, under these conditions producers possibly would seek to terminate the orders. The DFA witness characterized this potential scenario as a form of market disorder.

The DFA witness said that rising interest in the producer-handler option by large dairy farmers challenges the long-term viability of the entire Federal milk order system. The witness did acknowledge that no new producer-handler operations have entered either the Order 124 or 131 marketing areas in recent years. The witness also acknowledged that market information kept by the Department shows that the volume of sales by producer-handlers had declined nationally from 1.47 billion pounds per year to 1.16 billion pounds per year between 1988 and 1998.

The DFA witness offered modifications to Proposal 1 that would also be applicable to Proposal 3. Basically, in addition to limiting a producer-handlers route disposition to less than 3 million pounds per month, the modification made extensive changes in terminology as to how producer-handlers are defined. The intent of these modifications, the witness said, is to clarify that the burden of proof and the responsibility for providing all the details to substantiate proof to the Market Administrator for producer-handler status rests with the producer-handler.

The DFA witness testified that Market Administrators will continue to be relied upon by Federal orders to use their discretion in determining producer-handler status. According to the witness, the proposed modifications for the producer-handler definitions are expected to provide flexibility for a Market Administrator to investigate and audit proposed producer-handler operations and to ensure qualification requirements are met. In addition, the witness said that if Proposals 1 and 3 are adopted, it was reasonable that

existing producer-handlers in Orders 124 and 131 be given a period of time to adjust their operations to the proposed producer-handler requirements.

Another witness appearing on behalf of DFA testified in support of Proposals 1 and 3 on the basis that small and average-sized dairy farmers, including producer-handlers with milk production below 3 million pounds of milk per month, have higher production costs than larger dairy farms. The witness said that very large dairy farms tend to have management expertise and business sophistication, access to capital, access to veterinary services, and economies of size and scale that tend to lower their per unit costs of milk production. This DFA witness testified that a dairy farm would need approximately 1,800 cows to achieve a 3 million pound per month level of production available for bottling and route disposition.

The DFA witness did not know if 3 million pounds of route disposition per month was the precise number above which producer-handlers should become subject to the pricing and pooling provisions of Orders 124 and 131. Similarly, the witness did not know what economic impact adopting Proposals 1 and 3 would have on producer-handlers in the respective marketing areas. The witness did relate having knowledge of interest being expressed by dairy farmers who had monthly production in excess of 3 million pounds per month seeking possible producer-handler status.

A witness representing Northwest Dairy Association (NDA) testified that they market the milk of 603 milk producers traditionally associated with Order 124. The witness said that NDA also is the parent company of WestFarm Foods, an operator of three distributing plants located in Seattle, Washington, and Portland and Medford, Oregon. The witness added that NDA also operates four milk manufacturing plants in the Order 124 marketing area. The witness testified that while NDA does not have a direct connection to Order 131, it indirectly shares similar concerns with the proponents of Proposal 3 in that they share a border with California and share similar concerns regarding the Federal and State milk order systems. In addition, the witness noted that Order 124 has the second largest volume of producer-handler milk marketings of any Federal order—second only to Order 131.

The NDA witness was also appearing on behalf of Tillamook County Creamery Association, Farmers Cooperative Creamery, Inland Dairy,

and Northwest Independent Milk Producers, hereinafter collectively referred to as NDA, in support of Proposals 1, 2, and 3. The witness testified that the producer-handler exemption from the pooling and pricing provisions of Order 124 provides an unfair competitive advantage to producer-handlers at the expense of pooled producers and fully regulated handlers. According to the witness, the historical justifications for exempting producer-handlers because such entities are small operators without significant market impact on prices and they do not provide significant competition with fully regulated handlers are no longer warranted. The witness testified that producer-handlers in Order 124 are now a significant force in the marketing area and are likely to continue to increase in size and market significance. The witness noted that Congress had effectively supported the Department's long-standing producer-handler exemption from pooling and pricing provisions of Federal orders since the 1960's. The witness stated that only a few large producer-handlers currently operate in the Order 124 marketing area.

The witness indicated agreement with other proponent testimony that a producer-handler's raw milk cost was the Federal order blend price. According to the witness, the blend price represents an alternative market price available to a producer-handler. Accordingly, the witness asserted, the only reason a producer-handler would seek to continue an exemption from an order's pooling and pricing provisions would be to maintain a competitive advantage. The witness related that from a producer viewpoint the competitive advantage is the ability to retain the entire Class I value and from the handler viewpoint the competitive advantage is not accounting to the pool at the order's Class I price. The witness estimated the producer-handler advantage over the period of January 2000 through October 2003 to be the difference between the Order 124 Class I and blend prices which averaged about 15.4 cents per gallon or $1.79 per cwt.

The NDA witness asserted that during a period of rapidly rising milk prices, producer-handlers also have a competitive advantage by being able to enter into long-term fixed price contracts in a way fully regulated handlers cannot. In the opinion of the witness, by offering relatively long-term fixed price contracts, a producer-handler may be able to attract and retain customers using a pricing policy unavailable to fully regulated handlers. The witness stated that this represents a form of disorderly marketing.

According to the NDA witness, producer-handlers use pooled producers and pooled handlers to balance their milk supply. The witness testified that "balancing off of the pool" involves producer-handlers selling milk to retail outlets until their milk supply is exhausted with retail outlets buying additional milk supplies from fully regulated handlers to meet the shortfall. According to the witness, the fully regulated handler is not only the residual milk supplier but also effectively has the burden of balancing the Class I needs of the market not fulfilled by the producer-handler. Consequently, these burdens are transferred to the market's pooled producers by the regulated handlers. According to the witness, this tactic allows a producer-handler to maximize its revenue by obtaining the highest price available while essentially avoiding any costs of surplus milk disposal in lower-valued uses. This advantage is amplified, the witness said, when a producer-handler is able to balance its milk production and sales into areas not regulated by a Federal milk marketing order.

The NDA witness testified that the proposed 3 million pound per month route disposition limit for producer-handlers is also based on political considerations and on an intuitive notion. The witness explained that processing plants smaller than 3 million pounds per month are exempted by Congress from the 20-cent per hundredweight processor-funded fluid milk promotion program. As a result, the witness related that the proponents are of the opinion that this level would also prove to be acceptable in the context of its application to handlers regulated under the terms of a milk marketing order. In addition, the witness testified that NDA's subsidiary's (WestFarm Foods) own study of processing plant size and costs suggests that the DFA plant size and cost study may actually understate when plant processing cost efficiencies are gained. According to the witness, NDA's study suggests that this occurs at about the 2.5-million pound per month level indicating that plants of this size and larger lower their processing costs by about 10 cents per gallon. The witness related that a plant processing 3 million pounds per month would have a cost savings of approximately 11.4 cents per gallon. Accordingly, the witness concluded that producer-handler plants that dispose of Class I milk products in excess of 3 million pounds per month should therefore become subject to the pooling and pricing provisions of Order

124. The witness said this would ensure that all similar handlers would have the same raw milk costs.

The NDA witness also testified in support of Proposal 2. The witness viewed this as preventing producer-handlers from expanding the benefit of their regulatory status by balancing their supply on the market's pooled producers and at the same time tending to ensure that fully regulated handlers would not become residual suppliers of fluid milk products to the market.

The NDA witness speculated that the investment required for a processing plant to produce only milk packaged in gallons is relatively small when compared to a very large dairy farmer's existing investment in land, livestock, and equipment. The witness was of the opinion that the potentially higher returns on the additional investment for a processing plant producing only gallon containers of packaged fluid milk would be attractive to very large dairy farmers such that it would encourage large producers to become producer-handlers. According to the witness, such a scenario threatens the economic attractiveness of the Federal order program and the prevailing structure of the dairy industry.

While the NDA witness testified only to conditions affecting Order 124, the witness did indicate fluid milk marketing has been undergoing considerable structural changes for many years that are national in scope. The structural changes taking place throughout the dairy industry are most markedly exhibited by consolidation in the production, processing, marketing, and distribution of dairy products, the witness said. As an example, the witness illustrated that Vitamilk's decision to go out of business was a direct result of the acquisition of its two largest grocery store customers by Safeway and Kroger. The witness noted that Safeway and Kroger are both national companies that also process milk as fully regulated handlers for their own stores and other customers. The witness was of the opinion that Vitamilk could not find other profitable business because it was unable to compete effectively with existing producer-handlers and other competitors in the Pacific Northwest after losing a significant portion of its business by the Safeway and Kroger acquisition of their customers. The witness was of the opinion that as consolidation continues within the dairy industry, a Class I handler may find a declining number of marketing alternatives and thus give rise to market disorder. The witness was of the opinion that fully regulated handlers

could be displaced by producer-handlers.

The NDA witness testified that the rise of warehouse and very high volume "super stores" also has contributed to the structural changes in the dairy industry with packaged fluid milk products being supplied as cheaply as possible. According to the witness, "super stores" and warehouse stores are able to exert market power in obtaining the lowest market prices available for fluid milk products at the wholesale level.

The NDA witness testified that there are approximately 800 pooled producers on the Pacific Northwest order. According to the witness, all of these producers are small businesses who would receive a benefit in the range of 2.4—4 cents per hundredweight for their milk if Proposal 1 were adopted. An increase in producer income would result, the witness said, from the sharing of Class I revenue by pooling the largest producer-handlers in the marketing area who individually have route disposition in excess of 3 million pounds per month. According to the witness, the additional total Class I revenue that would accrue to the Order 124 pool would be in the range of $2.8—$4.0 million per month.

The NDA witness addressed concerns regarding instances where handlers and dairy farmers have made investments based on the provisions of a Federal milk order. In rationalizing concerns about the impact a change in regulation may have on business decisions using current order provisions, the witness noted several past Federal order decisions where regulatory changes had an impact on persons that had built and designed their business practices on existing order provisions. For example, the witness noted that the elimination of the "bulk tank handler" provision in the Western milk marketing order by a tentative final decision would have effectively reduced the value that proprietary bulk tank handlers could assign to their facilities. In addition, the witness related how the implementation of Federal milk order reform eliminated individual handler pools and reduced the value of those investments. According to the witness, these changes occurred as a matter of course with the operators of those facilities absorbing the actual costs of the regulatory changes. The witness also testified that the elimination of "double dipping" in the Upper Midwest, Central, Mideast, Northeast, Pacific Northwest, and Western orders had negative impacts on the businesses made by operators who were able to take advantage of those regulatory features before they were

changed. These changes were made without compensation to those operators who engaged in the practice of double dipping.

The NDA witness testified that opponents to placing a route disposition limit on producer-handlers incorrectly argue that as vertically integrated enterprises, producer-handlers face more risks and higher costs than do pooled producers and fully regulated handlers. The witness asserted that the Federal order program does not incorporate a value for risk in its regulatory framework. In addition, the witness noted that some producer-handlers are continuing to stay in business even as the total number of producer-handlers has declined in the last several years in the Order 124 marketing area. The witness related historical data from Market Administrator sources indicating that 10 of the 11 producer-handlers which have gone out of business in recent years in the Order 124 marketing area had monthly route disposition of less than 3 million pounds.

In other testimony, the NDA witness conceded that no handler is exempt from, or subject to, Federal milk order regulations on the basis of plant operating costs. In addition, the witness testified that a Federal milk order which had many producer-handlers supplying 10 percent of the Class I market would not represent a disruptive influence or create market disorder if the market share of the producer-handlers was stable (did not grow.) Also, the witness indicated that if the market share supplied by producer-handlers was stable but the number of producer-handlers supplying that market decreased, the impact of producer-handlers on the marketing conditions in the area would not be considered disorderly.

The NDA witness testified that a route disposition volume below 3 million pounds per month does not tend to lend a price or cost advantage to producer-handlers. The witness said that the impact of a producer-handler on a marketing area's blend price is directly related to the size of the marketing area. In this regard, the witness related that a 3 million pound milk bottling plant in the Upper Midwest Federal order, for example, would have a deminimus impact on that order's blend price but nevertheless maintained that a 3 million pound route disposition limit was a reasonable trigger to cause producer-handlers to become subject to the order's pooling and pricing provisions. The witness offered that an appropriate limit could be more than 3 million pounds, possibly as high as 4-million

pounds, while still reasonably meeting the overall objectives sought in Proposal 1. The witness cautioned that setting a limit that is too low—for example at 500,000 pounds per month—would essentially close the marketing and regulatory option of market entry as a producer-handler.

