# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EDALEEN DAIRY, LLC ) | |
| MALLORIE'S DAIRY, INC., and ) | |
| SMITH BROTHERS FARMS, INC. ) | |
| ) | |
| ) | CIVIL CASE NO. |
| --PLAINTIFFS, ) | |
| VS. ) | |
| ) | |
| MIKE JOHANNS, ) | |
| SECRETARY OF AGRICULTURE, ) | |
| UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE ) | |
| ) | |
| --DEFENDANT. ) | |

## DECLARATION OF RONALD D. KNUTSON, Ph. D.

My name is Ronald D. Knutson, and I am an emeritus professor in Dairy Economics at Texas A&M University. This Declaration is based upon my personal knowledge and belief and is provided in support of Plaintiffs' Motion For Temporary Restraining Order And/Or Preliminary Injunction And For Expedited Hearing. I am competent to testify about the statements and information in this Declaration if called upon to do so.

1. I earned my PhD in agricultural economics from the University of Minnesota in 1967 after earning my masters degree in agricultural economics from Pennsylvania State University in 1963 and my bachelor's degree in agricultural economics from the University of Minnesota in 1962.

2. Prior to taking emeritus status, I served as a professor and director of the Agricultural and Food Policy Center at Texas A&M.

3. Before joining Texas A&M, I served as an economist in the Agricultural Marketing Service of USDA—the same agency and division that has promulgated the rule at issue in this proceeding.

4. My work in dairy economics and government policy has been recognized by my designation as a

"Fellow" by the professional association of agricultural economists, the American Agricultural

Economics Association.  This honor is based upon scholarly contributions and has been bestowed

on less than 3 percent of the members of the agricultural economics profession.  Only one other

living dairy economist has received this award.

5.  I testified during the administrative proceeding in this matter on behalf of Smith Bros., Edaleen,

and Mallories Dairies the affected producer-handler,, and I am familiar with the proposed rule and

its practical application, if it were to take effect.

6.  A producer-handler is a unique business entity in the dairy industry that combines the function of

milk production with processing in a single operation under single management and control,

referred to as vertical integration.  As such, being a producer-handler requires a unique set of

management, business, and technical talents in both milk production and processing.

7.  A producer-handler is not a new concept in the dairy industry. Arguably, at one time when all

milk was delivered directly to consumers as a raw (unpastuerized) product, all producers were

producer-handlers.  With the advent of pasteurization and milk handling regulations, milk

production and processing became specialized function, except for a small number of producers

having the unique management, business, and technical expertise in both production and

processing.

8.  These producer-handlers bear all the risk involved in management, production, processing, and

marketing milk products, typically in the context of a family operation.  This compares with

conventional producers that bear the risks of production and conventional processors that bear

the risks of processing.  While producers typically share the risks of marketing through a large

cooperative entity, processors typically operate in a large multi-market corporate context.

2

9.  My experience with Federal Milk Market Order (FMMO) regulation indicates that the authority to regulate milk prices exists only when there is a transaction involving a transfer of the ownership of milk between the producer, or its cooperative representative, and a processor. In the case of a producer-handler, there is no such transaction and no transfer of ownership until the processed product is sold to the retailer or consumer.

10. In a FMMO, the only authority is to regulate producer prices. A producer-handler receives no price for milk except at the retail market level. At the same time he maintains all of the risk of the processing.   Therefore, as an economist, the only conclusion that can be drawn is that the Proposed Rule  on producer-handlers imposes a tax (referred to by the USDA as an "assessment") on the producer-handler.  This tax is a  real cost of production  that must be accounted for by the producer-handler.

11. The selection of 3 million pounds per month as the threshold for imposition of the producer-handler tax is purely arbitrary.  I am unaware of any study or presentation in dairy economics that has considered 3 million pounds  per month to be a threshold for anything.  As an economist I conclude that this is the point at which the industry  proponents of the tax believe that no producer-handler operation can survive.

12. In reality, the proponents have little to worry about.  On a comparative basis according to the hearing record the affected producer-handlers  process approximately  17.5 million pounds  of milk per month compared with a Pacific Northwest producer receipt volume of 528 million pounds per month.  In this content, the small sliver of volume represented by the affected producer-handlers is illustrated in Figure 1.  On an economic basis there is no reason to consider the affected producer-handler to be a disorderliness market threat to any of the other firms serving

3

the Pacific Northwest market.

13. It is the affected producer-handlers that have a right to be concerned because the regulations are a direct and vicious attack on their survival. While President Lincoln designated USDA as "the peoples' department," this regulation ironically, serves limited vested interests, while doing irreparable harm to the affected producers that benefit the masses of consumers through fostering greater competition and lower retail prices for milk.

14. Based on my analysis of the proposed regulations, the producer-handler entities that would be subject to these regulations would suffer real and immediate economic damages as a result of the regulatory changes that would also jeopardize the future of their operation as a producer-handler. This is because while they must pay an assessment (tax) on their sales, they do not receive any benefit in return such as price protection. The producer-handlers still assume all risks of all of production, marketing and processing; the assessment does not change that. A conventional processor only bears the risk of marketing and processing.

15. Under the new regulations, the affected producer-handlers would be obligated to pay a monthly assessment (tax) into the producer settlement fund of their marketing area, constituting a monetary charge of hundreds of thousands of dollars per month. The impact of this tax on their costs would be immediate. The extent to which these costs could be recovered from the market is problematic and would likely entail a basic change in the nature of their operations involving the discontinuation of their existence as producer-handlers. Additional costs are not easily extracted from the market and to do so requires the acquiescence of existing processors who would be expected to prefer the option of fewer competitors in the long run to a higher price in the short run.

