# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EDALEEN DAIRY, LLC )
MALLORIE'S DAIRY, INC. )
SMITH BROTHERS FARMS, INC. )
       Plaintiffs )
       vs. )
       ) CIVIL ACTION NO. 05 CV 2442 (PLF)
       )
MIKE JOHANNS, SECRETARY )
UNITED STATES DEPARTMENT OF )
AGRICULTURE )
       Defendant )
   and )
       )
DAIRY FARMERS OF AMERICA, INC. )
ET AL. )
       Intervenor-Defendants )

## MEMORANDUM OF INTERVENOR DAIRY FARMERS OF AMERICA, INC. (DFA) IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

## I.    INTRODUCTION AND SUMMARY OF DFA'S POSITION

Dairy Farmers of America, Inc. (DFA), an intervening Defendant, opposes Plaintiffs' request for temporary, preliminary and permanent injunctive relief. The Plaintiffs' request is an attempt to delay and frustrate the necessary restoration of orderly market conditions in the affected Orders which is the purpose of the Secretary's promulgation of the Proposed Rule requiring that extremely large producer-handlers participate in the pricing and pooling requirements in those Orders.

The federal milk marketing order system can achieve uniform minimum prices for dairy

-1-

farmers – its fundamental objective –  only if handlers, the processors of milk, are also assured

minimum price uniformity and competitive equity.  If large producer-handlers -- vertically

integrated commercial enterprises which engage in both milk production and processing -- are

exempted from the minimum price system, the system will ultimately crumble because handler

competitors will either be forced out of business by the unregulated producer-handlers, or will

become exempt from the system by integrating backward into milk production in order to

compete with producer-handlers.  In this proceeding, the Secretary of Agriculture, after

exhaustive on-the-record rulemaking proceedings adopted revisions to the marketing order

regulations in the Pacific Northwest and Arizona-Las Vegas orders which put a cap, or size

limitation, on producer-handlers of 3,000,000 pounds of Class I distribution in the market order

area per month.  This modest limitation to a regulatory exemption allows all but the largest ½ of

1% of dairy farms to become exempt producer-handlers should they so choose.  But the

regulation preserves the federal order system for the overwhelming majority of producers who

are not handlers, and handlers who are not producers, while allowing the traditional small (and

not so small) producer-handlers to continue to be exempt from regulation.  Only the mega-sized

producer handlers, such as Plaintiffs, are impacted by the regulation.  Their request that the court

preserve their privileged, exempt status via a temporary restraining order or preliminary

injunction should be rejected for several separate and independent reasons: (1) the court does not

have subject matter jurisdiction of the claims; (2) the Plaintiffs have a fully adequate remedy at

law for refund of the contested pool payments (should they ultimately prevail on the merits of

their claims); (3) the intervenor dairy farmers will suffer non-compensable losses if the

regulations are enjoined and the statutory objectives of establishing and preserving orderly milk

markets will be frustrated; and (4) the regulations are authorized by the Act and fully supported

by the hearing record.  For all these reasons, the request that the court intervene by granting

temporary and preliminary injunctive relief should be denied.

The Secretary's Proposed Rule is a well-reasoned, firmly supported, and plainly lawful

product of appropriate rulemaking procedures fully in accord with the underlying statute. The

Proposed Rule is consistent with the purposes and policies historically applicable to producer-

handlers and the principles of fairness and equity which are the bedrock of the Federal Milk

Order system.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Rulemaking

This case arises from a rulemaking proceeding conducted by the Secretary of Agriculture

pursuant to the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. §601 et

seq. ("AMAA") and the Administrative Procedure Act, 5 U.S.C.§§ 553-557 ("APA").  The

hearing concerned amendments to the regulations (7 C.F.R.§§ 1124 and 1131) governing the

marketing of milk in the Pacific Northwest and the Arizona-Las Vegas Marketing Areas.  The

hearings were held on September 23–25, 2003 in Tempe, Arizona, November 17–21, 2003, in

Seattle, Washington, and January 20–22, 2004, in Alexandria, Virginia before an Administrative

Law Judge, pursuant to the Rules of Practice of the agency, 7 C.F.R. Part 900.  More than 3000

pages of testimony was received from 29 witnesses.  Voluminous data was received in the form

of 69 exhibits.  Reams of additional data were administratively noticed[1], and, after the full on-

the-record rulemaking hearing, all interested participants had the opportunity to file briefs and

---

[1]  See hearing Exh. 69 (http://www.ams.usda.gov/dairy/pnw_alv/Ex69.pdf)  for a partial list of
officially noticed materials.

proposed findings.[2]

The Secretary issued his Recommended Decision April 7, 2005  and it was published April 13, 2005, at 70 Fed. Reg. 19636.    Exceptions thereto, and comments thereon, were filed by Plaintiffs, and all other interested parties, including DFA.  The final decision was issued December 9, 2005, and published at 70  Fed. Reg. 74166 (December 14, 2005).    If approved in a referendum of dairy farmers, it will be implemented by final Order.  The earliest effective date of the Order is anticipated to be March 1.[3]

