UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EDALEEN DAIRY, LLC<br>MALLORIE'S DAIRY, INC. and<br>SMITH BROTHERS FARMS, INC.<br><br>        Plaintiffs,<br>vs.<br><br>MIKE JOHANNS,<br>SECRETARY OF AGRICULTURE,<br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE<br>        Defendant. | CIVIL NO.: 05-CV-2442 PLF |

## DECLARATION OF ROGER CRYAN, Ph.D.

My name is Roger Cryan, and I am the Director of Economic Research for the National Milk Producers Federation ("NMPF"). This Declaration is filed on behalf of NMPF, a trade association representing agricultural milk marketing cooperative associations, and an agricultural milk marketing cooperative association in its own right. NMPF's offices are located at 2101 Wilson Boulevard, Suite 400; Arlington, VA 22201. I am authorized to prepare this Declaration on behalf of NMPF. This Declaration is based upon my personal knowledge and belief and is provided in support of Intervenors' Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction and for Expedited Hearing.

1. I earned my Ph.D. in Agricultural Economics from the University of Florida in 1997. I currently serve on the Advisory Committee on Agricultural Statistics, on appointment by the Secretary of Agriculture.

2. Prior to taking my current position, I served for four years as Economist for the Atlanta Milk Market Administrator within USDA's Agricultural Marketing Service, participating in the formulation and administration of four Federal milk marketing orders in the Southeastern United States, as well as the thorough overhaul of order language from 1996 through 1999. I am thoroughly familiar with Federal milk marketing orders in theory and practice.

3. I testified on behalf of NMPF in the rulemaking proceeding leading to the proposed rule at issue in this case. I am familiar with the proposed rule and its application, were it to take effect.

4. NMPF is a trade association founded in 1916 to represent the interests of U.S. dairy farmers and the milk marketing cooperative associations that they collectively own.

DC #209165 v2

5. NMPF's membership consists of 33 cooperative milk marketing associations. The membership of these cooperative associations totals approximately 60% of the nation's licensed dairy farms, producing over 70% of the U.S. milk supply, and 87% of the milk cooperatively marketed in this country. This makes NMPF the voice of more than 40,000 cooperative dairy producers.

6. Many of NMPF's members operate dairy product manufacturing facilities. In 2002, according to USDA, dairy farmer cooperatives produced 85% of powdered milk produced in this country, 71% of butter, 40% of cheese, and 7% of packaged fluid milk products. (See Ling, Charles K., *Marketing Operations of Dairy Cooperatives*, Research Report 201. U.S. Department of Agriculture, Rural Development, Rural Business-Cooperative Service. Washington, D.C. 2004. Available at http://www.rurdev.usda.gov/rbs/pub/RR201.pdf)

7. The overwhelming majority of these cooperative-produced dairy products were manufactured by NMPF's members.

8. Dairy farmer-owned manufacturing cooperatives represented by NMPF provide valuable balancing services to the milk markets, receiving milk and converting it to storable products when milk is in surplus, and maintaining idle capacity when supplies are tight. The effective operation of Federal milk marketing orders makes this possible, conveying benefits to all participants in the market.

9. On behalf of NMPF, I participated in the rulemaking process that led to the proposed rule at issue in this case, testified at hearing, and cross-examined witnesses.

10. As I testified during that process, the original basis for the producer-handler exemption was administrative expediency, rather than legal principle. The Federal milk marketing order program has its origins in the Agricultural Adjustment Act of 1933, which generally authorized the Secretary of Agriculture to enter into agreements with producers and to license handlers, in order to "restore normal economic conditions in the marketing of" milk and milk products. The Department combined these powers to implement marketing agreements enforced by licensing in numerous markets. These licenses are the direct antecedents of the Federal milk marketing orders. Although many markets were supplied primarily by handlers who procured milk from producers and cooperative associations, in the Kansas City market producer-handlers sold 50% of the milk and cream consumed when the market's license was instituted in 1935. This license was originally written to regulate producer-handlers just the same as any other handler, as specifically authorized in the Act and its successor, the Agricultural Marketing Agreement Act of 1937 (7 USC 608(c)(5)(C)). (The 1937 Act specifically re-enacted many of the provisions of the 1933 Act.) However, the market administrator encountered considerable resistance from a substantial number of these producer-handlers, who generally failed to submit reports and who refused to make payments to the equalization fund when they did submit reports. Most of the rest followed suit when the market administrator failed to enforce these requirements on non-compliers. Successive

amendments to the marketing agreement were made to lessen the burden on producer-handlers, but since no effective enforcement accompanied even these, non-compliance among producer-handlers continued to grow. In July 1935, unable or unwilling to surmount the practical difficulties of enforcement, USDA simply abandoned its attempts to regulate producer-handlers beyond reporting requirements. That is, producer-handlers were exempted from regulation as a matter of administrative expediency, based on their small size. This is the status that producer-handlers of all sizes enjoy today in all Federal order markets. (Early Developments of Milk Marketing Plans in the Kansas City, Missouri, Area. 1952; USDA.)