In agreeing with other testimony, a 3 million pound limit was consistent with what the NDA witness characterized as a political settlement reached with the Department in determining when handlers would become subject to a fluid milk promotion program assessment. According to the witness, important consideration was given to the threat of handlers with route disposition of less than 3 million pounds per month being able to band together and vote to terminate the fluid milk promotion program. The witness indicated that a 3 million pound level is also a coincidentally useful volume as it supports the DFA's consultant witness' plant size and cost study and analysis.

A witness appearing on behalf of NDA's WestFarm Foods testified in support of Proposals 1 and 2. The witness provided data comparing the variable costs of WestFarm's Medford, Oregon, bottling plant that processes 12 million pounds of milk per month with a hypothetical plant processing less than 3 million pounds per month. The witness testified that the results of this comparison were similar to the results of the DFA's study. The witness testified that WestFarm Food's study similarly concluded that as plant sizes increase, per unit processing costs tend to decrease.

The NDA witness testified that WestFarm Foods has lost significant sales of packaged fluid milk products to grocery stores and school milk contracts to producer-handler competitors. The witness reported that WestFarm Foods competed with one producer-handler in the Pacific Northwest for shelf space in 11 different retail outlets. According to the witness, the total volume of these sales was approximately 8 million pounds per year. The witness indicated that the producer-handler was able to offer longer term, fixed price contracts to retailers and thereby remove price volatility. The witness said that fully regulated handlers, like WestFarm Foods, do not have this ability because they must pay the Federal order Class I price which fluctuates every month.

The WestFarm Foods witness asserted that producer-handlers in Order 124 offer prices for fluid milk products that range from 15 to 45 cents per gallon cheaper than milk offered by fully regulated Class I handlers, depending

on the monthly changes in the order's Class I price. The witness further asserted that producer-handlers are able to displace the Class I use of milk on the Order 124 pool by selling fluid milk products into Alaska, an area not subject to order regulation, at prices below the Class I price. According to the witness, when a producer-handler displaces potential fully regulated handler sales in Alaska, the fully regulated handler's milk is forced to a lower use value which lowers the blend price paid to pooled producers. The witness asserted that if producer-handler competition was absent in Alaska, WestFarm Foods would be the dominant supplier to customers in that market. While noting that producer-handlers continue to provide significant competition to WestFarm's bottling operations, the witness testified that none of the producer-handlers are selling fluid milk products below the Federal order minimum Class I price.

The WestFarm Foods witness testified that WestFarm Foods must meet a specified level of Class I sales to qualify all of its milk receipts for pooling on Order 124. According to the witness, producer-handlers in the marketing area have become very aggressive sellers of milk and have increased their sales volume to the point where fully regulated Class I handlers are having difficulty qualifying all of their producer milk receipts for pooling on the order. The witness attributed such pooling difficulties to the lack of growth in the Class I market combined with growing producer-handler route disposition. In addition, the witness testified that NDA charges its customers an over-order premium of between 30 and 45 cents per cwt.

A witness appearing on behalf of Dean Foods offered testimony in support of Proposals 1, 2, and 3. The witness asserted that exemptions to pooling and pricing provisions of Federal milk marketing orders should be few. According to the witness, the basic underlying objectives of an order are to efficiently assure an adequate supply of milk for fluid uses and to enhance returns to dairy farmers. The witness said that the Federal milk orders achieve these objectives by: using a classified pricing plan setting minimum class prices, utilizing the marketwide pooling of the classified values of milk to return a blend price to dairy farmers and verifying handler reporting through audits. The witness stressed that absent uniform and universal application of an order to market participants, some market participants will reap competitive advantages due solely to

selective exemption from regulation rather than for business reasons.

According to the Dean witness, only a few types of firms have been historically exempted from the pooling and pricing provisions of Federal orders which include government and university facilities, small processors, and producer-handlers—characterizing the producer-handler exemption as one of administrative convenience. The witness was of the opinion that producer-handlers should only be exempt from the pooling and pricing provisions of Federal orders when the effect of providing a regulatory exemption has a negligible effect on market participants. In this regard, the witness was of the opinion that a penny or more impact on the order's blend price was significant. Relating this opinion to conditions in Order 131, the witness determined that the order's blend price would be affected by a penny when the route distribution of a producer-handler was at the 950,000 pound per month level.

The Dean witness testified that a dairy farmer operating as a producer-handler can receive a higher price than the alternative of an order's blend price, depending on the internal transfer price. The witness explained that a processor operating as a producer-handler essentially has the ability to "acquire" milk at a transfer price as the milk moves from the farm enterprise to the processing enterprise. In this regard, the witness related that such a transfer price can be represented by the difference between the order's blend price and the Class I price. However, the witness conceded that if the producer-handler is viewed as a single seamless entity, the application of transfer pricing may reveal less information than would an evaluation of all costs and revenues in determining the extent of the competitive advantage that a producer-handler may enjoy by regulatory exemption from the pricing and pooling provisions of an order.

The Dean witness also noted that using an internal transfer price may be of limited value as it does not involve price discovery achieved through arms-length transactions. However, the witness was of the strong opinion that regardless of a measure of operating performance or efficiency, a producer-handler would always have a competitive advantage over a fully regulated handler. The witness asserted that the competitive advantage which accrues to the producer-handler is the difference between the order's Class I price and the blend price. In this regard the witness was of the opinion that producer-handlers would always be able

to compete more effectively than fully regulated handlers because of their exemption from the pooling and pricing provisions of an order.

The witness offered an opinion as to why there has not been significant market entry of new producer-handlers if being exempt from the pricing and pooling provisions of an order confers significant competitive advantages over fully regulated handlers. In this regard, the witness offered that resources do not move easily between different enterprises within the dairy industry because of cost and regulatory risk. The witness also offered the opinion that if large companies, such as Kroger, attempted to become a producer-handler, legislative changes to prevent such outcomes would quickly result.

The Dean Foods witness was of the opinion that the notion of disorderly marketing should be seen to exist when the regulatory terms of trade between competitors are different. Along this theme, the witness testified that in Order 131, disorderly marketing conditions exist because the terms of trade between competitors are not the same, citing specifically the regulatory exemption from pooling and pricing for producer-handlers and no similar exemption for their fully regulated competitors. However, the witness contrasted the growing presence and market share in fluid milk distribution by producer-handlers in Order 131 with the stable market share of producer-handlers in Order 124.

A witness appearing on behalf of Alan Ritchey, Incorporated (ARI), a family-owned dairy farm business located in Texas and Oklahoma, testified in opposition to limiting route disposition of producer-handlers as advanced in Proposals 1 and 3. The witness testified that ARI marketed its milk through DFA because DFA was the only available buyer in the area. The witness testified that ARI opposed Proposals 1 and 3 because it would limit the option of becoming a producer-handler for those dairy farmers seeking alternative marketing options for their milk. The witness characterized the dairy industry as consolidating and forcing dairy farmers to consider abandoning their traditional relationships with cooperatives. The witness viewed becoming a producer-handler as a high-risk business venture but an important alternative that should continue to be available to dairy farmers.

The ARI witness also testified that cooperatives with membership and market presence which is national in scope have market power that may be reducing the revenue of individual dairy farmers who have no other milk

marketing alternatives than through a cooperative. In the opinion of the witness, preserving the existing producer-handler definition provides dairy farmers with an alternative mechanism to market their milk directly and retain all of the revenue earned. In this regard, the witness indicated that ARI could see no reason why the route disposition of a producer-handler should be limited to 3 million pounds per month while regulated handlers have no limitations on route disposition.

A witness appearing on behalf of Braum's Dairy (Braum's), a producer-handler located in Tuttle, Oklahoma, testified in opposition to Proposals 1 and 3. The witness testified that Braum's milks approximately 10,000 cows and processes its milk production into fluid milk and cultured and ice cream products. The witness said that all of the milk and milk products produced by Braum's Dairy are marketed exclusively through its own retail outlets. The witness further testified that Braum's does not have sales to wholesale customers and maintained that they do not directly compete with fully regulated handlers.

The Braum's witness is of the opinion that Proposals 1 and 3 seek to eliminate competition by producer-handlers for the benefit of fully regulated handlers and will result in many producer-handlers becoming fully regulated. The witness also was of the opinion that Proposals 1 and 3 were advanced as a means to ultimately seek amending the producer-handler provision in all Federal milk orders even though the provision has worked well for the past 66 years.

The witness indicated that Braum's had not always been a producer-handler but due to Federal order pooling rules for out-of-area milk that were detrimental to Braum's interests, the decision was made to become a producer-handler. The witness said that in addition to the problems posed by pooling rules when the company was a fully regulated handler, Braum's also attributed difficulty acquiring a reliable and sufficient quantity of high-quality milk on a timely basis as a reason for becoming a producer-handler.

A witness appeared in opposition to Proposals 1 and 3, on behalf of Mallorie's Dairy, Edaleen Dairy, and Smith Brothers Dairy, all producers-handlers in the Order 124 marketing area. The witness was the owner of the Pure Milk and Ice Cream Company (Pure Milk), a large Texas producer-handler that is no longer in operation. This witness, hereinafter referred to as the SBEDMD witness, testified that Pure

Milk was located in Waco, Texas, and had route disposition across a large part of Texas that is now part of the Southwest milk marketing area. According to the witness, Pure Milk was the combination of a profitable dairy farm whose milk was pooled on the Texas order and a profitable fluid distributing and manufacturing plant that produced an array of various fluid milk products, ice cream and ice cream mixes. The witness was of the opinion that limiting route disposition would render the option of becoming a producer-handler an unattractive business option under any circumstances. The witness stressed that without the ability to grow or otherwise attain economies of size and scale, the producer-handler business model could never be successful.

The SBEDMD witness testified to participating in a Federal milk order hearing that similarly sought to limit the route disposition of producer-handlers under the Texas order in 1989. According to the witness, the argument advanced at that time was that the competitive advantage of being exempt from the order's pooling and pricing provisions enjoyed by large producer-handlers would undermine the economic viability of the Federal milk order program by causing harm to pooled producers and fully regulated handlers. The witness indicated that Pure Milk, operating as a producer-handler, failed not as a result of any competitive advantage arising from exemptions from pooling and pricing provisions but from the unique risks and costs associated with operating as a producer-handler.

The SBEDMD witness testified that, for a time, Pure Milk was convinced that there was an advantage to operating as a producer-handler instead of operating as a pooled producer or a fully regulated handler. The witness related that this view was held until Pure Milk lost a major customer that caused it to become consistently unprofitable. In this regard, the witness testified that Pure Milk had an account with a very large grocery chain in Texas and explained that when the large grocery chain customer learned of Pure Milk's involvement in the 1989 milk order hearing the account was lost. The witness characterized and described this business loss as an example of the regulatory risk of being a producer-handler.

The SBEDMD witness also testified that Pure Milk was unable to obtain and retain significant long-term contracts except for some school business and prison sales. The witness said that as a producer-handler, there was simply too much marketing risk and insufficient

long-term contract business to justify the additional required investment in plant and equipment to operate profitably. The witness testified that as a result of losing a large retail account after being its supplier for two years to a fully regulated handler, Pure Milk lost sufficient revenue and decided to end operations as a producer-handler.

The SBEDMD witness also related that in order to operate its plant profitably, Pure Milk would have had to achieve a volume of 1.2 million pounds per month, a level it never attained. In addition, the witness said, the company was never able to contain costs to a level at which it could compete effectively with large fully regulated handlers in the marketing area. The witness testified that Pure Milk's fully regulated competitors had larger plants and operated 24 hours a day, 7 days a week, while Pure Milk's plant, in contrast, operated about 17 hours a day, 5 days a week. The witness concluded that because their competitors operated at a higher capacity, they had plant efficiencies Pure Milk could not achieve. The witness attributed Pure Milk's inability to achieve the desired level of plant efficiency to the producer-handler definition which limited and constrained their ability to purchase additional milk supplies from others during their low production seasons. The witness also attributed Pure Milk's inability to achieve desired plant efficiencies to their inability to market surplus milk production at a profit during high milk production seasons. The witness described these as other examples of regulatory risk faced by a producer-handler.