4

16. Related highly probable and irreparable damages to producer-handler entities arise from increased risk that buyers bear as a result of having built a business relationship or model with a producer-handler that generally, for example, involves a smaller line of high volume products delivered in gallon containers or specialized products such as rBST-free milk. Because the dairy industry is highly consolidated, information spreads quickly among buyers and sellers of dairy products. As a result, the announcement of the USDA decision immediately placed affected producer-handlers at a definite competitive disadvantage as their competitors use the fact of the decision and its imminent implementation as a tool to create uncertainty as to the future of producer-handlers as a source of supply and the resilience of the business model on which the buyer has relied for a source of milk supply. Therefore, this uncertainty is used by conventional suppliers to entice supplier changes and to undermine the future of producer-handlers as competitors.

17. The behavior I describe above is a rational economic reaction by competitors of producer-handlers impacted by the USDA announcement of the Proposed Rule. Furthermore, the described behavior provides a rational reason for customers of producer-handlers to actually switch accounts. The loss of a single large customer can directly and abruptly jeopardize a producer-handler as a business entity.

18. Absent an injunction preventing the USDA regulations from taking effect, these artificial pressures on producer-handler/customer relationships will continue and damages will result.

19. In response to the USDA decision, the affected producer-handlers face the absolute need to adjust their business operations. As I explained in my testimony to USDA, the producer-handler is a single integrated operation that capitalizes on the efficiencies of vertical integration. The imposition of the tax on producer-handlers will necessarily require changes to the way producer-

5

handlers do business, none of which can be expected to sustain either the income or the value of the current business operations. These options include: (a) Discontinue milk production and expend large amounts of capital to grow their operations and capitalize on the economies of scale in processing. The success of this option is highly problematic since, even if the capital were available, the primary competitors are multi-market in scope. (b) Close down their processing operations and become a conventional producer marketing milk through the dominant cooperative. The salvage value of the processing operation would be practically nothing because they were constructed to serve the producer-handler market. (c) Sell production assets and reduce producer handler capacity to fall beneath the 3 million pound threshold established by the new regulations. This option may not be feasible because it would require operating the existing plant at less than capacity, meaning higher fixed costs per unit of output. In addition the lower volume plant may not be able to reliably supply larger volume buyers, thus jeopardizing the market and the producer-handlers' business model. (d) Expand the scope of both the production and processing operations to take advantage of economies of size while expanding the ability to serve customers. This is not a feasible option because there are limits on economies of size in production. Further, as I stated above, existing competitors will make expansion of sales difficult at best. Based upon my interviews with the affected producer-handlers, the ability for them to survive as producer-handlers under the Proposed Rule is miniscule.

20. Absent an injunction preventing the USDA regulations from taking effect, the affected producer-handler operations will sacrifice their future viability pending the outcome of a full trial.

21. The new costs related to the tax on producer-handlers also impact the overall value of producer-handler businesses. Payments to the federal order producer settlement fund would come directly

6

from the bottom line of these operations. From an economic and financial standpoint, this reduces the profitability of the organizations, their chances for survival, and for reasons described in item 18 above adversely affects their valuation as a business.

22. If not enjoined, the USDA regulations will result in decreased creditworthiness and diminished value of the producer-handlers. Even if the USDA regulations are ultimately overturned, these harms can never be accurately quantified or remedied.

23. The ultimate beneficiaries of the USDA regulations would be conventional processors who would face less competition, and large cooperatives which could supply more milk to conventional processors.

24. If permitted to take effect, the USDA regulations would decimate the affected producer-handlers and mean higher prices for consumers. According to the hearing record, the financial impact on other dairy producers in terms of higher prices would fall in the range of 2-4 cents per hundredweight of milk marketed in the Pacific Northwest market. Figure 2 clearly illustrates how insignificant this range of impacts are relative to the market blend price. As a percent of the blend price received by milk producers this is less than 1 percent. which is statistically insignificant. A fellow dairy economist at Cornell University and the head of its Dairy Markets and Policy Program, Professor Andy Novakovic, has noted the insignificance of this amount by indicating that that the dairy farmer recipients of this new benefit would have to look hard to determine the impact on their milk check. Furthermore, the conclusion in the Final Decision that "Importantly, the impact on the marketing area's blend price by the exemption from the pooling and pricing provision by any of the individual producer-handlers whose sales exceed 3 million

pounds per month on the average exceeds $0.01, a level found to be significant and disruptive to orderly marketing." is patently ridiculous, has no basis in fact, and is not supported in the verbiage of the decision. This is my conclusion and is completely consistent with the comment of Professor Novakovic. Conversely, enjoining the USDA rule will continue policies that USDA has operated under for nearly seventy years.

I declare under pains and penalties of perjury that the foregoing is true and correct. Executed on this 20 day of December 2005.

RONALD D. KNUTSON, Ph. D.

8



Figure 1 - Relative Size of Pacific Northwest Producer Milk Receipts to Producer-Handlers' Milk Volume

Figure 2 - Range of Contribution of Proposed Producer-Handler Regulation to the Pacific Northwest Blend Price for Milk, 2003

Pacific Northwest Lower Bound



Pacific Northwest Upper Bound