### B.  The Parties

Plaintiffs are three producer-handlers operating in the Pacific Northwest Order.  The combined Class I sales of Plaintiffs are in excess of 160 million pounds per year accounting for more than 7 percent of Order 124's annual Class I sales. (Hollon Declaration, ¶ 11[4])  The lost value to the Order 124 pool is in excess of $30,000,000 per year. (Hollon Declaration, ¶ 11) Plaintiffs are in the 98th percentile of producer size in Order 124; and in the 99.5th percentile nationally. (Hollon Declaration, ¶ 11)  These are substantial commercial enterprises, each with monthly sales in the $1,000,000 range and each with dozens, if not scores, of employees.  (Herbein Declaration, Exh. A)

---

[2]  The entire hearing record is posted on the USDA/AMS webpage at: http://www.ams.usda.gov/dairy/pnw_alv/pnw_alv_exhibits.htm.

[3]  The final order amending the existing regulation cannot be published until after the producer referendum approving the amended order.  The referendum ballots will not be certified by the Market Administrator before January 17.  The order must be published at least 30 days before its effective date, pursuant to 7 C.F.R. 900.14(a), unless "good cause" is found for a shorter notice period.

[4]  Three Declarations are attached to this Memorandum: (1) Declaration of Elvin Hollon; (2) Declaration of Carl Herbein, CPA; and (3) Declaration of Roger Cryan, Ph.D.  They will be referenced as, e.g. ("Hollon Declaration, ¶ ___)

The Defendant Secretary of Agriculture is the official charged with administration of the federal milk orders promulgated pursuant to the Agricultural Marketing Agreement Act of 1937 (the "AMAA"), as amended, 7 U.S.C. §601, et seq.

DFA is a cooperative association of more than 13,500 dairy farms producing milk in forty-nine (49) states. (Hollon Declaration, ¶ 4)  DFA, as the nation's largest dairy cooperative, markets more than 28% of the nation's milk supply, from coast to coast. (Hollon Declaration, ¶ 4)    DFA regularly markets milk on 10 of the 11 federal milk orders, including the Pacific Northwest Order. (Hollon Declaration,¶ 4 )  DFA was a proponent of the Proposed Order and has intervened to defend the Secretary's actions.

**C.    The Federal Milk Marketing Order System in General**

      1.  The Federal Order pools.

Since the 1930's the United States Department of Agriculture has been authorized to regulate the marketing of raw milk by dairy farmers pursuant to the Agricultural Marketing Agreement Act of 1937 (the "AMAA"), as amended, 7 U.S.C. §601, et seq.[5]  The regulations, referred to as "orders,"  promote stable, orderly marketing conditions among and between dairy farmers and milk buyers (commonly referred to as "handlers") in local or regional marketing areas.[6]  The basic tool for promotion of market stability is the establishment of minimum milk

---

[5]  The 1937 legislation amended and readopted the landmark 1933 and 1935 AAA Acts; Agricultural Adjustment Act of 1933, 45 Stat. 31; as amended, Act of August 24, 1935; 49 Stat. 753.

[6]  The Supreme Court has discussed the history of the milk order program and reviewed its operations on several occasions, including: Zuber v. Allen, 396 U.S. 168 (1969); Lehigh Valley Cooperative Farms v. United States, 370 U.S. 76 (1962); Brannan v. Stark, 342 U.S. 451 (1952); Stark v. Wickard, 321 U.S. 288 (1944); and United States v. Rock Royal Coop., 307 U.S. 533 (1939).

prices and a "pool" of milk value shared equally by all farmers supplying the market.

The pooling mechanism allows all farmers to receive a uniform minimum price (called the "blend" or "uniform price") regardless of the specific buyer or use to which each farmer's milk is put.  At the same time, the purchasers (handlers) are assured of competitive parity by paying a uniform minimum price on the basis of the use of their milk.  Milk used for fluid (drinking) products accords the highest Class I price; milk used for soft products such as yogurt, cottage cheese or ice cream commands a Class II price; milk used to produce hard products cheese and related products is in Class III; and milk used for butter and nonfat dry milk powder is Class IV.   Through the pool or "Producer Settlement Fund" mechanism, the Market Administrator, an employee of the Secretary of Agriculture, collects payments from handlers based on the handler's use of milk and distributes payments to producers on the basis of the average value for the entire market.

2.   Producer-handlers in the federal order system.

Historically there have been only a few types of firms that have been exempted from the pooling and producing provisions of milk orders.[7]  The producer-handler exemption originated as a matter of expediency, not principle, and after 70 years market conditions demand its modification.  (Cryan, Tr. 889)[8]  The present exemption of the producer-handler traces to Kansas

---

[7]   These have included: (a) institutional milk processing plants such as those operated by governmental institutions and universities; (b) small plants for which the administrative costs of regulation exceed the regulatory benefit; (c) plants located in Clarke County, Nevada; and (d) producer-handlers.  Only plants in Clarke County, Nevada, have a legal right to be exempted from regulation.  The exemption of the other three types of plants had been permitted for administrative convenience or to achieve a modest social objective.  (Christ, Tr. 1593)

[8]   References to the transcript of testimony at the rulemaking hearing will be in the form: (Witness name, transcript page).