11. In May 1935 the Supreme Court invalidated the National Industrial Recovery Act for its excessive delegation of Congressional authority to the executive branch. The marketing agreement and licensing provisions of the Agricultural Adjustment Act of 1933 gave the President and Secretary of Agriculture similarly broad and ambiguous powers over agriculture. In August of 1935, for this reason, Congress amended this Act to codify the previous practices of the USDA, re-establishing the licensing of handlers as Federal milk marketing orders. Significantly, these 1935 amendments included language "providing a method for making adjustments in payments, as among handlers (including producers who are also handlers) to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at prices fixed" by USDA. In other words, the regulation of producer-handlers was specifically authorized. This language has been retained to the present day (7 USC 608(c)(5)(C)), as part of a continuous system of milk market regulation; for example, the recent creation of the Central Federal Milk Marketing Order incorporated the Greater Kansas City Order, which had been continuously in force since its December 1936 establishment as the immediate successor to the license discussed above. (See Federal Milk Market Order Statistics Annual Summaries for 1999 & 2002. USDA/AMS.)

12. Today, a small number of large producer-handlers bears no practical resemblance to the small operations that evaded regulation in 1935. As the hearing record shows, they are large enough to compete on the same basis as any other handler, and to have a substantially greater impact on their markets.

13. If the Proposed Rule is adopted, each producer-handler with more than 3 million pounds of packaged fluid milk sales per month within the marketing areas defined by 7 CFR 1124.2 and 7 CFR 1131.2 will be required to contribute to the producer settlement funds (the "pool") under the respective order. These contributions will be paid at a rate equal to the difference between the announced classified prices for their milk as used and the minimum uniform price paid to all dairy farmers.

14. These payments would be shared by the producers participating in the Federal order "pool." This means that "losses" that former producer-handlers might incur under the proposed rule would be equally balanced by "gains" to producers who, the hearing record shows, have greater right to those proceeds.

DC #209165 v2

15. There is broad support across the industry for the Proposed Rule among both producers and processors, as shown by the breadth of representation in this hearing and in USDA's rulemaking procedure.

16. The "Declaration of Ronald D. Knutson, Ph.D." is incorrect in asserting that 3 million pounds per month is an arbitrary limit to the exemption. USDA concluded that the record supported eliminating the exemption altogether, but that the scope of the hearing was limited by the original petition to limits equal to not less than 3 million pounds. (See 70 FR 74186.)

17. The "Declaration of Ronald D. Knutson, Ph.D." is also incorrect in asserting that producer-handlers receive and would receive no benefits from the Federal order program. At present, Smith Brothers Farms, Inc. ("Smith"), one of the plaintiffs, operates a home delivery business. The packaged fluid milk products Smith sells are produced in their own plant, and as a producer-handler Smith avoids payment into the "pool", as discussed above. However, they also sell manufactured dairy products, whose manufacturers receive payments from the "pool", as a result of the products' classification. This means that Smith is having it both ways, benefiting from the products whose manufacture is made less expensive by the regulation, but avoiding obligations for other products. (See Smith Brothers Farms' home delivery order form, available at http://www.smithbrothersfarms.com/products05.pdf)

18. Similarly, since customers need not buy all their milk from a single source, all producer-handlers benefit from the balancing services provided to the market as a whole. That is, when the producer-handlers' own-farm supply is short, they can raise their prices, and their retail customers can turn to other sources to effectively balance that supply.

19. In addition, absent their producer-handler status, each of these handlers would be free to balance their supplies more directly on the larger market; they could receive the "pool" price for their surpluses, and purchase milk to make up for deficits in own-farm production.

20. Therefore, it can be seen on the basis of the foregoing, every participant in Federally-regulated markets receives benefits from that regulation.

21. Today's large producer-handlers closely resemble manufacturing cooperatives in several important respects. In each case both the farm and the manufacturing facilities are owned by the same people. In the case of the producer-handler, there is one owner; in the case of the cooperative, there are many owners. Cooperatives are regulated as handlers, regardless of their capacity for self-balancing; they are not exempted from minimum price for the added responsibility of operating a plant. By this token, there is no basis for distinguishing between the interests of the cooperative members who will be hurt by delaying the prospective implementation of the proposed rule and the interests of the producer-handlers who will gain from that delay.

22. The "Declaration of Ronald D. Knutson, Ph.D." is further incorrect in asserting that, since the Federal orders regulate the price paid by handlers to producers, producer-handlers cannot be regulated. Many forms of regulation and tax administration define and regulate the value of transfers within a firm, and the transfer of milk between the farm and processing operations of a producer-handler may be equally subject to such regulation through the Federal orders, just as the transfer of "own-farm" milk production to processing is currently regulated for many handlers who operate dairy farms but do not meet the producer-handler definition.

23. Finally, the Proposed Rule does not impose new burdens on producer-handlers. Rather, it removes a special privilege. They have always been regulated, insofar as they must meet certain criteria to maintain producer-handler status. Modifying the qualifications for that status is well within the authority of the Secretary.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this ___ day of December 2005.

*[signature]*

Roger Cryan, Ph.D.

5

DC #209165 v2