At the closing of the Pure Milk plant, the witness indicated that he then managed Promised Land Dairy which operated as a small producer-handler from 1996–1999 supplying specialty packaged fluid milk products to health food and grocery stores. The witness said that Promised Land Dairy's specialty operation, selling Jersey cow milk in glass bottles, also failed to be profitable for the same reasons as the Pure Milk Company—the inability to balance supplies, the inability to achieve plant operating efficiencies, and the inability to obtain and retain a long-term customer base. The witness testified that Promised Land Dairy ended its operation as a producer-handler because it could not achieve profitability.

In additional testimony, the SBEDMD witness was of the opinion that relying on the concept of transfer pricing as a means for demonstrating that a pricing advantage accrues to producer-handlers by being exempt from the order's

pooling and pricing provisions was misplaced. The witness maintained that as a producer-handler, the only measure of success is the profitability of the entire operation. However, the witness said that Pure Milk used the marketing order's blend price as a transfer price for the limited purpose of conducting internal evaluations of its production performance and to derive a measure of its plant's operating efficiency. The witness testified that the company did use Federal order minimum class prices as a basis for pricing milk to its customers and as a basis for making contract bids.

A second witness appearing on behalf of Smith Brothers Farms, Edaleen Dairy, and Mallorie's Dairy, testified in opposition to Proposals 1, 2, and 3. This witness, hereinafter referred to as the SBEDMD second witness, was of the opinion that these proposals would adversely restrain competition in the dairy industry in both the Order 124 and 131 marketing areas. The witness testified that the producer-handler exemption from pooling and pricing in Orders 124 and 131 serve a needed and useful purpose by providing market niches and marketing alternatives for operators with dairy production and processing expertise as a means to remain competitive in an era of otherwise increasing industry consolidation. The witness was of the opinion that the best measure of orderliness in dairy markets should be on results rather than on the mechanics and operations of a milk marketing order. According to the witness, orderly marketing implies protecting the rights of producers to choose their market outlet freely without coercion or unreasonable barriers to market entry.

The SBEDMD second witness criticized the proponent's use of the Cornell University processing plant study, also relied upon by the NMPF witness, as a basis to support the proposed 3 million pound per month route disposition limit for producer-handlers. The witness was critical of the Cornell study, in part, because the minimum plant sizes considered in the study were 4 times or 12 million pounds larger than the 3 million pound limit contained as part of Proposals 1 and 3. The witness also was of the opinion that the Cornell plant study yielded results that were statistically insignificant because the number of plants used in the study was too small to reveal useful information. The witness explained that the sample of plants used in the study was not applicable to considerations regarding marketing conditions in Orders 124 and 131 because: (1) The data were improperly grouped into

regions using the Consumer Price Index rather than the Producer Price Index, (2) the sample of plants did not include any plants located in the two marketing order areas, and (3) the sample of plants could not demonstrate any similarity to producer-handlers in either of the two marketing order areas.

The SBEDMD second witness also testified that DFA's plant cost study results were similarly based on faulty data. According to the witness, the statistical analyses used in the DFA plant cost study should have been based on observations of individual plant costs rather than by averaging plant cost across the various classes of plant sizes selected for inclusion in the study. In addition, the witness testified that the analyses should have considered all plant costs by region, labor type, and type of regulated handler rather than relying only on selected costs.

The SBEDMD second witness was of the opinion that the interest in advancing Proposals 1 and 3 stems from what the witness characterized as the arbitrary setting of higher than needed Class I differentials in all Federal milk orders. According to the witness, higher than needed Class I differential levels were set because of proponent lobbying efforts during Federal milk order reform. According to the witness, lowering Class I differential levels would effectively reduce the incentive for further business expansion of producer-handlers.

In addition, the SBEDMD second witness was of the opinion that producer-handlers add much needed competition in the Order 124 and 131 marketing areas. According to the witness, the high concentration ratio of handlers-to-dairy farmers in both orders has created a near monopsony of milk buyers that has negative implications for prices received by dairy farmers. The witness also characterized the high concentration ratio of handlers-to-dairy farmers as contrary to the public interest because it may result in higher prices to consumers.

The SBEDMD second witness pointed to other changes in marketing conditions that warrant not changing the current regulatory exemptions of producer-handlers. The witness testified that the consolidation of cooperatives through mergers into fewer and larger cooperatives, together with full-supply marketing contracts, has reduced dairy farmer income because cooperatives can re-blend and re-distribute revenue to their members at a value below the order's blend price. The witness also testified that cooperatives that are national in scope may not be meeting the local needs of their dairy farmer

members in markets where such cooperatives are the dominant buyer of milk because it leaves producers without alternative marketing options except to sell their milk through the dominant cooperative. With such changes to marketing conditions, the witness concluded that becoming a producer-handler provides dairy farmers a useful and needed alternative to limited marketing options resulting from dairy industry consolidations.

The SBEDMD second witness characterized the application of the pooling and pricing provisions of Orders 124 and 131 as essentially an imposition of a tax on producer-handlers. The witness said that the pooling and pricing provisions of the orders should apply only to those handlers that purchase milk from producers. Along this theme, while acknowledging that producer-handlers are also handlers, the witness did not view an intra-firm transfer of milk from the farm production enterprise to the processing plant enterprise as equivalent to a purchase of milk by a handler from a dairy farmer. The witness testified to awareness of a court ruling equating intra-firm transfers of milk as identical to purchases of milk but considered such rulings not being relevant to the context of this proceeding for limiting the route disposition volume of a producer-handler.

A third witness appearing on behalf of Smith Brothers Farms, Edaleen Dairy, and Mallorie's Dairy, also testified in opposition to Proposals 1 and 2. The witness provided financial information regarding efficient dairy processing plant size and costs. The witness indicated that successful long-term operators in the fluid processing business must operate their plants efficiently and process sufficient volumes to achieve a competitive cost structure. The witness said that establishing a maximum monthly processing limit of 3 million pounds for producer-handlers limits them to operating plants that would be unable to capitalize on the economies of scale required to further reduce per unit costs to more competitive levels.

A former Market Administrator of the pre-reform Central Arizona milk marketing order testified in opposition to Proposal 1, 2, and 3. The witness explained that if regulated, producer-handlers would be subject to the pooling and pricing provisions of an order by being required to pay into the producer-settlement fund of the order on the basis of their Class I sales in the marketing area.

A witness appearing on behalf of Smith Brothers Dairy (Smith Brothers), a producer-handler located in the Order 124 marketing area, testified in opposition to Proposals 1 and 2. According to the witness, Smith Brothers has been operating as a producer-handler for some 43 years. The witness testified that Smith Brothers is a family owned and operated enterprise that survives by serving niche markets not well served by other market participants, including fully regulated handlers. The witness testified that the largest single market niche served by Smith Brothers is home delivery, representing approximately 70 percent of its fluid milk sales. According to the witness, Smith Brothers purposely pursued this market niche beginning in 1980 when home delivery represented only a third of their fluid milk sales. The witness was of the opinion that the goal of the proponents advancing the adoption of Proposal 1 is to eliminate producer-handlers as competitors in the Order 124 marketing area.

The witness maintained that Smith Brothers has not been a disruptive factor in the Order 124 marketing area. The witness testified that Smith Brothers does not directly compete for customers with large fully regulated handlers as it does not have sales to grocery chains, convenience stores, or large commercial retailers in the marketing area. Relying on Market Administrator statistics for Order 124, the witness related the decline in the number of producer-handlers from 73 in 1997 to 11 in 2000 and a decline in route disposition by all producer-handlers of nearly 6 percent between 2000 and mid-2003 as evidence that clearly demonstrates producer-handlers are not a source of market disorder. The witness also discounted the notion that producer-handlers enjoy a competitive advantage by noting the lack of entry of new producer-handlers in the Order 124 marketing area.

The Smith Brothers witness testified that the majority of regulated handlers in Order 124 are much larger, more diversified, and not interested in the niche market of home delivery that Smith Brothers serves. The witness testified that limiting a producer-handler's route disposition to less than 3 million pounds per month would cause them to not only lose their status as a producer-handler but may even result in Smith Brothers terminating operations altogether.

The Smith Brothers witness explained that producer-handlers face different costs and risks than do pooled producers and fully regulated handlers. According to the witness, producer-handlers have balancing risks, farm

production risks, and processing risks that, when combined into a single business enterprise, are greater than those borne by either pooled producers or fully regulated handlers. The witness asserted that any pricing advantage the producer-handler may have is offset by the combination of these costs and by the loss of opportunity to produce, acquire and market other dairy products.

The witness testified that Smith Brothers, in part, balances its own milk production by selling surplus milk into Alaska, an area not regulated by a Federal milk order, and characterized Alaska as an under-served market.

A second witness, an independent milk distributor appearing on behalf of Smith Brothers, also testified in opposition to Proposals 1 and 2. The witness testified to operating a milk distribution business for more than 26 years and was one of approximately 60 other independent distributors selling Smith Brothers dairy products to market niches including coffee shops, independent convenience stores, the home delivery market, and daycare operations that larger market participants do not serve. The witness attributed long-term business success as a distributor to personal service, nostalgia, and product quality. The witness also attributed sales success by advertising that the milk distributed is produced without growth hormones and that the milk is produced and processed by a family farm business.

A third witness for Smith Brothers Dairy also testified in opposition to Proposals 1 and 2. The witness was of the opinion that these proposals are designed to eliminate producer-handlers as competitors of fully regulated handlers. The witness was also of the opinion that both proposals are intended to serve as an intentional market entry barrier for other large producers who may seek to become producer-handlers as a means to regain control of their milk marketings.

The witness related that Smith Brothers evaluates itself as a single integrated enterprise. The witness testified that as the person responsible for measuring the efficiency of the operation, Smith Brothers does not rely on the concept of transfer pricing as a means to measure the efficiency or market value of their milk production. The witness testified that Smith Brothers does not compare its cost of production to the Federal order Class I price or the blend price in measuring the efficiency of its operations. According to the witness, Smith Brothers compares their total costs to

the prices the company receives for its products (total receipts).

A witness appearing on behalf of Edaleen Dairy, a producer-handler located in the Order 124 marketing area, testified in opposition to Proposals 1 and 2. The witness stated that as the milk production manager and co-owner of Edaleen Dairy, their cost of milk production is higher than that estimated by those proposing a limit on the route dispositions of producer-handlers. The witness testified that Edaleen Dairy's milk production costs exceeded a recent Order 124 blend price of $10.50 per cwt.

The witness testified that Edaleen Dairy once held a milk supply contract with Starbucks by replacing Sunshine Dairy, a fully regulated handler. According to the witness, the contract provided more than a year's lead time for Edaleen Dairy to develop additional milk production and processing capacities. The witness said that the Starbucks account was offered to Edaleen Dairy on the basis of its customer service, product quality and price.

The witness testified that Edaleen Dairy eventually lost its Starbucks' contract to Safeway, a fully regulated handler, noting that Starbucks phased out Edaleen Dairy as a supplier over a 6-month period. The witness said that reasons given for the loss of the account was that Safeway offered to supply milk at a lower price and Starbucks' rapid growth gave rise to geographical supply needs that Edaleen Dairy could not meet. The witness explained that the 6-month phase-out of Edaleen Dairy as a milk supplier to Starbucks was unusual in the dairy business. The witness said that more typically account terminations are given with a month's notice or less.

The witness testified that Edaleen Dairy's balancing costs are greater than that of the pooled producers of Order 124. The witness also testified that during periods of low market prices for milk, balancing costs are particularly difficult to manage. The witness related that Edaleen Dairy's surplus milk production is sold to fully regulated handlers but they are paid $1.50 per cwt less than the Class III price.

The Edaleen Dairy witness testified that there are several factors that tend to restrain the growth of producer-handlers. According to the witness, environmental regulations, marketing and production risks, and management risks all act to limit the ability for business expansion. The witness said that the size of potential customers also can constrain a producer-handler's operational flexibility and ability to expand the business. The witness said,

for example, that a very large customer, such as a warehouse customer, may be such a large part of a producer-handler's capacity that losing such a customer can risk continued economic viability of the entire operation because it is so difficult to absorb the loss of revenue and to find new customers.

The Edaleen Dairy witness testified that producer-handlers also serve market niches that fully regulated handlers do not service. The witness said that if a limit on producer-handler route disposition had been in place when the Starbucks account became available, for example, the opportunity to service that account would not have been possible. The witness asserted that limiting the sales volume of producer-handlers also would effectively eliminate servicing new market niches that might arise in the future. In this regard, the witness cited the example of coffee-kiosk shops that were not of interest to fully regulated handlers until the mid-1990's.