City in the early 1930s.[9]  In August of 1935,  Congress amended the Agricultural Adjustment

Act to codify the previous practices of the USDA, re-establishing the licensing of handlers

through issuance of Federal Milk Marketing Orders.  (Cryan, Tr. 893)  These 1935 amendments

include language (now codified at 7 U.S.C. §608c(5)(C)) providing a method for making

adjustments in payments as among handlers –  "including producers who are also handlers" -- to

the end that the total sums paid by each handler shall be equal to value of the milk purchased by

such handler at prices fixed by the USDA.  Thus, in 1935 the regulation of producer-handlers

was specifically authorized and this language has been retained to the present day as part of a

continuous system of milk market regulation.  (Cryan, Tr. 893)

The early difficulties in regulating producer-handlers gave way over the years to a degree

of  indifference about their regulation because of their generally shrinking numbers and small

size.  Even today, in many markets most producer-handlers fall under the 150,000-pound size

exemption. (See Hearing Exh. 33F; Attachment 1)  It is the large producer-handlers such as

Plaintiffs, however, which have changed the landscape with respect to use of this privileged

status in the marketplace.  (Cryan, Tr. 893)

3.  Plaintiffs and disorderly marketing in Order 124.

The hearing record documented in detail the competitive advantage and market impact

with regulated handlers which the Plaintiffs (and the Producer-Handler in Order 131) have.  In

May 2003, the three largest producer-handlers in the Pacific Northwest averaged 4.7 million

_____

[9]  USDA Marketing Research Report No.14, dated May 1952, entitled "Early Development of
Milk Marketing Plans in Kansas City, Missouri, Area" gives a detailed history of the events of
that time. Official notice was taken of this publication. (Hearing Exh. 27, 27a) More details of
the history of producer-handler regulation are in Dr. Cryan's Declaration, ¶¶ 10–11, and hearing
testimony, Tr. 889–895.

pounds of Class I route disposition per month. (Hearing Exh. 33-F)  At the same time, there were

six (6) fully regulated handlers accounting to the pool at Class I prices which were smaller, on

average, than the 3 largest producer-handlers in the Order.  Those six fully regulated plants had

average Class I sales of 3.96 million pounds in May 2003.  (Hollon Tr. 2472; Hearing Exh. 33F-

G; Attachment 1) Thus, with similar economies of scale, the producer-handlers enjoyed a major

competitive advantage by avoiding the minimum pooling and pricing provisions of the Federal

Orders.  (Hitchell, Tr. 214; Vander Pol, Tr. 476; Arbuthnot, Tr. 413)   In both Order 131 and

Order 124, producer-handlers – not subject to any minimum pricing regulations –  were in direct

competition in the Class I market with regulated handlers.

        The record established, and the Secretary found, that in Order 124, a fully regulated

handler met its demise at least in part because of lost sales to producer-handlers.  The Vita-

Milk story is informative.  Vita-Milk lost a distributing company customer to Plaintiff Edaleen and the

sales staff of Vita-Milk reported that the Edaleen price was eleven to twelve cents per gallon

below Vita-Milk's best net price to distributors.  The customer explained that the lower price

offered by  Edaleen was the reason for switching the account from Vita-Milk to Edaleen.

(Vander Pol, Tr.  470)   In an effort to regain this distributor customer, Vita-Milk offered a price

per gallon which equaled its cost of production through the bottling phase, but did not include

delivery, marketing, office or other administrative and overhead costs.  The Vita-Milk sales staff

learned from its former customer that Edaleen was offering it milk at $.10 per gallon less than

this price.  (Vander Pol, Tr. 470-471)  Producer-handlers were able to offer prices to customers

of Vita-Milk that were below Vita-Milk's costs.  Vander Pol attributed this price differential in

part to the inequity in pricing resulting from the producer-handler exemption.  (Vander Pol, Tr.

469)  This type of competition was possible because the producer-handler price advantage in

                                            -8-

Order 124 averaged from $.14 to $.16 cents per gallon from 2000 through 2003. (Hollon, Tr.1008, Hearing Exh. 33 A2; Attachment 1)

Vita-Milk also lost business in half-pint sales to Edaleen in the school lunch program market in the Puget Sound area. Part of the reason this business was lost was that producer-handlers' bidding on school lunch contracts could offer fixed price contracts for extended periods of time, which Vita-Milk – as a regulated handler subject to changing Order prices – could not offer. (Vander Pol, Tr. 472-473) Producer-handlers are able to offer long-term fixed price contracts simply because they do not have to account to the federal order pool for changes in regulated minimum prices when there is a change in the Order price. (Vander Pol, Tr. 471; Van Dam Tr. 1511)

Before Vita-Milk closed in August 2003, there had been four generations of family involved in the business. (Vander Pol, Tr. 477)