The Edaleen Dairy witness testified that an important element of why their producer-handler operation is valued by their customers is because they have complete and total control of the production and processing of their milk. The witness testified that without the producer-handler exemption from the pooling and pricing provisions of Order 124, Edaleen Dairy would not be able to offer such a differentiated fluid milk product to its customers.

A second witness, also appearing on behalf of Edaleen Dairy, testified in opposition to Proposals 1, 2, and 3. The witness testified that Edaleen Dairy operates an efficient dairy farm operation and processing plant as a producer-handler. The witness was of the opinion that a producer-handler operates a farm and a plant with risks that differ from the risks faced by dairy farmers and processing plant operators. According to the witness, a producer-handler differs from pooled dairy farmers in three different ways: (1) Pooled producers are guaranteed the minimum Federal order blend price, (2) pooled producers do not bear the marketing risk and additional costs involved in selling their milk, and (3) pooled producers do not bear the risks and costs of operating a processing plant. With regard to how a producer-handler differs from fully regulated handlers, the witness cited three important differences: (1) Fully regulated handlers purchase their milk supply and therefore do not incur the risk of production, (2) fully regulated handlers know the cost of raw milk before buying it from dairy farmers, and (3) a producer-handler bears the risk

and cost of balancing its milk supply and operates at its sole risk and enterprise, a regulatory constraint not applicable to fully regulated handlers.

The Edaleen Dairy witness amplified the above differences between producers-handlers, dairy farmers, and fully regulated handlers. With respect to dairy farmer and producer-handler differences, the witness noted that a pooled producer can deliver milk to alternative buyers if its primary buyer is not available but that a producer-handler can only deliver milk to its own plant and a dairy farmer has no legal requirement or economic responsibility for the viability of any particular processing plant or handler. With respect to the fully regulated handler and producer-handler differences, the witness noted that a fully regulated handler can acquire any quantity of milk from any number of dairy farmers and the business failure of any individual dairy farmer does not have an overwhelming impact on the economic viability of a fully regulated handler's operation.

The Edaleen Dairy witness testified that combined risks—as a producer and as a handler—are not incurred by either a pooled producer or a fully regulated handler. The witness testified, for example, that if a producer-handler loses a sale it continues to have milk production that must be disposed of and the costs of that milk production must be paid regardless of whether a market exists for that milk. According to the witness, the risks and costs of production, processing, and marketing accrue to the entire operation because producer-handlers are a single operating enterprise.

Additionally, the Edaleen Dairy witness said, there are inseparable links between the production and processing portions of the producer-handler because if either the milk production process fails or the processing process fails, both processes affect the single operating entity. The witness testified that the regulation of the processing and marketing operations of a producer-handler coincidentally regulates the dairy farm portion of the producer-handler enterprise. According to the witness, the most important benchmark for a producer-handler is whether in the long-run the total revenue received for its milk exceeds the total costs of its operation.

The Edaleen Dairy witness testified that the Federal order blend price is irrelevant to a successful producer-handler and bears no relation to the prices received from its milk sales. The witness expressed the irony of testimony concerning the importance of

the blend price to producer-handlers by parties who do not operate as producer-handlers. The witness said that Edaleen Dairy ignores what the Federal order blend price may be for the month and seeks to sell milk at the highest possible price but never intentionally below the Federal order Class I price. The witness noted that during the past several years there have been times when the Class I price fell below the cost of production. During such times, the witness was of the opinion that fully regulated handlers have a distinct advantage over producer-handlers.

The Edaleen Dairy witness testified that cooperatives have certain regulatory advantages by being able to re-blend pool proceeds and actually pay their members less than the order blend price. The witness claimed that re-blending allows cooperatives to use their bottling operations to essentially subsidize their processing operations. The witness testified that if a producer-handler's route disposition was more than 3 million pounds per month, the required payment into the producer-settlement fund would return no benefit to the producer-handler. According to the witness, the proceeds paid to the producer-settlement fund would simply be distributed to other pooled producers. This would, according to the witness, have an adverse impact on small businesses such as Edaleen Dairy, a business with fewer than 500 employees.

In addition, the Edaleen Dairy witness saw no justification for limiting the route disposition of producer-handlers in Order 124 because Market Administrator statistics indicate a declining market share of the Class I market by producer-handlers. The witness also asserted that limiting the route distribution of producer-handlers would essentially close the marketing option that becoming a producer-handler offers to large producers. The witness viewed such restrictions as acting to reduce competition among handlers rather than enhancing it.

A third witness, the founder of Edaleen Dairy, also testified in opposition to Proposals 1, 2, and 3. The witness related that when acquiring financing, bank loan officers will only consider Edaleen Dairy's cows as appropriate collateral for financing. The witness testified that bankers place no asset value for loan collateralization on Edaleen Dairy's processing plant facilities.

A witness appearing on behalf of Mallorie's Dairy, a producer-handler located in the Order 124 marketing area, testified in opposition to Proposals 1 and 2. The witness said that Mallorie's

Dairy markets its milk on a wholesale basis directly and through independent distributors and small independent retailing establishments ranging from grocery stores to coffee shops. According to the witness, the milk production enterprise of their producer-handler operation is very efficient, producing an average of 80 pounds of milk per day per cow. The witness testified that Mallorie's Dairy's largest customer is an independent distributor who has developed a niche market by supplying small companies that other fully regulated handlers do not serve.

According to the witness, Mallorie's Dairy lost a grocery store chain account which had been one of its large long-term customers to a fully regulated handler. The witness stressed that any price advantage that Mallorie's Dairy derives from the existing producer-handler exemption from the pooling and pricing provisions of Order 124 is offset by the cost of balancing its milk supply, about 20 percent of its production. The witness said that Mallorie's Dairy performs its balancing requirements by selling its surplus milk to a local cooperative at the lower of the Class III or Class IV price minus a substantial discount. According to the witness, balancing sales represents about 10 percent of Mallorie's' total sales while specialty milk sales to commercial food processors represent the remainder.

The Mallorie's Dairy witness was unsure of the full impact that adoption of Proposals 1 and 2 would have on Mallorie's Dairy. However, the witness said that Mallorie's Dairy would lose its producer-handler status and thus be forced to expand its plant size in order to continue operating, to remain competitive and to exploit their current marketing strengths while seeking new business from warehouse stores such as Costco and Walmart.

The founder of Sarah Farms, a producer-handler located in the Order 131 marketing area, testified in opposition to Proposals 1, 2, and 3. The witness was of the opinion that the purpose of the public hearing was to eliminate Sarah Farms as a competitor in the Order 131 marketing area. The witness said that imposing a 3-million pound per month route disposition limit on producer-handlers would restrict the growth of Sarah Farms while leaving competing cooperatives and proprietary handlers free to compete without additional restraints. The witness was of the opinion that imposing a route disposition limit on producer-handlers as advanced in Proposal 3, was based on projected future conditions and was therefore both unjustified and speculative. According to the witness, a

restriction on sales volume would force a dramatic change to Sarah Farms' business structure and practices when there was no evidence of an unfair regulatory advantage by being exempt from the Order 131 pooling and pricing provisions.

The witness testified that Sarah Farms' sales exceed 3 million pounds per month, noting that the majority of its current sales, and sales since becoming a producer-handler in 1995, are in Arizona. The witness said that some major customers include Sam's Club, Basha's (a grocery store chain), Costco, and other smaller independent retailers. The witness said that Sarah Farms' growth was directly related to its ability to fill a market void left by competitors who exited the dairy business leaving an opportunity that others could not completely fill.

The witness asserted that Sarah Farms produces a differentiated product from that of its competitors by marketing its fluid milk products with tamper resistant caps and by delivering their fluid milk products to customers within 24 hours of milking which, according to the witness, adds up to 7 days to the shelf life of its products. The witness also said that Sarah Farms' gallon-sized fluid milk products are shipped in cardboard containers, which further differentiates these products from their competitors.

The Sarah Farms witness testified that being a producer-handler is a high-risk undertaking. Relying on Market Administrator data, the witness noted that the number of producer-handlers in Order 131 has declined from six in 1980 to only two in 2003, an important indicator of the high-risk nature of being a producer-handler.

The witness testified that Sarah Farms pays its own balancing costs and does not transfer these costs to other fully regulated handlers or pooled producers of Order 131. In addition, the witness testified that as a producer-handler, Sarah Farms simultaneously bears all of its own production, marketing, and processing costs and risks unlike pooled producers and fully regulated handlers. The witness also was of the opinion that a fluid milk processing plant under construction in Clark County, Nevada, an area exempt from Federal milk regulation, poses a greater competitive threat to producers and fully regulated handlers than any other entity. The witness also testified that Sarah Farms does not sell its milk below the Order 131 Class I price plus the cost of transportation, packaging, and processing.

A witness representing Food City, a retail grocery chain, testified on behalf

of Sarah Farms. The witness testified that Food City, and its parent company, the Basha's operate some 144 stores in Arizona, New Mexico, and California. The witness said that Food City buys milk from Sarah Farms and from a fully regulated handler. The witness indicated that Food City's opposition to Proposal 3 was to help assure that Food City continues to have more than a single supplier for its fluid milk needs. The witness indicated that in the longer term, the availability of multiple suppliers tends to assure competitive pricing, reliable service, and product quality. The witness said that Food City's interest in multiple suppliers transcended the issue of whether the supplier is a fully regulated handler or a producer-handler.

### Post Hearing Briefs and Motions

Post hearing briefs filed on behalf of proponents and opponents made extensive arguments as they relate to case law, arguing legal contexts for why large producer-handlers should or should not become subject to the pooling and pricing provisions of the Pacific Northwest and the Arizona-Las Vegas marketing orders. Presented herein are discussions of the briefs as they relate to the economic and marketing conditions of the two orders.

A brief filed on behalf of NDA reiterated its support for the adoption of Proposals 1, 2, and 3. They noted that both Orders 124 and 131 have fully regulated handlers operating plants whose route disposition of Class I milk are smaller than the largest producer-handlers in the two orders. NDA stressed that the Department cannot ignore a situation where the smallest regulated handlers in the market are not provided equitable minimum prices as intended by Congress when the AMAA established the requirement that classified pricing be uniform to all handlers.

In brief, NDA took issue with the notion by opponents that producer-handler balancing costs are greater than that of fully regulated handlers. NDA argued that the milk order program does not attempt to consider all costs or address issues of profitability. They noted that balancing costs are typically borne by regulated handlers over and above the minimum cost structure reflected in the orders. In this regard, NDA noted that opponents expanded on the burden of their own balancing costs but did not consider balancing costs incurred by fully regulated handlers. They further explained that balancing costs may also be absorbed through marketwide pooling through the mechanism of Class III and Class IV

pricing, which stressed NDA, is not applicable to producer-handlers.

The rapid and extensive growth of Sarah Farms was also noted by NDA who claimed that Sarah Farms now has captured 15 to 20 percent of all the Class I sales in Order 131. This equates, the NDA brief said, to a reduction in Class I premium dollars by at least $2.5 million per year. In the Order 124 area, added NDA, producer-handlers account for about 10 percent of total in-area Class I sales and similarly reduce Class I premium dollars.

A brief filed on behalf of DFA reiterated their support for the adoption of proposals 1, 2, and 3 stressing that small dairies which do not impact total pool value should be the only exempted producer-handlers. DFA noted that in Order 124 the three largest producer-handlers, which average nearly 5.0 million pounds of Class I sales each per month, are larger in size than one-third of the order's fully regulated distributing plants. According to the DFA brief, in Order 131, Sarah Farms has captured more than 15 million pounds of Class I sales per month. DFA was of the opinion that orderly marketing conditions can only be maintained if any exceptions to classified pricing are limited and justified. DFA emphasized that large producer-handlers in the two orders have captured a significant share of the Class I sales which thereby reduces returns to all producers while retaining substantial Class I proceeds for each producer-handler on an individual handler pool basis.

The DFA brief also reiterated reasons why 3 million pounds of Class I route distribution should be established as the cap for producer-handler exemption from full regulation. They stated that there is a similar benchmark applicable in the Fluid Milk Promotion Act of 1990. They also indicated that volumes of milk sales from stores in the marketing areas indicate that at the 3 million pound level, a handler could supply a number of small stores. They noted that at this threshold size, producer-handlers' economies of scale are sufficient enough that as handlers, producer-handlers can be competitive with fully regulated handlers. Lastly, DFA maintained that, as producers, producer-handlers have substantial economies of scale in on-farm milk production that if exempt from pooling, gives producer-handlers a significant advantage in the marketplace for fluid milk sales.