 In Order 124 there was also "cherry-picking" of the market in sizes of milk containers sold by producer-handlers. Producer-handlers would sell their milk primarily in gallon containers. Regulated handlers were then left with the less-profitable market for milk in smaller containers such as half-gallons and pints. (Arbuthnot, Tr. 444) Mallories Dairy produces primarily gallon containers and no quart, pint or half-pint containers; pool handlers must provide Mallories' customers with primary supplies of half gallons and all smaller containers. (Flanagan, Tr. 2361–68) Mallories also private labels for Thriftway stores in the same private label which pool handlers provide for Thriftway. This allows Thriftway to balance Mallories' supplies with pool-sourced milk. (Flanagan, Tr. 2398–99)

The expert witnesses for the proponents demonstrated  (1) that the large producer-handlers had and economic advantage in competition with fully regulated competitors; (2) that

there was no basis in the history of the producer-handler provisions which justified the current exemption for the largest producer-handlers; (3) that the economies of scale for 3,000,000 pound per month producer-handlers were such that they could operate effectively in competition with regulated handlers; and (4) that if the producer-handler issue was left uncorrected the regulatory program based on the establishment of uniform minimum prices among competing handlers could not survive.

The producer-handlers testified to their longstanding operations and to their desire to continue to operate as they have operated. They contended that they had special costs of operating and balancing which did not apply to regulated handlers; but they put no financial evidence into the hearing record to support the bare assertions. To allow the Secretary to evaluate the credibility of the producer-handlers' cries of doom, the proponents offered the expert testimony of Carl Herbein, CPA, quite possibly the leading dairy cost accountant in the country, to test the economic viability of the Order 124 producer-handlers, now the Plaintiffs in this litigation. Using all data available to him, Mr. Herbein presented a pro forma view of the dairy processing operations of the Plaintiffs, assuming that they were required to pay minimum regulated prices for raw milk. That pro forma financial analysis, Hearing Exh. 68 (Exh. A to Herbein Declaration), was never challenged by Plaintiffs. Mr. Herbein's Declaration, filed herewith reviews his pro forma analysis at the hearing in the light of the Plaintiffs' Declarations before this court. His conclusion was, and is, that using industry benchmark costs of processing, producer-handlers of the size of Plaintiffs are capable of operating profitably while paying minimum regulated prices for their raw milk.

Noting the significance of Plaintiffs' continued failure to provide financial data for their operations, Mr. Herbein states: "Plaintiffs have chosen not to submit actual financial

information from their business operations.  If they had done so, a more precise economic

analysis could be performed.  Typically, when historical information is not presented it is for a

reason (usually information would be disclosed that would not be helpful to the parties [sic]

cause).”  (Herbein Declaration)

> 4.  <u>The requested injunction and its impact.</u>

Plaintiffs currently enjoy, for themselves,  more than 7% of the Class I sales in Order 124

while they are but 3 of 873 dairy farmers supplying the market.  (Hollon Declaration, ¶ 11) The

value of the Order 124 pool for all producers is reduced by $2.8 million dollars each month if

Plaintiffs are not pooled.  (<u>Id</u>.) There are measurable, monthly losses to every producer in Order

124 which will continue, without any legal remedy or recourse, so long as the Secretary’s Order

does not go into effect.

On the basis of all that can be known of the economics of Plaintiffs’ enterprises, they can

be economically viable when paying minimum regulated prices.  (Herbein Declaration) At least

six fully regulated handlers pay minimum class prices for milk and are significantly smaller than

are Plaintiffs.  (Hollon Declaration, ¶ 11)  Plaintiffs had more than two (2) years to prepare for

the possibility of full regulation.  However, their Declarations do not indicate that they have

prepared.  (Herbein Declaration)

**III.  ARGUMENT**

**A.  <u>Standards for Preliminary Injunctive Relief.</u>**

The traditional equitable standards that must be met in this circuit to establish entitlement

to a preliminary injunction have been often stated.   A party seeking a preliminary injunction

must show: that it has a substantial likelihood of success on the merits; that there is a threat of

irreparable harm to the Plaintiffs absent an injunction; that there is no threat of substantial harm

to the opposing parties if the injunction issues;  and that the injunction is consistent with the public interest.  E.g.,  United States v. Microsoft Corp., 146 F.3d 935, 943 (D. C. Cir. 1998); O'Hara v. District No. 1- PCD, 56 F.3d 1514, 1522 (D.C. Cir. 1995).  Plaintiffs meet none of these criteria.

>        **B.        Plaintiffs Are Not Likely to Succeed on the Merits.**

>        1.  The Court has no jurisdiction over the producer-handlers' complaint as they have not exhausted their statutorily-created exlusive remedy.

At the threshold, Plaintiffs are not likely to succeed on the merits of their claim because they lack the legal right to pursue their claims directly in this forum.  As a result, the court need not even reach the detailed and complex milk order regulations of the Secretary of Agriculture, which Congress has entrusted to his administration.