A brief filed on behalf of UDA continued to iterate its support for the adoption of Proposal 3. They indicated that they did not support limiting

producer-handlers sales to 3 million pounds per month on the basis that it was the same benchmark as in the Fluid Milk Promotion Act of 1990. Rather, UDA finds merit in regulating large producer-handlers above 3 million pounds per month in route sales because at such a size they are able to achieve economies of scale that enable them to be competitive factors in the market and able to compete with fully regulated handlers.

A brief was filed on behalf of Shamrock Foods Company, Shamrock Farms Company and the Dean Foods Company in continued support of the adoption of Proposal 3. They emphasized that Sarah Farms' doubling of Class I sales between 1998 and 2003 was not known and could not have been known during the time of adopting the consolidated orders as a part of Federal milk order reform. In this regard, they also noted that at the time of Federal milk order reform, the Department could not have known of the growing importance to integrated operations such as Kroger and Safeway of price competition from large warehouse box stores such as Costco caused by large producer-handler sales. Lastly, they indicated that no limit had been placed on producer-handlers during Federal milk order reform because it could not have been known that losses to pooled participants would increase by a multiple of nearly four from before to after implementation of order reform.

A brief filed on behalf of NMPF continued to iterate its support for adoption of proposals that would limit the size of producer-handlers. NMPF was of the opinion that the exemption for producer-handlers violates the principles of producer equity upon which the milk order program relies. In addition, they were of the opinion that producer-handler exemption threatens orderly marketing. They explained that farms with over 3 million pounds of monthly production account for about 15 percent of the total U.S. milk supply which equates to about 40 percent of fluid milk sales. Continued exemption of producer-handlers from pooling and pricing, the NMPF maintained, threatens both producer and handlers.

A Statement of Interest was filed on behalf of two cooperatives, Select Milk Producers and Continental Dairy Products, indicating support for adoption of Proposal 3 as submitted by UDA. Select Milk Producers is a New Mexico milk marketing cooperative and Continental Dairy Products is an Ohio milk marketing cooperative.

A consolidated brief filed on behalf of Edaleen Dairy, Mallorie's Dairy, Smith Brothers Farms, and Sarah Farms

stressed that as producer-handlers who have sales in excess of three million pounds per month, adoption of any proposal that would subject them to the pooling and pricing provisions of the orders would cause their organizations to be severely affected. They stressed that if they become required to make equalization payments to the producer-settlement fund, this would take millions of dollars per year away from their operations and redistribute it to other producers with no return benefit to their operations.

In brief, Edaleen Dairy, Mallorie's Dairy, Smith Brothers Farms, and Sarah Farms indicated that the advantages producer-handlers have as alleged by proponents, vanish when the financial benefits of not having to pay minimum prices and avoiding equalization payments to the producer-settlement fund are offset by their balancing costs. Any remaining advantage should be viewed as acceptable given the increased risks producer-handlers incur in the marketplace. They indicated that rational persons would not take on additional risk without the prospect of additional rewards.

In brief, Edaleen Dairy, Mallorie's Dairy, Smith Brothers Farms, and Sarah Farms stressed that, in their opinion, neither milk supply or prices for milk in the two marketing areas had fluctuated unreasonably, noting that milk was in such sufficient supply that with or without producer-handlers supplies are plentiful. They did not view their fluid milk sales in the marketing area as contributing to the erosion of classified prices or blend prices. They cited hearing record statistics to assert that they are not a cause of market disorder or cause the inefficient movement of milk. They cited the reduction in the number of producer-handlers, emphasizing that between 1975 and 2000, the Pacific Northwest order producer-handler numbers fell from 73 to 11 with average daily pounds of production increasing only 4.7 percent between 1985 and 2000. For the Arizona-Las Vegas order, they noted that since 1982, the number of producer-handlers fell from seven to two. According to the brief, on the basis of such statistics, there can be no finding that producer-handlers have unabated growth or that they are a source of market disruption.

A motion to strike the testimony and related exhibits concerning plant operating costs offered by DFA's consultant witness was filed on behalf of Edaleen Dairy, Mallorie's Dairy, Smith Brothers Farms and Sarah Farms. The presiding Administrative Law Judge received this motion after the certification of the hearing record on June 1, 2004. Given that the objection goes to the weight to be given to the testimony and exhibits and not to their admissibility, the motion is denied.

A Motion to Strike the exceptions and comments of the large producer-handlers—Sarah Farms, Edaleen Dairy, Mallorie's Dairy, and Smith Brothers Farms—was filed on behalf of DFA. This motion was received on July 11, 2005, and sought to prevent the introduction of new material into the record by opponent producer-handlers. The Department has concluded that the testimony, briefs, and the relevance of comments and exceptions filed by all parties is clearly delineated in the context of the official record. Accordingly, the motion by DFA, and a subsequent motion filed jointly on behalf of DFA, Dean, UDA, Shamrock Farms and Shamrock Foods, are denied.

A Motion to Supplement the Public Record due to ex parte communications was filed on behalf of Sarah Farms on April 7, 2005. This motion sought additional information to amplify the public record of this proceeding based on the attendance of the AMS Dairy Programs Deputy Administrator at the annual meeting of Dairylea Cooperative where a speaker publicly addressed issues germane to this proceeding and producer-handlers in the Federal milk order program in a speech. A Memorandum to the Record Regarding Ex Parte Communications was issued on May 23, 2005, by the Deputy Administrator, Dairy Programs explaining that no Dairy Programs officials engaged in ex parte discussions of the material issues of this proceeding at the Dairylea Cooperative meeting on October 12–13, 2004, nor at the DFA annual meeting on March 23–24, 2005, nor at any other forum. This memorandum is available for public inspection at the Office of the USDA Hearing Clerk and at the Dairy Programs Web site, *www.ams.usda.gov/dairy/*.

## Comments and Exceptions

A number of proponents for regulating large producer-handlers, including Shamrock Foods Company, Dean Foods Company, United Dairymen of Arizona, and Shamrock Farms (hereinafter Shamrock, et al.) submitted joint comments and exceptions to the Recommended Decision. The proponents were joined by the Alliance of Western Milk Producers representing California cooperatives (1100 dairy farmer members) in support of the Recommended Decision's findings.

The Shamrock, et al., comments agreed with the Recommended Decision's finding that the criteria for determining whether a producer-handler is a small or large business rest on the producer-handler's capacity as a producer. Proponents noted that most handlers, regardless of their regulatory status, would be considered small businesses because of the 500 employee threshold established by the Small Business Administration's definition of a large business for milk processing plants.

The Shamrock, et al., comment reiterated the position of the proponents that an impact of more than a penny per cwt per month on an order's blend price is sufficient to indicate a significant impact on the blend price that dairy farmers receive by pooling milk on these orders. In addition, they agreed with the Recommended Decision's finding that producer-handlers with route disposition of fluid milk products in excess of 3 million pounds per month had a significant and disruptive impact in these marketing areas. According to the comment, these impacts are large enough to warrant a new review of the producer-handler exemption from the pooling and pricing provisions of the orders.

Shamrock, et al., took exception to the recommended 3 million pound per month in-area Class I route disposition as the threshold beyond which producer-handlers would become subject to the pooling and pricing provisions of the orders. They explained that this threshold was too generous and should have been set at some level less than 3 million pounds per month. Shamrock, et al., was joined in this exception by the National Milk Producers Federation. Shamrock et al., also took exception to the charge of ex parte communications between USDA officials and certain leaders of the proceeding alleged by large producer-handlers who would likely become regulated if the orders were amended. According to the comment, such allegations were unwarranted.

Comments and exceptions by DFA similarly supported the findings of the Recommended Decision. The comments by DFA called for immediate implementation of the proposed full regulation of producer-handlers with in-area route disposition of fluid milk products in excess of 3 million pounds per month. They noted that each month's delay in implementing the proposed rule significantly reduces the blend price for pooled producers. They agreed with the Recommended Decision and the Shamrock, et al; conclusion that a producer-handler's characterization of being a small or large business should be based on the producer-handler's capacity as a producer.

DFA's comments also noted that the record of the proceeding supported the conclusions of the Recommended Decision on the disorder caused by exempting large producer-handlers from the pooling and pricing provisions of the orders. In this regard, their comments reiterated from their post-hearing brief that large producer-handler balancing costs are much lower in these marketing areas than historical balancing costs of small producer-handlers. As with Shamrock, et al., the comment noted that allegations of ex parte communications between DFA and USDA officials were unfounded.

As with Shamrock, et al., DFA took exception to adopting a threshold of 3 million pounds per month of in-area route disposition. They maintained that the threshold should include all route disposition not just in-area route disposition. DFA was joined in this exception by National Milk Producers Federation.

Six hundred ten e-mail comments received expressed support for the Recommended Decision's findings. These comments were from dairy farmer members of cooperatives, employees of cooperatives, representatives of producer and processor organizations from California, as well as producer and processor organizations in the Pacific Northwest and Arizona-Las Vegas marketing areas. Comments indicating support received via the U.S. Postal Service and fax also were largely from dairy farmers, cooperatives, associations of cooperatives, and their employees.

Supporting comments for the Recommended Decision's findings by dairy farmer and dairy farmer organizations focused on the pricing and sales advantages that producer-handlers have by being exempt from classified pricing and marketwide pooling. Specifically, these comments stressed that the impact on fully regulated handlers and pooled producers is directly related to the size of producer-handlers. In general, these comments contain the common theme that the pricing advantage enjoyed by producer-handlers has been the difference between an order's Class I price and blend price. The comments generally support the conclusion that, small producer-handlers, having route disposition below 3 million pounds per month, have not been a significant factor in the Pacific Northwest or Arizona-Las Vegas marketing areas.

The large producer-handlers from the Arizona-Las Vegas and Pacific Northwest marketing areas submitted joint comments and exceptions in opposition to the findings of the Recommended Decision. These entities

included Sarah Farms, Mallorie's Dairy, Edaleen Dairy, and Smith Brothers Farms, Inc. Their exceptions specifically reiterated opposition to adopting any measure that would cause them to be subject to the order's pooling and pricing provisions. They also took exception to the finding that impacts on an order's blend price are significant and disruptive to orderly marketing. This finding, they stressed, is arbitrary and capricious because, in their opinion, record evidence is not sufficient to reach this conclusion.

The large producer-handlers' joint exception disagreed with the Recommended Decision's finding that large producer-handlers should be viewed as large businesses in their capacity as dairy farmers rather than in their capacity as handlers. In this regard, they concluded that if producer-handlers are considered for regulation on the basis that they are large in their capacity as dairy farmers, they cannot have their exemption from pooling and pricing provisions removed because the AMAA provides the authority to only regulate handlers and not dairy farmers. They continued to assert that they are seamless integrated entities that cannot be viewed in separate capacities as producers and handlers. Thus, the exception concluded that large producer-handlers should be viewed as small businesses because they have fewer than 500 employees.

The large producer-handlers' took exception to the Recommended Decision's findings concerning the impact on order blend prices noting that milk market prices vary over time as marketing conditions change. They concluded that such variations in prices are unrelated to the level of route disposition of producer-handlers individually or in the aggregate. In addition, they stressed that even if large producer-handlers enjoyed advantages as claimed by proponents, their aggregate share of the market in the Pacific Northwest during the period 2000–2003 had decreased.

The large producer-handlers' joint exception asserted that the record demonstrates that fully regulated handlers are able to compete effectively with large producer-handlers. They took exception to the Recommended Decision's finding that large producer-handlers are the cause of market disruption and characterized the finding as arbitrary and capricious. In their view, such a finding is not established or supported in the record. The exception maintains that normal variability in milk prices and gains or losses of commercial accounts are contained in the record as examples and

explanations of activities that the Recommended Decision incorrectly characterizes as market disruption and disorderly marketing.

In separate exceptions, Sarah Farms reiterated their opposition to the findings of the Recommended Decision maintaining that market disorder resulting from the alleged advantages enjoyed by producer-handlers is not demonstrated in the record. They noted that producer-handler market share in the Pacific Northwest order had declined in the year preceding the hearing—from 10 percent to 9 percent. They asserted that producer-handler market share in the Arizona-Las Vegas order was 10 percent during the same period, concluding that no finding of either competitive advantage or market disorder can be made. Mallorie's Dairy, Edaleen Dairy, and Smith Brothers Farms, presented separate and similar exceptions.