There are no cases in the nearly seventy (70) years of federal milk orders which hold that producer-handlers have the right to go directly to court as producers and avoid the requirements for administrative review which are incumbent upon handlers.  While the courts have rightfully and properly protected the ability of dairy farmers, the intended beneficiaries of this statutory scheme, to have judicial review of the Secretary's exercise of his authority in the course of administering the AMAA, with respect to handlers, the law is unequivocal: Handlers **must** exhaust their administrative remedies under the AMAA, see 7 U.S.C. § 608c(15), before obtaining court review of the Secretary's actions.  Block v. Community Nutrition Institute, 467 U.S. 340 (1984); United States v. Ruzicka, 329 U.S. 287 (1946); Hershey Foods Corp. v. Department of Agriculture, 253 F.3d 520 (D.C.Cir. 2002); American Dairy of Evansville v. Bergland, 627 F.2d 1252, 1259 (D.C.Cir. 1980).  These principles were recently applied by Judge Lamberth in Northwest Independent Producers Association v. Ann M. Veneman, Civil

Action No. 03-700 (April 6, 2004), where he dismissed for lack of jurisdiction the claims of cooperatives (and their producer proxies) for failure to exhaust the statutory remedies pursuant to 7 U.S.C. 608c(15)(A).

Judicial review at this point in the administrative process could only be appropriate if Plaintiffs have standing as producers and review is not precluded.  However, the cases, even when viewed (as these producer-intervenors would view it) most favorably to producer interests, do not provide these Plaintiffs with the right to invoke this court's authority and avoid the established agency review provisions.

The Supreme Court held in <u>Stark v. Wickard</u>, 321 U.S.288 (1943), that producers had standing to obtain judicial review of milk order provisions authorizing specific deductions of money from the fund from which the producers were paid for their milk because they had "such a personal claim as justifies judicial consideration . . . much more definite and personal than the right of complainants to judicial consideration of their objections to regulations...."  321 U.S. at 305.  <u>Stark</u> has been followed where producers have challenged milk order regulations which directly reduce the price they receive from the pool: See, e.g., <u>Zuber v. Allen</u>, 396 U.S. 168 (1969)(nearby location differentials reduced blend price);  <u>Farmers Milk Union Cooperative v. Yeutter</u>,  930 F.2d 466 (6th Cir.1991)(location differentials to producer blend price);  <u>Dairylea Cooperative, Inc. v. Butz,</u> 504 F.2d 80 (2d Cir. 1974)(base-excess plan adjustments to blend price);  <u>Suntex Dairy v. Bergland,</u>  591 F.2d 1063, 1065-1067 (5th Cir.1979), *rehearing denied,* 670 F.2d 181, *cert. denied,* 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982)(order expansion reduced Plaintiffs' blend price);  <u>Lehigh Valley Farmers v. Block,</u>  640 F.Supp. 1497 (E.D.Pa.1986), *aff'd on other grounds,* 829 F.2d 409 (3d Cir.1987)(order expansion).   But where a **handler** burden is concerned, direct court review is not available to those indirectly impacted,

-13-

whether they be consumers, <u>Block v. Community Nutrition Institute</u>, supra, (pricing of reconstituted nonfat dry milk sold as Class I) or producers, <u>United Dairymen of Arizona v. Veneman</u>, 279 F.3d 1160 (9th. Cir. 2002)(interpretation of producer-handler definition); cf. <u>Marchezak v. McKinley</u>, 607 F.2d 37 (3rd Cir. 1979)(producers did not have "standing" to obtain review of payment terms imposed upon handlers).

If producer-handlers were entitled to direct court review as producers, there would never be administrative review of producer-handler regulations because all producer-handlers are producers.  But the history of the AMAA documents that just the opposite has been true: Producer-handlers have always been regarded as handlers when challenging order provisions. Producer-handler administrative appeals began as early as <u>In re Martin S. Cosgrove</u>, 1 Ag. Dec. 503 (1942), aff'd <u>Cosgrove v. Wickard</u>, 49 F.Supp. 232 (D. Mass. 1943)(Section 15(B) court review).[10]  and have continued through the decades to the present. E.g.,  <u>In re Independent Milk Producer-Distributors' Association</u>, 20 Agric. Dec. 1 (1961); <u>In re Jacob Tanis</u>, 17 Agric. Dec. 1091 (1958); <u>In re Sunflower Dairy</u>, 15 Agric. Dec. 1 (1956);  <u>In re: Kreider Dairy Farms, Inc.</u>, 94 AMA Docket No. M-1-2, 1995 WL 598331 (1995).  The <u>Ideal Farms v. Benson</u>, 288 F.2d 608 (3rd Cir. 1961), litigation was pursued under Section 15(B) with the producer-handler plaintiffs paying into the pool while the litigation went forward.  The litigation in <u>Brown v. United States</u>, 367 F.2d 907 (10th Cir. 1966), documents the necessity for payment into the order pending review of the merits of producer-handler allegations.

These "producer-handler" Plaintiffs are proxies for the handler side of their operations They are entitled under the AMAA to judicial review of handler obligations, but only after the

---

[10]  The preceding case of  <u>Elm Spring Farm v. United States</u>, 127 F.2d 920 (1st Cir. 1942) was an enforcement action pursuant to 7 U.S.C. 608a(6).

statutory avenues for administrative relief have been exhausted.  This is critical for administration of the order program.  United States v. Ruzicka, 329 U.S. 287 (1946).