Each large producer-handler noted in their separate exception that at current route disposition levels, their monthly revenue would decline significantly if they become required to make equalization payments to the order's producer-settlement fund. Edaleen Dairy, for example, stated that their monthly revenue would decline by $125,000. The other large producer-handlers noted in their separate exceptions that owners, employees and customers would experience similar losses in revenue from reduced sales volume in their efforts to maintain producer-handler status.

In separate exceptions Edaleen Dairy noted that lowered revenues may in turn reduce employment at their dairy farm and processing plant and may even affect employment in supporting service businesses as a result of down-sizing their operations. They were joined in similar exceptions by Smith Brothers Farms, Mallorie's Dairy, and Sarah Farms. All large producer-handlers also asserted that their full regulation would decrease competition and that their customers would likely experience increased prices and reduced product choices.

Within the April 13–June 13, 2005, comment period, 12,223 e-mail comments and more than 5,600 hard-copy comments were received through the U.S. Postal Service or by fax that opposed fully regulating large producer-handlers. In addition, 1969 pages of petitions containing a total of 26,267 signatures opposing the findings of the Recommended Decision were received. The signed petitions were submitted by Edaleen Dairy, Mallorie's Dairy, and Sarah Farms. Of the 12,223 e-mail comments received, approximately

11,590, or about 95 percent, opposed the Recommended Decision's findings. These comments were generated as part of a write-in campaign by what appeared to be customers located in the United States, Canada, and Mexico of the large producer-handlers opposing their full regulation.

Other comments received in opposition to the Recommended Decision included letters from the United States Senators from Alaska and some members of the U.S. House of Representatives from the States of Oregon, Washington, and Arizona. Several Oregon and Washington elected State, county and municipal officials and regional economic development organizations provided exceptions expressing opposition to the Recommended Decision's findings. The exceptions speculated that fully regulating producer-handlers might result in job losses at locations where these producer-handlers produce and bottle milk and market their dairy products. Some of these comments speculated that independent residential milk route operators in Oregon might be forced out of business if large producer-handlers became fully regulated.

Exceptions opposing implementation of the Recommended Decision were submitted on behalf of consumer and processor interests from unregulated areas who currently purchase milk from some of the large producer-handlers. These parties expressed concern that milk prices in unregulated areas, such as Alaska, would rise significantly if large producer-handlers became fully regulated.

**Findings**

Although producer-handlers have not been fully regulated as a general practice, the AMAA provides the authority to regulate handlers of milk to carry out the purposes of the AMAA. With respect to producer-handlers, the legislative history indicates that there is authority to regulate such operations if they are so large as to disrupt the market for producers. In the past during other rulemaking proceedings, producer-handlers have been found not to disrupt the marketing of milk and milk products.

Nevertheless, restrictions were placed on producer-handlers. Both the Pacific Northwest and the Arizona-Las Vegas orders currently permit producer-handlers to purchase up to 150,000 pounds per month of supplemental milk only from pool sources. In addition, the Arizona-Las Vegas order, prohibits the disposition of Class I products by a producer-handler to a wholesale customer who is also serviced by a pool

distributing plant that supplies the same product in a same-sized package with a similar label in the same month. While each order has its own unique definition, it is accurate to say that in general, producer-handlers are required to operate their businesses at their own enterprise and risk, meaning that the care and management of the dairy animals and other resources necessary for the production, processing, and distribution of their Class I products are the sole responsibility of the producer-handlers.

Producer-handler exclusion from pooling and pricing provisions also has been historically based on the premise that the objectives of the AMAA (orderly marketing) could be achieved without extending regulation to this category of handler. In previous rulemaking decisions, the Department has articulated its authority to subject producer-handlers to further regulation, including being subject to marketwide pooling and minimum pricing provisions, if they singularly or collectively have an impact on the market. For example, in a Final Decision (31 FR 7062–7064; May 13, 1966) for the Puget Sound order, a predecessor to the Pacific Northwest order, the Department found that producer-handlers should continue to be exempt from pooling and pricing provisions of the order with the caveat that the producer-handlers could be subject to further regulation if justified by prevailing market conditions. This position was amplified in a subsequent Puget Sound Final Decision (32 FR 1073–1074; July 21, 1967) where the Department found that a hearing should be held to consider the regulation of producer-handlers if the marketing area is susceptible to being affected by producer-handlers or if producer-handler sales could disrupt or operate to the detriment of other producers in the market. Such policy was also articulated in another decision concerning producer-handlers (Texas and Southwest Plains, Recommended Decision, 54 FR 27179, June 28, 1989). That decision concluded that subjecting producer-handlers to the pooling and pricing provisions of the order would be appropriate if it could be shown that producer-handlers cause market disruption to the market's dairy farmers or regulated handlers.

The proposals for fully regulating producer-handlers in this proceeding, specifically making them subject to the order's pooling and pricing provisions, are based primarily on issues relating to producer-handler size, specifically the volume of Class I route disposition. The producer-handler exemption from pooling and pricing provisions is

proposed to end when the volume of Class I route disposition in the marketing area exceeds 3 million pounds per month.

In considering issues relating to size, producer-handlers are dairy farmers that process and sell only their own milk production. These entities are dairy farmers as a pre-condition to operating a processing plant as producer-handlers. Consequently, the size of the dairy farm determines the production level of the operation and is the controlling factor in the capacity of the processing plant and possible sales volume. Accordingly, the major consideration in determining whether a producer-handler is a large or small business focuses on its capacity as a dairy farm. Under SBA criteria, a dairy farm is considered large if its gross revenue exceeds $750,000 per year with a production guideline of 500,000 pounds of milk per month. Accordingly, a dairy farm with sales of its own milk that exceeds 3 million pounds per month is considered a large business.

Another factor to consider regarding the size of producer-handlers is their ability to have an impact on the market's pooled participants. Indicators of market disruption affecting dairy farmers who pool their milk on the orders and by the orders' fully regulated handlers should be determined on the basis of prices that are uniform to producers and equitable among handlers. When these price conditions are present, milk marketing order areas are considered to be exhibiting orderly marketing—a key objective of the AMAA that relies on the tools of classified pricing and marketwide pooling. In the absence of equity among producers and handlers such conditions are and should be deemed to be disorderly.

As already discussed above, producer-handler exemptions from the pooling and pricing provisions of the orders are based upon the premise that the burden of surplus disposal of their milk production is borne by them alone. Consequently, they have not shared the additional value of their production that arose from Class I sales with pooled dairy farmers. In this regard, to the extent that producer-handlers are no longer bearing the burden of surplus disposal, specifically disposal of milk production in some form other than Class I, gives rise to considering regulatory measures that would tend to provide price equity among producers and handlers that is eroded when producer-handlers are permitted to retain the entire additional value of milk accruing from Class I sales.

The record supports finding that producer-handlers with more than 3

million pounds of route disposition per month in both the Pacific Northwest and the Arizona-Las Vegas marketing areas are the primary source of disruption to the orderly marketing of milk. This disorder is evidenced by significantly inequitable minimum prices that handlers pay and reduced blend prices that dairy farmers receive under the terms of each area's marketing order. Accordingly, producer-handler status under the Pacific Northwest and the Arizona-Las Vegas orders should end when a producer-handler exceeds 3 million pounds per month of in-area Class I route disposition.

Review of the intent of the producer-handler provision and the marketing conditions arising from this provision in these orders could warrant finding that the original producer-handler exemption is no longer valid or should be limited to 150,000 pounds per month Class I route disposition limit. However, the hearing notice for this proceeding constrains such a finding to a level of not less than 3 million pounds per month of Class I route dispositions.

Adopting a 3 million pound Class I route disposition limit on producer-handlers is supported in direct testimony by proponent witnesses and other marketing data, most notably the volume of Class I route disposition relative to the total volume of Class I sales, and structural changes in the markets. Producer-handlers with more than 3 million pounds of Class I route disposition significantly affect the blend price received by producers. This decision finds merit in DFA's and Dean's testimony that a blend price impact of 1-cent per cwt is significant. The reduction in the blend prices received by producers in the Pacific Northwest and Arizona-Las Vegas orders, attributable to producer-handler route disposition are significant and greater than 1-cent per cwt. The record evidence supports a conclusion that the exemption of producer-handlers from pooling and pricing has reduced the blend price between \$0.04 to \$0.06 per cwt per month in the Arizona-Las Vegas marketing area and between \$0.02 to \$0.04 per cwt per month for the Pacific Northwest marketing area since January 2000. The causes of the blend price reduction arise from a producer-handler's ability to price fluid milk at an amount between the blend price and the order's Class I price combined with the producer-handler's size relative to the total volume of Class I milk disposition in the respective marketing areas.

In general, the difference between the Class I price and the blend price not paid into the producer-settlement fund is the pricing advantage enjoyed by

producer-handlers over fully regulated handlers. While this has always been the case, those producer-handlers with route disposition of more than 3 million pounds of milk per month in these two orders are large enough to have a negative impact on the prices received by pooled dairy farmers. Since fully regulated handlers do not have the ability to escape payment into the producer-settlement fund of the difference in their use-value of milk and the order's blend price like producer-handlers, regulated handlers competing against large producer-handlers are at a competitive price disadvantage.

Even though producer-handlers argue otherwise, this decision agrees with proponent arguments, most notably by the NMPF witness, that the difference between the Class I price and the blend price is a reasonable estimate of the pricing advantage producer-handlers enjoy even if it is not possible to determine the precise pricing advantage of any individual producer-handler. This pricing advantage is compounded as producer-handler size, and the accompanying increase in the volume of Class I sales in the marketing area, begins to increasingly affect the blend price received by pooled producers.

The record contains specific examples demonstrating that producer-handlers with route disposition of more than 3 million pounds per month have and are placing their fully regulated competitors at a comparative sales disadvantage. For example, Shamrock Foods, a regulated handler with substantial sales in the Arizona-Las Vegas marketing area, is constrained in competing on a price basis for customers by the order's minimum prices that must be paid for milk procurement. Meanwhile, the large producer-handler is able to compete for commercial customers at prices that a regulated handler is unable to match. The competitive pricing advantage of producer-handlers is clearly attributable to their exemption from paying the difference between the Class I and blend price into the producer-settlement fund. This competitive pricing advantage has been recognized previously by the Department (Milk in the Texas Southwest Plains Marketing Area, 54 FR .27182) and determined not to cause disorderly marketing conditions. However, marketing conditions and the overall dairy industry's marketing structure have changed significantly in these orders resulting in disorderly marketing conditions as evidenced by lower blend prices received by pooled producers. The producer-handlers are significantly larger in these two orders and while they are solely responsible for their production and processing

facilities, they are not assuming the entire burden of balancing their production with their fluid milk requirements as discussed later in this decision.

The record evidence supports concluding that the one large producer-handler represents between 12–18 percent of the total Class I sales volume in the Arizona-Las Vegas marketing area. The record evidence supports a conclusion that the exemption of this producer-handler has reduced the blend price received by pooled producers between \$0.04 and \$0.06 per cwt per month in the Arizona-Las Vegas marketing area. Similarly, record evidence reveals that producer-handler exemption from pooling and pricing in the Pacific Northwest reduces the blend price to all other dairy farmers by \$0.02–\$0.04 per cwt. The Pacific Northwest marketing area has eight producer-handlers, with four having Class I route disposition exceeding 3 million pounds per month. In the aggregate, all producer-handlers in the Pacific Northwest account for nearly 10 percent of the total Class I sales in the marketing area. Importantly, the impact on the marketing area's blend price by the exemption from the pooling and pricing provision by any of the individual producer-handlers whose sales exceed 3 million pounds per month on average exceeds \$0.01, a level found to be significant and disruptive to orderly marketing. While the marketing conditions of the Pacific Northwest area differ from the Arizona-Las Vegas marketing area in the number of producer-handlers and the relative market share of producer-handlers, evidence of market disruption by producer-handlers resulting in lower blend prices is a common factor of both orders.

The record, based on Market Administrator data, supports concluding that the annualized reduction in revenue received by the average pooled producer in the Pacific Northwest marketing area would range from \$1,500–\$3,000 from the \$0.02–\$0.04 cents per cwt per month reduction on the order's blend price during 2003. For the Arizona-Las Vegas marketing area the record supports concluding that the annualized reduction in revenue received by the average pooled producer would range between \$11,000–\$17,000 from the \$0.04–\$0.06 per cwt impact of large producer-handlers on that order's blend price per month for 2003.