      2.   The challenged regulation is authoirzed under the AMAA and the product of reasoned decision-making.

      a.   The Authority to Regulate Producer-Handlers under the AMAA is Clear.

      The Agricultural Marketing Agreement Act of 1937, as amended, (the "AMAA") provides clear and plain authority for the full regulation of producer-handlers in federal milk marketing orders.  Indeed, the authority is so direct, and the precedents so firmly established, that the arguments made here by the producer-handlers are legally frivolous.

      7 U.S.C.  § 608c(5)(C), which provides the authorization for marketwide pooling of classified use values among producers, **expressly** authorizes pooling producer-handlers, as follows:

> In order to accomplish the purposes set forth in paragraphs (A) [uniform handler prices] and (B) [uniform producer prices] of this subsection, **providing a method for making adjustments in payments, as among handlers (including producers who are also handlers)**, to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) of this subsection. (emphasis supplied)

      Producer-handlers have challenged this authority on many occasions, beginning decades ago.  The challenges have been uniformly unsuccessful.  In Acme Breweries v. Brannan, 109 F.Supp. 116 (N.D.Cal. 1952), the plaintiff brewery processed its own hops and challenged the authority of the Secretary of Agriculture's hops marketing order to regulate the terms of its use of its own-grown hops.  The court rebuffed the challenge, pointing out that as a processor Acme was part of the stream of commerce in agricultural commodities which the AMAA was intended

to regulate.  It was not being regulated in its capacity as a producer; but as a processor and that

was fully authorized by Congress.

In Ideal Farms v. Benson, 288 F.2d 608 (3rd Cir. 1961), the producer-handlers in the New

York – New Jersey market launched an all-out legal attack on tightened regulations under Order

2 which held them accountable under the order for milk produced on their own farms,

contending then (as the Declaration of Dr. Knutson argues today) that they did not "purchase"

their own milk and, therefore, there was no authority to regulate those transactions.  The court

disagreed, pointing out, 288 F.2d at 613:

> Were we to accept appellants' construction of the word
> "purchased" they would avoid the intent of the Act to achieve a
> fair division of the more profitable fluid milk market among all
> producers and they would avoid the necessity of sharing the
> burden of surplus milk.

The Ideal Farms court relied upon the interpretation of "purchased" as "acquired for

marketing" which had been first articulated by the Supreme Court in United States v. Rock

Royal Co-operative, 307 U.S. 533 (1939), and applied consistently by the courts thereafter in,

inter alia,  Elm Spring Farm v. United States, 127 F.2d 920 (1st Cir. 1942) and Shawangunk

Cooperative Dairies v. Jones, 153 F.2d 700 (2d Cir. 1946).  The Ideal Farms court also traced the

history of producer-handler provisions in the various orders (not only the New York-New Jersey

order) and concluded "from the very beginning [of the Act] the Department of Agriculture has

construed the Act so as to permit regulation of producer-handlers in their capacities as handlers."

288 F.2d at 615.  The court further held that this interpretation was well-founded upon legislative

colloquy in the Senate in 1935 before the AAA was reenacted.  Id.

The Act is the same today as it was in 1935 (when the AAA was reenacted), in 1952

(when Acme Breweries was decided), and in 1961 (when Ideal Farms was litigated), and the

-16-

attempts to avoid sharing the benefits and burdens of the milk marketplace are also the same today. The legal conclusion must be the same as well.

This judicial and legislative history puts into proper context the legislative language upon which Plaintiffs rely and which first appeared in the 1960s. When Congress first said in the 1960s that the "legal status of Producer-handlers of milk under the [AMAA] . . . shall be the same after [this Act]. . . as it was before [the legislation]" it was adopting and incorporating the law as it was at that time which has been set out in <u>Ideal Farms</u>, describing and applying as it did the history of administrative and judicial views of producer-handlers under the AMAA. <u>Ideal Farms</u> was the **only** law with respect to producer-handlers at the time of these initial legislative pronouncements. The legislation did not purport to create new rights and it did not do so. It provides no safe haven for the Plaintiffs.

In addition to the undisturbed court precedents which support the Secretary's authority to regulate producer-handlers, the Judicial Officer of the Department has repeatedly and in great detail explained the Secretary's authority to fully regulate producer-handlers in a series of decisions including, <u>In re Independent Milk Producer-Distributors' Association</u>, 20 Agric. Dec. 1 (1961); <u>In re Jacob Tanis</u>, 17 Agric. Dec. 1091 (1958); and <u>In re Sunflower Dairy</u>, 15 Agric. Dec. 1 (1956).

b. <u>The challenged amendment is the product of reasoned decision-making and fully supported by the record.</u>

The Secretary's final decision is fully supported by a compendious administrative record which documented the disorder which producer-handlers were creating in both Order 124 and Order 131. Proponents brought forth the testimony of lay and expert witnesses who testified with respect to both Orders 124 and 131. Not only was the Proponents' testimony detailed and

in depth, but the Plaintiffs did not meet the issues with data of their own. Thus, the Secretary had a record which virtually cried out for relief and the modest relief he fashioned is appropriate and lawful. We would call the court's attention to several key points:

The undeniable competitive advantage. Proponents documented again and again the undeniable: That unregulated producer-handlers have a raw milk cost advantage versus regulated handlers. The producer-handlers, and their apologists such as Dr. Knutson, have continued to contend only that there is some unquantifiable additional risk (or costs) which negate any possible advantage. Whether this applies to smaller producer-handlers, under 3,000,000 pounds is a question for another day. In this record, Dr. Cryan (Declaration attached) and Mr. Herbein (Declaration attached), as well as other expert witnesses including Elvin Hollon, Paul Christ, and William Van Dam, all demonstrated that the large producer-handlers had economies of scale and production which overcame any possible burdens of producer-handler status. The Plaintiffs, again, refused to offer any quantitative evidence of costs to document claims of special costs, risks, and burdens. When the Plaintiffs offered no data to support assertions of special costs, it was completely intolerable to allow their continued free competition with fully regulated handlers of the same or smaller size who were required to pay minimum class prices for milk. Thus, the existence of a competitive advantage, found by the Secretary, is well-grounded in the record.

The disorder of displaced pool sales and pool handlers. In Order 124, the record established that producer-handlers in aggregate had acquired 10% of the market's Class I sales. This meant blend price losses to regulated, pool producers every month in quantifiable amounts of $.02 to $.04 per cwt. In October and November of 2005, the losses to the pool were $200,000 to $300,000 net, more than $500 per pool producer. (Hollon Declaration, ¶ 11) While pool

producers lose revenue every month to the large producer-handlers, regulated handlers such as Vita-Milk lost their economic viability due in substantial part to the un-matchable competitive pressures of the producer-handlers. The Vita-Milk story and the ongoing lost pool sales were key well-documented findings of market disorder in Order 124.

The amendments are limited and prudent. When reading the Plaintiffs' complaint and papers, one would think that the producer-handler exemption was entirely abolished by the Proposed Rule, since that statement is made repeatedly. This is not true, however. Under the rules adopted for Orders 124 and 131, the exemption remains available to more than 98% of dairy farmers. Only the largest of the large dairy producers who choose to go into the fluid milk processing business will be placed on the same playing field as regulated handlers of comparable size.

C.    **Plaintiffs Will Not Suffer Irreparable Harm Absent an Injunction as There Is a Full and Adequate Statutory Remedy for Recovery of Any and All Pool Assessments If Such Are Found to Be "Not in Accordance with Law"** .

Plaintiffs will not suffer irreparable harm in the absence of an injunction. The monetary harm which Plaintiffs allege they would suffer is fully compensable at law, through the administrative process, and, therefore, cannot establish a basis for injunctive relief.

The plaintiff handlers have a remedy at law and, thus, there is no irreparable harm. The law is well settled that if federal order handlers are improperly charged for milk by illegal administrative actions, they are entitled to recover damages to make them whole. In this court in Carnation Co. v. Butz, 372 F.Supp. 883 (D.D.C. 1974), milk processors successfully challenged price increases imposed by the Secretary. The processors, after pursuing their administrative remedies, appealed to this court which set aside the actions of the Secretary and

-19-

ordered refunds made of overcharges.  372 F.Supp at 889.  For price overcharges or improper

charges there is effective review available to the producer-handlers.  The relief available

includes not only a declaration of rights, but refund of overcharges, with interest.  If the

Plaintiffs are being illegally made subject to the milk order  under the final rule, their fully

adequate and exclusive recourse is a proceeding brought pursuant to Section 15(A) of the

AMAA, followed by a Section 15(B) court appeal if necessary.

    Other cases further make absolutely clear that where improper charges are exacted upon

handlers in milk orders,  the remedy is a full refund of charges inappropriately made and a

prospective injunction against the further enforcement of the invalid regulation.  For instance, in

Abbotts Dairies, Division of Fairmont Foods v. Butz, 584 F.2d 12 (3d Cir. 1978), after a long

course of litigation the circuit court directed refunds to the Plaintiffs of charges imposed under

an invalid order.  Similarly, in other cases the result for worthy handler claims has been uniform.

See Borden, Inc. v. Butz, 544 F.2d 312 (7th Cir. 1976); Fairmont Foods v. Hardin, 442 F.2d 762

(D.C. Cir. 1971); Kinnett Dairies, Inc., v. Madigan, 766 F.Supp.515 (M.D.Ga. 1992); Cumberland

Farms, Inc. v. Lyng, 1989 W.L.85062 (D.N.J. July 18, 1989).   In Sani-Dairy v. Yeutter, 91 F.3rd

15 (3rd Cir. 1996), more than $1,000,000 was returned to the successful plaintiffs from the

federal order pool after litigation.    Underscoring the adequacy of the remedy, the refunds come

with reasonable interest to compensate Petitioners for the loss of use of funds and to avoid any unjust

enrichment.  Kinnett Dairies, Inc., v. Madigan, supra; In re Borden, Inc., 38 Agric.Dec. 1061, 1071-

72 (1979).  See also Cumberland Farms Inc. v. Lyng, supra.  Plaintiffs have an adequate remedy at

law for any financial losses incurred by illegal pool charges, if they ultimately prevail on the

merits of their claims.