As in the Arizona-Las Vegas marketing area, producer-handlers in the Pacific Northwest similarly enjoy a competitive sales advantage because they do not procure milk at the order's

Class I price as required of fully regulated handlers. This has resulted in fully regulated handlers not being able to compete with producer-handlers for Class I route sales. For example, Vitamilk testified that as regional grocery chains were acquired by national handlers in the Pacific Northwest marketing area, independent regulated handlers such as Vitamilk found themselves unable to compete for sales with large producer-handlers in the changed marketing environment of fewer wholesale customers on a price basis. Vitamilk demonstrated that the pricing advantage that accrues to producer-handlers from their exemption from pooling and pricing provisions created an insurmountable marketing obstacles that eliminated Vitamilk's ability to compete for available customers in the marketing area on the basis of minimum Class I prices established by the order.

For both the Pacific Northwest and the Arizona-Las Vegas marketing areas, record evidence demonstrates that large producer-handlers have a comparative pricing advantage over fully regulated handlers. Without full regulation of large producer-handlers, the order is not able to ensure equitable minimum prices to similarly situated handlers. Such an advantage has resulted in fully regulated handlers losing sales to producer-handlers on the basis of minimum prices. Producer-handlers have similarly lost accounts to fully regulated handlers but for reasons other than minimum prices established by the orders.

Consideration was given to the themes of the more than 12,000 e-mail comments, petition subjects and arguments advanced by large producer-handlers that were received during the briefing and comment periods of the Recommended Decision. One of these themes is that large producer-handlers are family-owned business enterprises in both orders that should receive support through their special status. This concern does not acknowledge that the producers who are the competitors of large producer-handlers are nearly all family-owned dairy farms who are members of cooperatives. Another highly commented theme given consideration in this decision and raised by large producer-handlers was that certain market niches that they serve in the public interest such as providing home delivery and hormone free milk will not be provided by fully regulated handlers and may not occur if they become fully regulated. There is no record evidence to support concluding that home-delivery or availability of hormone free milk would be disrupted by having the pooling and pricing provisions of the orders apply to large producer-handlers. Accordingly, this decision does not agree with the arguments of either the large producer-handlers or in those exceptions of other interested parties arguments that full regulation would eliminate their ability to provide home-delivery or hormone-free milk to their customers. No provision of any Federal milk marketing order prevents or promotes the marketing practices that handlers use to service their customer demands for home-delivery or in providing hormone-free milk products.

The record supports concluding that producer-handlers with more than 3 million pounds of route disposition per month have gained the ability to no longer bear the burden of the surplus disposal of their milk production. This represents a significant development that warrants the need for regulatory action because producer-handler exemption from the pooling and pricing provisions of the orders has been rationalized on the basis that producer-handlers bear the entire burden of balancing their own production. A producer-handler not bearing the burden of balancing their milk production essentially shifts such burden to the market's pooled producers while simultaneously retaining the full value of Class I sales for themselves.

Record evidence, reinforced by subsequent exceptions, demonstrates that large producer-handlers are able to use their pricing advantage to transfer their burden of surplus disposal to regulated handlers. Evidence provided by an affiliate of NDA demonstrates that producer-handlers were able to use their pricing advantage to displace sales of regulated handlers into Alaska. According to the witness testimony, producer-handlers were able, at will, to displace the established accounts of fully regulated handlers on the basis of minimum prices. The testimony supports concluding that such sales by large producer-handlers displace fluid milk sales of fully regulated handlers that would otherwise have been producer-handler surplus.

A changing retail environment gives rise to the potential of producer-handlers entering into sales agreements to furnish the retailers with as much milk as the producer-handler can deliver. Marketing milk to national grocery discounters creates an environment in which the producer-handlers can sell nearly their entire production to such a retailer, bypassing the need to balance their production. In such a marketing environment, the regulated market's pooled producers essentially become the residual suppliers of Class I milk to the market when a producer-handler's production is not able to satisfy the fluid milk demands of their customer. The retailer need only purchase milk from fully regulated handlers to offset what a producer-handler is not able to supply. This is of growing concern to both producer and regulated handler interests in the Pacific Northwest and the Arizona-Las Vegas marketing areas because consumers are buying an increasing share of their grocery needs from discount outlets.

The record evidence, reinforced with subsequent comments, also reveals that producer-handlers in both the Pacific Northwest and the Arizona-Las Vegas marketing areas with route disposition of more than 3 million pounds per month enjoy sales of fluid milk products into unregulated areas such as Alaska and California. These examples contribute to demonstrating a shifting of the burden of balancing their milk production onto the order's pooled producers. This outcome has the compounded disadvantage for regulated handlers and their producer-suppliers because fully regulated handlers must account to the marketwide pool for Class I sales outside of the marketing area at the order's Class I price. This yields a two-fold advantage to producer-handlers—the ability to eliminate balancing their milk production through Class I sales at the expense of the regulated market and the ability to compete on a consistent basis at prices that fully regulated handlers are unable to meet.

This evidence contradicts the notion that the balancing of their milk production is a burden borne exclusively by the producer-handler. Thus it is reasonable to find that producer-handlers with Class I route distribution in excess of 3 million pounds per month in the Pacific Northwest and the Arizona-Las Vegas marketing areas are not truly balancing their production. Accordingly, this decision finds that the burden of balancing has been essentially shifted to the market's pooled participants. This decision also finds that large producer-handlers have and use a pricing advantage that cannot be overcome by fully regulated handlers. This advantage increases only as producer-handler size increases. Therefore, it is reasonable that large producer-handler status should be limited.

This decision considered the relevance of a 3 million pound route disposition threshold on producer-handler route disposition. The relative impact on the market's pooled

participants by producer-handlers having more than 3-million pounds of route disposition in the market is measurable and significant in both the Pacific Northwest and Arizona-Las Vegas marketing areas. When considered in the aggregate, producer-handlers in the Pacific Northwest with over 3 million pounds of route disposition collectively have more significant share of the Class I market which further lowers the blend price received by dairy farmers.

All handlers have different production and processing costs. These differences may be due to differing levels of plant operating efficiencies related to their size or to that portion of their milk supply that may be produced and supplied from their own farms. Whatever the cost differences, all fully regulated handlers must pay the same minimum Class I price and equalize their use-value of milk (generally, the difference between the Class I price and the blend price) into the order's producer-settlement fund. Similarly, all producers have differing milk production costs. Producer cost differences, for example, may be the result of farm size or differing milk production levels attributable to management ability. Nevertheless, producers, regardless of their costs, receive the same minimum blend price.

This decision finds that disorderly marketing conditions exist in the Pacific Northwest and Arizona-Las Vegas marketing areas. The source of the disorder is directly attributable to the operations of large producer-handlers and their exemption from the pooling and pricing provisions of the orders. The record evidence for full regulation of large producer-handlers with route disposition in excess of 3 million pounds per month support finding that market disruption is present because the blend prices paid to producers in both orders are measurably and significantly lowered.

This decision finds that producer-handlers with route disposition in excess of 3 million pounds per month enjoy significant competitive sales advantages because they do not account to the marketwide pool at the same minimum Class I price for raw milk procurement. This clearly gives large producer-handlers a pricing advantage over fully regulated handlers when competing for sales. This pricing advantage becomes amplified as producer-handler size increases further affecting the minimum price producers receive. Adoption of a 3 million pound per month threshold for producer-handlers should tend to significantly reduce disorderly marketing conditions

that arise from inequitable Class I prices to handlers. A 3 million pound per month limitation on route disposition would likely result in the full regulation of a current producer-handler in the Arizona-Las Vegas marketing area. Of the producer-handlers operating in the Pacific Northwest marketing area, four producer-handlers would likely become regulated by adopting the 3 million pound per month limitation on route disposition. Adoption of this limitation will not completely eliminate the impact of the other producer-handlers in the Pacific Northwest marketing area but should nevertheless result in a significant and immediate reduction in market disorder and disruption by assuring that similarly situated handlers face the same minimum Class I prices and producers receive the same blend prices.

The hearing notice contained a proposal that would make the producer-handler definition of the Pacific Northwest order the same as that for the Arizona-Las Vegas order, most notably the proposed requirement would not permit a producer-handler to market to the same client the same product in a similar package with a similar label in the same month as a regulated handler. The record does not contain sufficient evidence of disorderly marketing conditions that would support recommending a prohibition on producer-handlers in marketing to the same client the same product in a similar package with a similar label in the same month as a regulated handler.

Additionally, the proposals contained in the hearing notice seeking the full regulation of producer-handlers when they surpass a 3-million pound per month threshold in Class I route dispositions in the marketing area were substantially modified during the hearing. The modifications redescribe producer-handlers and harmonize the producer-handler definitions between the two orders with changed terminology. The record evidence does not support finding that a compelling need exists to make the Pacific Northwest producer-handler definition the same as that for the Arizona-Las Vegas order. The current producer-handler definitions of both orders adequately describe those entities that qualify as producer-handlers.

**General Findings**

The findings and determinations hereinafter set forth supplement those that were made when the Pacific Northwest and the Arizona-Las Vegas orders were first issued and when they were amended. The previous findings and determinations are hereby ratified

and confirmed, except where they may conflict with those set forth herein.

(a) The tentative marketing agreement and the order, as hereby proposed to be amended, and all of the terms and conditions thereof, will tend to effectuate the declared policy of the Act;

(b) The parity prices of milk as determined pursuant to Section 2 of the Act are not reasonable in view of the price of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the marketing area(s), and the minimum prices specified in the tentative marketing agreements and the orders, as hereby proposed to be amended, are such prices as will reflect the aforesaid factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest;

(c) The tentative marketing agreements and the orders, as hereby proposed to be amended, will regulate the handling of milk in the same manner as, and will be applicable only to persons in the respective classes of industrial and commercial activity specified in marketing agreements upon which a hearing has been held; and

(d) All milk and milk products handled by handlers, as defined in the tentative marketing agreement and the order as hereby proposed to be amended, are in the current of interstate commerce or directly burden, obstruct, or affect interstate commerce in milk or its products.

**Rulings and Exceptions**

In arriving at the findings and conclusions, and the regulatory provisions of this decision, each of the exceptions received was carefully and fully considered in conjunction with the record evidence. To the extent that the findings and conclusions and the regulatory provisions of this decision are at variance with any of the exceptions, such exceptions are thereby overruled for the reasons previously stated in this decision.

**Marketing Agreement and Order**

Annexed hereto and made a part hereof is one document—A Marketing Agreement regulating the handling of milk.

It is hereby ordered that this entire final decision and the Marketing Agreement annexed hereto be published in the **Federal Register.**

**Referendum Order To Determine Producer Approval; Determination of Representative Period; and Designation of Referendum Agent**

It is hereby directed that a referendum be conducted and completed on or

before the 30th day from the date this decision is published in the **Federal Register**, in accordance with the procedure for the conduct of referenda (7 CFR 900.300—311); to determine whether the issuance of the order as amended and hereby proposed to be amended, regulating the handling of milk in the Pacific Northwest and Arizona-Las Vegas marketing areas are approved or favored by producers, as defined under the terms of the order, as amended and as hereby proposed to be amended, who during such representative period were engaged in the production of milk for sale within the aforesaid marketing area.

The representative period for the conduct of such referendum is hereby determined to be June 2003.

The agent of the Secretary to conduct such referendum is hereby designated to be James R. Daugherty, the Pacific Northwest and Arizona-Las Vegas Market Administrator.

**List of Subjects in 7 CFR Parts 1124 and 1131**

Milk marketing orders.

Dated: December 9, 2005.

Lloyd C. Day,

*Administrator, Agricultural Marketing Service.*

**Order Amending the Order Regulating the Handling of Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas**

(This order shall not become effective unless and until the requirements of § 900.14 of the rules of practice and procedure governing proceedings to formulate marketing agreements and marketing orders have been met.)

*Findings and Determinations*

The findings and determinations hereinafter set forth supplement those that were made when the order was first issued and when it was amended. The previous findings and determinations are hereby ratified and confirmed, except where they may conflict with those set forth herein.

(a) *Finding.* A public hearing was held upon certain proposed amendments to the tentative marketing agreement and to the order regulating the handling of milk in the Pacific Northwest and Arizona-Las Vegas marketing areas. The hearing was held pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601—674), and the applicable rules of practice and procedure (7 CFR Part 900).