    Plaintiffs contentions that they will be unable to withstand the costs of regulation during

legal review must be taken with a grain of salt. Regulatory price risk is part of being a dairy farmer in the federal order system. As Elvin Hollon's Declaration details, dairy farmers in other areas (Colorado, Utah, and Georgia, for instance) and other circumstances (combination of federal order pools) have suffered regulatory price reductions comparable to those faced by Plaintiffs. Those farmers were much smaller, on average, than Plaintiffs. Nevertheless, farmers in those areas continued in business without mass liquidations as Plaintiffs threaten. (Hollon Declaration, ¶ 12) Plaintiffs have a remedy at law which is their legal recourse. The threatened of herd liquidations and job losses are not necessary and should not sway the court in its consideration of the legal remedies available.

**D.  An Injunction Would Cause Substantial Irreparable Losses to Dairy Farmers in Orders 124 and 131.**

In stark contrast to Plaintiffs' ability to recover any losses suffered from an illegal order of the Secretary, DFA members and the other affected dairy farmers will suffer huge and irreparable harm if the Secretary's order is enjoined. The losses which producers in Order 124 would suffer, which will be between $200,000 and $300,000 per month, are completely without remedy. There is simply no means for those losses to be recovered; and Plaintiffs allege none. Thus, where Plaintiffs can recover losses, if they prevail on the merits, and the innocent parties who will be harmed if a TRO or preliminary injunction is granted have no recourse, the balance of equities in this equation tilts decidedly to the intervenors and similarly- situated producers.

The request for an injunction must be denied because innocent dairy farmers will be irreparably harmed if the injunction is granted.

**E.  An Injunction Would Harm the Public Interest.**

The public interest, as expressed by the Congress in the AMAA, is that the Secretary use

his expertise in administering the federal milk order program for the primary benefit of dairy

farmers.  Since dairy farmers are the intended beneficiaries of the statute, the court should be

extraordinarily hesitent to intervene in the administrative process in a way which will harm the

overwhelming majority of producers, as this requested injunction will do.   The program is not

intended to guarantee a profit to any processor, whether the processor be a producer, cooperative

or private business.  Nevertheless, all regulated parties are provided with remedial options to

assure that their regulation for the benefit of dairy farmers is within the bounds of legal

authority.   The public interest will be served by allowing the Secretary to implement his

carefully studied amendments to the federal order program.

IV.    **CONCLUSION**

The Secretary of Agriculture has exercised his informed discretion in conducting a fair

and proper federal milk order rulemaking as directed by Congress.  The Plaintiffs are not likely

to succeed on the merits of their claims inasmuch as the court lacks jurisdiction to hear the case

and the challenged regulations are authorized by the AMAA and were promulgated within the

required procedures of the APA.  Moreover, the Plaintiffs will not suffer irreparable harm absent

an injunction, but to the contrary the issuance of an injunction will cause substantial irreparable

losses to dairy farmers in Orders 124 and 131.  In addition, an injunction will harm the public

interest.   Plaintiffs failure to show likely success on the merits coupled with the harm that will

come to the defendant and intervenor-defendants provides no basis for the Court to overturn the

rules issued by the Secretary as a product of his extensive efforts which were thorough and

thoughtful.  Therefore, the Plaintiffs' request for temporary and preliminary injunctive relief

should be denied.


Respectfully submitted,


Date: December 29, 2005          By:___/s/   Marvin Beshore_____
                                 Marvin Beshore, Esquire
                                 Attorney ID # 31979 (PA)
                                 #D00232 (DCDC)
                                 130 State Street
                                 P. O. Box 946
                                 Harrisburg, PA 17108-0946
                                 (717) 236-0781

                                 Attorneys for Dairy Farmers of America, Inc. (DFA)

-23-

## CERTIFICATE OF SERVICE

On this 29th day of December, 2005, I, Marvin Beshore, Esquire, hereby certify that I caused the foregoing document to be served through the ECF system on the persons listed below:

Benjamin F. Yale, Esq.                      Email: benyale@cs.com
Kristene H. Reed, Esq.
Ryan K. Miltner, Esq.
Yale Law Office
102 West Wapakoneta St.
Waynesfield, OH 45896


Rupa Bhattacharyya, Esq.                    Email: rupa.bhattacharyya@usdoj.gov
U.S. Department of Justice
20 Massachusetts Avenue, N.W.
Room 7338
Washington, D.C. 20530


Charles M. English, Jr. Esquire             Email: cenglish@thelenreid.com
D.C. Bar No.: 386572
Sara Pikofsky, Esquire
D.C. Bar No.: 485948
Thelen Reid & Priest LLP
701 8 th Street NW
Washington, DC 20001


By: _____/s/_____
Marvin Beshore, Esquire
Attorney ID # 31979 (PA)
#D00232 (DCDC)
130 State Street
P.O. Box 946
Harrisburg, PA 17108-0946
(717) 236-0781
Attorney for Dairy Farmers of America, Inc. (DFA)