Upon the basis of the evidence introduced at such hearing and the record thereof, it is found that:

(1) The said order as hereby amended, and all of the terms and conditions thereof, will tend to effectuate the declared policy of the act;

(2) The parity prices of milk, as determined pursuant to Section 2 of the Act, are not reasonable in view of the price of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the aforesaid marketing area. The minimum prices specified in the order as hereby amended are such prices as will reflect the aforesaid factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest; and

(3) The said order as hereby amended regulates the handling of milk in the same manner as, and is applicable only to persons in the respective classes of industrial or commercial activity specified in, a marketing agreement upon which a hearing has been held.

(4) All milk and milk products handled by handlers, as defined in the tentative marketing agreement and the order as hereby proposed to be amended, are in the current of interstate commerce or directly burden, obstruct, or affect interstate commerce in milk or its products.

*Order Related to Handling*

*It is therefore ordered,* that on and after the effective date hereof, the handling of milk in the Pacific Northwest and Arizona-Las Vegas marketing areas shall be in conformity to and in compliance with the terms and conditions of the order, as amended, and as hereby amended as follows:

The provisions of the order amending the order contained in the Recommended Decision issued by the Administrator, Agricultural Marketing Service, on April 7, 2005, and published in the **Federal Register** on April 13, 2005 (70 FR 19636), are adopted and shall be the terms and provisions of these orders. The revised orders read as follows:

1. The authority citation for 7 CFR Parts 1124 and 1131 continues to read as follows:

**Authority:** 7 U.S.C. 601—674.

**PART 1124—MILK IN THE PACIFIC NORTHWEST MARKETING AREA**

2. Amend the *Producer-handler* definition of the Pacific Northwest milk marketing order by revising § 1124.10 to read as follows:

**§ 1124.10   Producer-handler.**

*Producer-handler* means a person who operates a dairy farm and a distributing plant from which there is

route distribution within the marketing area during the month not to exceed 3 million pounds and who the market administrator has designated a producer-handler after determining that all of the requirements of this section have been met.

(a) *Requirements for designation.* Designation of any person as a producer-handler by the market administrator shall be contingent upon meeting the conditions set forth in paragraphs (a)(1) through (5) of this section. Following the cancellation of a previous producer-handler designation, a person seeking to have their producer-handler designation reinstated must demonstrate that these conditions have been met for the preceding month.

(1) The care and management of the dairy animals and the other resources and facilities designated in paragraph (b)(1) of this section necessary to produce all Class I milk handled (excluding receipts from handlers fully regulated under any Federal order) are under the complete and exclusive control, ownership and management of the producer-handler and are operated as the producer-handler's own enterprise and its own risk.

(2) The plant operation designated in paragraph (b)(2) of this section at which the producer-handler processes and packages, and from which it distributes, its own milk production is under the complete and exclusive control, ownership and management of the producer-handler and is operated as the producer-handler's own enterprise and at its sole risk.

(3) The producer-handler neither receives at its designated milk production resources and facilities nor receives, handles, processes, or distributes at or through any of its designated milk handling, processing, or distributing resources and facilities other source milk products for reconstitution into fluid milk products or fluid milk products derived from any source other than:

(i) Its designated milk production resources and facilities (own farm production);

(ii) Pool handlers and plants regulated under any Federal order within the limitation specified in paragraph (c)(2) of this section; or

(iii) Nonfat milk solids which are used to fortify fluid milk products.

(4) The producer-handler is neither directly nor indirectly associated with the business control or management of, nor has a financial interest in, another handler's operation; nor is any other handler so associated with the producer-handler's operation.

(5) No milk produced by the herd(s) or on the farm(s) that supply milk to the producer-handler's plant operation is:

(i) Subject to inclusion and participation in a marketwide equalization pool under a milk classification and pricing program under the authority of a State government maintaining marketwide pooling of returns, or

(ii) Marketed in any part as Class I milk to the non-pool distributing plant of any other handler.

(b) *Designation of resources and facilities.* Designation of a person as a producer-handler shall include the determination of what shall constitute milk production, handling, processing, and distribution resources and facilities, all of which shall be considered an integrated operation, under the sole and exclusive ownership of the producer-handler.

(1) Milk production resources and facilities shall include all resources and facilities (milking herd(s), buildings housing such herd(s), and the land on which such buildings are located) used for the production of milk which are solely owned, operated, and which the producer-handler has designated as a source of milk supply for the producer-handler's plant operation. However, for purposes of this paragraph, any such milk production resources and facilities which do not constitute an actual or potential source of milk supply for the producer-handler's operation shall not be considered a part of the producer-handler's milk production resources and facilities.

(2) Milk handling, processing, and distribution resources and facilities shall include all resources and facilities (including store outlets) used for handling, processing, and distributing fluid milk products which are solely owned by, and directly operated or controlled by the producer-handler or in which the producer-handler in any way has an interest, including any contractual arrangement, or over which the producer-handler directly or indirectly exercises any degree of management control.

(3) All designations shall remain in effect until canceled, pursuant to paragraph (c) of this section.

(c) *Cancellation.* The designation as a producer-handler shall be canceled upon determination by the market administrator that any of the requirements of paragraph (a)(1) through (5) of this section are not continuing to be met, or under any of the conditions described in paragraphs (c)(1), (2) or (3) of this section. Cancellation of a producer-handler's status pursuant to this paragraph shall be effective on the first day of the month following the month in which the requirements were not met or the conditions for cancellation occurred.

(1) Milk from the milk production resources and facilities of the producer-handler, designated in paragraph (b)(1) of this section, is delivered in the name of another person as producer milk to another handler.

(2) The producer-handler handles fluid milk products derived from sources other than the milk production facilities and resources designated in paragraph (b)(1) of this section, except that it may receive at its plant, or acquire for route disposition, fluid milk products from fully regulated plants and handlers under any Federal order if such receipts do not exceed 150,000 pounds monthly. This limitation shall not apply if the producer-handler's own-farm production is less than 150,000 pounds during the month.

(3) Milk from the milk production resources and facilities of the producer-handler is subject to inclusion and participation in a marketwide equalization pool under a milk classification and pricing plan operating under the authority of a State government.

(d) *Public announcement.* The market administrator shall publicly announce:

(1) The name, plant location(s), and farm location(s) of persons designated as producer-handlers;

(2) The names of those persons whose designations have been cancelled; and

(3) The effective dates of producer-handler status or loss of producer-handler status for each. Such announcements shall be controlling with respect to the accounting at plants of other handlers for fluid milk products received from any producer-handler.

(e) *Burden of establishing and maintaining producer-handler status.* The burden rests upon the handler who is designated as a producer-handler to establish through records required pursuant to § 1000.27 that the requirements set forth in paragraph (a) of this section have been and are continuing to be met, and that the conditions set forth in paragraph (c) of this section for cancellation of the designation do not exist.

## PART 1131—MILK IN THE ARIZONA-LAS VEGAS MARKETING AREA

3. Amend the *Producer-handler* definition of the Arizona-Las Vegas milk marketing order by revising § 1131.10 to read as follows:

### § 1131.10  Producer-handler.

*Producer-handler* means a person who operates a dairy farm and a distributing plant from which there is route distribution within the marketing area during the month not to exceed 3 million pounds and who the market administrator has designated a producer-handler after determining that all of the requirements of this section have been met.

(a) *Requirements for designation.* Designation of any person as a producer-handler by the market administrator shall be contingent upon meeting the conditions set forth in paragraphs (a)(1) through (5) of this section. Following the cancellation of a previous producer-handler designation, a person seeking to have their producer-handler designation reinstated must demonstrate that these conditions have been met for the preceding month.

(1) The care and management of the dairy animals and the other resources and facilities designated in paragraph (b)(1) of this section necessary to produce all Class I milk handled (excluding receipts from handlers fully regulated under any Federal order) are under the complete and exclusive control, ownership and management of the producer-handler and are operated as the producer-handler's own enterprise and its own risk.

(2) The plant operation designated in paragraph (b)(2) of this section at which the producer-handler processes and packages, and from which it distributes, its own milk production is under the complete and exclusive control, ownership and management of the producer-handler and is operated as the producer-handler's own enterprise and at its sole risk.

(3) The producer-handler neither receives at its designated milk production resources and facilities nor receives, handles, processes, or distributes at or through any of its designated milk handling, processing, or distributing resources and facilities other source milk products for reconstitution into fluid milk products or fluid milk products derived from any source other than:

(i) Its designated milk production resources and facilities (own farm production);

(ii) Pool handlers and plants regulated under any Federal order within the limitation specified in paragraph (c)(2) of this section; or

(iii) Nonfat milk solids which are used to fortify fluid milk products.

(4) The producer-handler is neither directly nor indirectly associated with the business control or management of, nor has a financial interest in, another handler's operation; nor is any other handler so associated with the producer-handler's operation.

(5) No milk produced by the herd(s) or on the farm(s) that supply milk to the producer-handler's plant operation is:

(i) Subject to inclusion and participation in a marketwide equalization pool under a milk classification and pricing program under the authority of a State government maintaining marketwide pooling of returns, or

(ii) Marketed in any part as Class I milk to the non-pool distributing plant of any other handler.

(6) The producer-handler does not distribute fluid milk products to a wholesale customer who is served by a plant described in § 1131.7(a), (b), or (e), or a handler described in § 1000.8(c) that supplied the same product in the same-sized package with a similar label to a wholesale customer during the month.

(b) *Designation of resources and facilities.* Designation of a person as a producer-handler shall include the determination of what shall constitute milk production, handling, processing, and distribution resources and facilities, all of which shall be considered an integrated operation, under the sole and exclusive ownership of the producer-handler.

(1) Milk production resources and facilities shall include all resources and facilities (milking herd(s), buildings housing such herd(s), and the land on which such buildings are located) used for the production of milk which are solely owned, operated, and which the producer-handler has designated as a source of milk supply for the producer-handler's plant operation. However, for purposes of this paragraph, any such milk production resources and facilities which do not constitute an actual or potential source of milk supply for the producer-handler's operation shall not

be considered a part of the producer-handler's milk production resources and facilities.

(2) Milk handling, processing, and distribution resources and facilities shall include all resources and facilities (including store outlets) used for handling, processing, and distributing fluid milk products which are solely owned by, and directly operated or controlled by the producer-handler or in which the producer-handler in any way has an interest, including any contractual arrangement, or over which the producer-handler directly or indirectly exercises any degree of management control.

(3) All designations shall remain in effect until canceled pursuant to paragraph (c) of this section.

(c) *Cancellation.* The designation as a producer-handler shall be canceled upon determination by the market administrator that any of the requirements of paragraph (a)(1) through (5) of this section are not continuing to be met, or under any of the conditions described in paragraphs (c)(1), (2) or (3) of this section. Cancellation of a producer-handler's status pursuant to this paragraph shall be effective on the first day of the month following the month in which the requirements were not met or the conditions for cancellation occurred.

(1) Milk from the milk production resources and facilities of the producer-handler, designated in paragraph (b)(1) of this section, is delivered in the name of another person as producer milk to another handler.

(2) The producer-handler handles fluid milk products derived from sources other than the milk production facilities and resources designated in paragraph (b)(1) of this section, except that it may receive at its plant, or

acquire for route disposition, fluid milk products from fully regulated plants and handlers under any Federal order if such receipts do not exceed 150,000 pounds monthly. This limitation shall not apply if the producer-handler's own-farm production is less than 150,000 pounds during the month.

(3) Milk from the milk production resources and facilities of the producer-handler is subject to inclusion and participation in a marketwide equalization pool under a milk classification and pricing plan operating under the authority of a State government.

(d) *Public announcement.* The market administrator shall publicly announce:

(1) The name, plant location(s), and farm location(s) of persons designated as producer-handlers;

(2) The names of those persons whose designations have been cancelled; and

(3) The effective dates of producer-handler status or loss of producer-handler status for each. Such announcements shall be controlling with respect to the accounting at plants of other handlers for fluid milk products received from any producer-handler.

(e) *Burden of establishing and maintaining producer-handler status.* The burden rests upon the handler who is designated as a producer-handler to establish through records required pursuant to § 1000.27 that the requirements set forth in paragraph (a) of this section have been and are continuing to be met, and that the conditions set forth in paragraph (c) of this section for cancellation of the designation do not exist.

[FR Doc. 05–24024 Filed 12–9–05; 2:16 pm]
BILLING CODE 3410–02–P