## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDALEEN DAIRY, LLC,                    )
MALLORIE'S DAIRY, INC., and            )
SMITH BROTHERS FARMS, INC.,            )
                                       )     Civil No. 05-CV-2442 PLF
    Plaintiffs,                 )
                                       )
        v.                    )
                                       )
MIKE JOHANNS, SECRETARY OF             )
AGRTICULTURE, and the UNITED STATES    )
DEPARTMENT OF AGRICULTURE,             )
                                       )
    Defendants.                 )
_____)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiffs herein seek emergency relief in the form of a temporary restraining order and preliminary injunction with respect to Proposed Regulations of the U.S. Department of Agriculture ("USDA") issued pursuant to the authority of the Agricultural Marketing Agreement Act of 1937 ("AMAA") which currently have no force and effect of law, and will not have such force and effect, if at all, for months. Plaintiffs claim that USDA has proposed a change to the complex regulatory scheme that governs the marketing of dairy products in the Pacific Northwest region in a manner that, if it becomes effective, exceeds USDA's statutory authority under the AMAA. As demonstrated below, plaintiffs have little likelihood of success with this argument because under settled judicial precedent, USDA has authority to regulate "producer handlers" like plaintiffs under the AMAA in the same fashion as other handlers.

Plaintiffs also contend that because they allege that they are harmed by the mere existence

of the Proposed Rule, despite its lack of force and effect of law, USDA should be immediately enjoined from continuing the procedures that will ultimately result in a determination as to whether the Proposed Rule will be adopted as final, and that USDA should be immediately enjoined from implementing the Proposed Rule.

The Proposed Rule at issue, published in the Federal Register on December 14, 2005, proposes to alter the Milk Marketing Order currently in effect for the Pacific Northwest Region, 7 C.F.R. Part 1124, and is subject to a referendum of dairy producers, which is currently ongoing and will not be completed before January 12, 2006. The Proposed Rule cannot become effective until such referendum is completed and it is determined whether two-thirds of eligible dairy producers voted in favor of the amendatory language contained in the Order; only if such approval is garnered will USDA publish a Final Rule, which will become effective thirty days after publication. Because, accordingly, at the earliest, it will be March 1, 2006 before any such Final Rule has the force and effect of law, immediate emergency relief would have no legal effect and is manifestly unwarranted.

## BACKGROUND

### 1. The Milk-Marketing System

In the 1930's, partly in response to the Great Depression, Congress enacted a series of statutes including the Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. 601 et seq., to regulate the marketing of milk and other dairy products. See, e.g., Zuber v. Allen, 396 U.S. 168, 172-78 (1969); Lehigh Valley Farmers v. Block, 829 F.2d 409, 411-12 (3d Cir. 1987); Dairylea Cooperative, Inc. v. Butz, 504 F.2d 80, 84-85 (2d Cir. 1974) (all describing the history and purposes of the AMAA and its implementation by USDA). The AMAA authorizes USDA to ensure "an orderly flow of the supply of [various commodities, including milk] to avoid

unreasonable fluctuations in supplies and prices." 7 U.S.C. § 602(4).

The need to regulate milk marketing, which animates the AMAA, derives from two distinct phenomena. First, mik "used for fluid consumption . . . commands a higher price than milk of the same quality that is used in the manufacture of dairy products such as cheese and butter." Lehigh Valley Farmers, 829 F.2d at 84; Alto Dairy v. Veneman, 336 F.3d 560, 562 (7th Cir. 2003). Thus, absent government intervention, farmers (also known as "producers") have an incentive to engage in destabilizing competition for fluid-milk sales. See Zuber, 396 U.S. at 172-174. Second, while milk production is cyclical, with production heavier in the spring and summer and lighter in the fall and winter, demand for fluid milk is fairly stable. Id. Because fluid milk has a relatively short shelf-life, farmers must maintain sufficiently large herds to produce enough fluid milk even in the period of lean production. Id. As a consequence, there is a substantial surplus in the more fruitful months, which, absent regulation, creates a substantial advantage for milk processors (also known has "handlers") to the detriment of producers. These two phenomena led to "utter chaos" in the unregulated market, id. at 174, and to "destructive" competition for the more profitable fluid milk sales. Dairylea Cooperative, Inc., 504 F.2d at 84.

The purpose of the AMAA's regulatory system is "to remove ruinous and self-defeating competition among the producers," id., and "to raise producer prices," Block v. Community Nutrition Inst., 467 U.S. 340, 342 (1984) (quotations and citation omitted). To accomplish this purpose, the AMAA authorizes USDA to "establish and maintain such orderly marketing conditions . . . as will establish, as the price to farmers, parity prices." 7 U.S.C. § 602(1). Under this authority, for decades, USDA has issued regional milk-marketing orders guaranteeing producers that they will receive a uniform minimum price for the milk that they sell to regulated purchasers regardless of the end use to which it is put. 7 U.S.C. §608c(5)(A); Lamers Dairy, Inc.

v. U.S. Dep't of Agric., 379 F.3d 466, 469 (7th Cir. 2004), cert. denied, ___ U.S. ___, 125 S. Ct. 1592 (2005). USDA regulations under the AMAA apply to handlers, which the AMAA generally defines as "processors, associations of producers, and others engaged in the handling of [milk]." USDA regulations add further specificity to the definition of handlers. See, e.g., 7 C.F.R. § 1000.9. The AMAA prohibits regulation of producers "in their capacity as producers." 7 U.S.C. § 608c(13)(B).

The uniform minimum price paid to producers for milk is known as the "blend" or "pool" price. Lamers Dairy, Inc., 379 F.3d at 469. Because the value of milk varies according to its end use, the USDA, in its marketing orders, classifies milk according to its end use and establishes minimum prices for each class of milk. 7 U.S.C. § 608c(5)(A). For example, milk intended for fluid consumption is categorized as Class I milk, see 7 C.F.R. § 1000.40(a), while milk for yogurt, cheese, and butter is denominated Class II, Class III, and Class IV milk, respectively, see 7 C.F.R. § 1000.40(b) - (d). These classified minimum prices are used to construct the blend price, to which farmers selling milk regulated under an order are entitled. The blend price is "based on a weighted average of all units of production of classes of milk sold to handlers [i.e., purchasers of milk] associated with the marketing area." Lamers Dairy Inc., 379 F.3d at 469. In other words, the sums of the revenues from the different classes of milk sold are divided by the total units of milk sold to give a 'blended' price per unit. Each farmer is entitled to receive at least this price for each unit of milk sold, irrespective of the use to which it is put.

Under this marketing scheme, handlers who buy milk for lower-value uses, such as cheese manufacturing, pay more in blend price (because higher-value milk pulls the average up) than they receive in milk value, as measured by the classified minimum prices. To account for this, the AMAA provides for a "producer settlement fund." 7 U.S.C. § 608c(5)(C). Handlers who have

purchased milk that has a per-unit value greater than the blend price pay into this fund in the amount of the difference.  Handlers who have purchased milk that has a per-unit value lower than the blend price correspondingly withdraw money from the fund.  Thus, "the final amount paid by each handler equals the value of the milk that the handler has purchased."  Lamers Dairy, Inc., 379 F.3d at 469.  These requirements are generally referred to as pooling and pricing requirements.

Pursuant to the AMAA, the Secretary has issued different milk-marketing orders for different regions of the country.  See Lamers Dairy, Inc., 379 F.3d at 470.  This case involves the Pacific Northwest Marketing Order, 7 C.F.R. Part 1124.

### 2. Regulation of Producer-Handlers

In implementing the AMAA, current USDA regulations for the Pacific Northwest marketing region exempt from pooling and pricing requirements those dairy farms, referred to as "producer-handlers," that operate as fully integrated enterprises.  See, e.g., 7 C.F.R. §§ 1124.10; 1124.60; 1124.70.  The producer-handler exemption encompasses "small dairy farms that produce, process and distribute their own milk at their own risk."  Kreider Dairy Farms, Inc. v. Veneman, 142 Fed. Appx. 581, 582 (3rd Cir. 2005).  The rationale for the exemption of these entities is that "such businesses are so small that they have little or no effect on the pool."  Stew's Leonard v. Glickman, 199 F.R.D. 48, 50 (D. Conn. 2001) (citation omitted).  Consistent with this policy, the marketing order at issue in this case – the Pacific Northwest Marketing Order – currently exempts producer-handlers from the requirement that they pay into the producer settlement fund, regardless of whether they sell a higher percentage of their milk in fluid form.  See, e.g., 7 C.F.R. §§ 1124.60 & 1124.70.  Although the definition of "producer-handler" generally encompasses those dairy farmers that process their own milk, the specific regulatory

definition of "producer-handler" differs from marketing area to marketing area and takes account of local market characteristics. Compare 7 C.F.R. § 1124.10 (defining "producer-handler" for the Pacific Northwest marketing area) with 7 C.F.R. § 1131.10 (defining "producer-handler" for the Arizona-Las Vegas marketing area).

Because of the exemption of producer-handlers from the ordinary pooling and pricing requirements of the dairy marketing orders, there is a significant incentive for a handler with higher than average fluid milk sales to obtain producer-handler status.[1] On the other hand, the producer-handler exemption works to the disadvantage of producers whose milk is pooled under the Orders to the extent that the producer-handler's higher-value fluid milk sales would, if they were part of the regulated pool, tend to increase the weighted average that determine the blended price that producers receive for their milk. See United Dairymen of Arizona v. Veneman, 279 F.3d 1160, 1165 (9th Cir. 2002) (recognizing that the producer-handler exemption "injures producers by reducing the blend price and . . . injures handlers by providing a competitive advantage to producer handlers").

### 3. The Proposed Rule

Under the Proposed Rule published by USDA on December 14, 2005, the amendment to the Pacific Northwest Marketing Order currently under consideration would "place entities currently considered producer-handlers . . . on the same terms as all other fully regulated handlers provided they meet the criteria for being subject to the pooling and pricing provisions of [this

---

[1] Producer-handlers are required to be designated by the market administrator for each region and such designation is contingent on entities seeking such status meeting the requirements set forth by USDA regulation. See, e.g., 7 C.F.R. § 1124.10. "The burden rests upon the handler who is designated as a producer-handler to establish through records . . . that the requirements . . . have been and are continuing to be met, and that the conditions set forth . . . for cancellation of designation do not exist." Id. at § 1124.10(e).

order]." 70 Fed. Reg. at 74166. Thus, if adopted, under the proposed amendment, "[e]ntities currently defined as producer-handlers under the terms of [this order] will be subject to the pooling and pricing provisions of the order[] if their route disposition of fluid milk products is more than 3-million pounds per month. Producer-handlers with route disposition of less than 3-million pounds per month will not be subject to the pooling and pricing provisions of the order[]." Id.[2] Thus, if adopted, the amendments made by this Proposed Rule would require producer-handlers who meet the 3-million pounds per month threshold to make payments into the producer settlement fund in same fashion as currently fully-regulated handlers.[3]

### 4. Procedures for Amendment of Milk-Marketing Orders

Amendments to the provisions of a milk-marketing order must be made through formal, on-the-record rulemaking. 7 U.S.C. §§ 608c(1) & (17); 7 C.F.R. §§ 900.3 & 900.1(j). The proceeding is instituted by the filing and publication of a notice of hearing containing the terms or substance of the proposed amendment. 7 C.F.R. § 900.4(a), (b). At the hearing, interested parties are entitled to present testimony and documentary evidence in support of or in opposition to the proposed amendment. Id. at § 900.8(b)(1), (4). After USDA has held a hearing on a proposed amendment to a milk-marketing order, interested persons may file proposed findings and conclusions and written arguments or briefs based on evidence received at the hearing. Id. at

---

[2] Route disposition means "a delivery to a retail or wholesale outlet (except a plant), either directly or through any distribution facility (including disposition from a plant store, vendor, or vending machine) of a fluid milk product in consumer-type packages or dispenser units classified as Class I milk." 7 C.F.R. § 1000.3.

[3] Handlers currently subject to the pooling and pricing provisions of USDA's milk marketing order are referred to as "fully regulated handlers," because, while USDA has excluded producer-handlers from the pricing and pooling requirements to which fully regulated handlers are subject, producer-handlers are, in fact, subject to other forms of regulation under the Act. They are, for example, subject to reporting requirements in order to establish and maintain their status as producer-handlers under the applicable regulations. See, e.g., 7 C.F.R. § 1124.10 (e).

§ 900.9.  After considering the evidence received at the hearing and the submissions made

thereafter, the Administrator will, in the usual course, issue a recommended decision published in

the Federal Register.  Id. at § 900.12.  Once this recommended decision is published, interested

parties again have the opportunity to file written comments on the proposed amendments.  Id. at

§ 900.12(c).  After review and consideration of these comments, USDA issues a proposed rule,

reflecting any changes to the recommended decision that USDA decides are advisable based on

the comments received.  Id. at § 900.13a.  The Proposed Rule cannot become effective, however,

until two-thirds of the affected producers consent to its adoption as a rule via a referendum.  7

U.S.C. §§ 608c(8) & (9).

    With respect to the Proposed Rule at issue in this litigation, on August 6, 2003, USDA

published a Notice of Hearing to consider proposed amendments to the Pacific Northwest

Marketing Order, 7 C.F.R. Part 1124, as well as the Arizona-Las Vegas Marketing Order.  7

C.F.R. Part 1131.[4]  68 Fed. Reg. 46505; see also Declaration of John R. Mengel ("Mengel

Decl."), attached hereto as Ex. A, ¶ 2.[5]  This Notice announced that a "public hearing is being

held to consider proposals to amend the producer-handler provisions" of these two marketing

orders, and that the proposals seek to, "among other things, end the regulatory exemption of

producer-handlers from the pooling and pricing provisions of these two orders."  68 Fed. Reg.

46505.  The public hearing was convened on September 23-25, 2003, in Tempe, Arizona,

reconvened and continued on November 17-21, 2003, in Seattle, Washington, and reconvened

and continued again on January 20-22, 2004, all pursuant to public notices published in the

_____

    [4]  Because plaintiffs herein operate within the Pacific Northwest Marketing region, only
the amendments to that order are at issue in this case.

    [5]  The text of the proposed rule set forth in this initial notice was corrected on August 30,
2003.  See 68 Fed. Reg. 51202.

Federal Register.  See 68 Fed. Reg. 46505; 68 Fed. Reg. 62027; 68 Fed. Reg. 74874;

see also Mengel Decl. ¶ 3.

On April 13, 2005, USDA published a Recommended Decision for public notice and

comment.  70 Fed. Reg. 19636; Mengel Decl. ¶ 4.  The notice indicated that comments were to

be submitted on or before June 13, 2005.  70 Fed. Reg. 19636.  On December 14, 2005, USDA

published the Proposed Rule.  70 Fed Reg. 74166; Mengel Decl. ¶ 5.  In issuing that Proposed

Rule, USDA "directed that a referendum be conducted and completed on or before the 30th day

from the date this decision is published in the Federal Register . . . to determine whether the

issuance of the order as amended and hereby proposed to be amended . . . are approved or

disapproved by [certain defined] producers."  70 Fed. Reg. at 74189.  Such a referendum is

conducted pursuant to procedures set forth at 7 C.F.R. §§ 900.300-311, and requires that two-

thirds of producers vote in favor of the Proposed Rule before it can become effective.  7 U.S.C. §

608c (9); see Mengel Decl. ¶¶ 5, 9.  Following publication of the proposed rule on December 14,

2005, ballots were mailed by the designated referendum agent to eligible producers.  See Mengel

Decl. ¶ 6.  Ballots are due to be returned to the referendum agent with a postmark no later than

January 12, 2005.  Id. ¶ 7.  Ballots will not be counted for five days to allow for receipt of all

ballots.  Thus, the earliest the referendum results will be known is January 17 or 18, 2005.  Id. ¶ 8.

Depending on results of referendum, USDA will prepare a Federal Register publication of

a Final Rule.  If the producer vote approves the amendment to the Pacific Northwest marketing

order, the Final Rule will make the appropriate findings and establish an effective date for the

amendments which would be at least thirty (30) days after publication.  Mengel Decl. ¶ 10.  If the

producer vote does not approve the amendment to the order, the publication would provide

notice of USDA's intention to terminate the order.  Id. ¶ 10.  Thus, at the earliest – depending on

the time needed to complete clearances and publication of either a Final Rule or Notice of Intent

to Terminate in the Federal Register – any Final Rule issued after ascertaining the results of the

referendum will not occur before March 1, 2006. Id. ¶ 10.

## ARGUMENT

A temporary restraining order or preliminary injunction is an "extraordinary remedy that

should be granted only when the party seeking the relief, by a clear showing, carries the burden of

persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997)). A movant is entitled to such extraordinary relief only

when it can persuasively, and by a clear showing, demonstrate (1) that it has a likelihood of

success on the merits; (2) that it would suffer irreparable harm without injunctive relief; (3) that

an injunction would not substantially harm other interested parties; and (4) that issuance of an

injunction is in the public interest. Cobell, 391 F.3d at 258 (citations omitted). Plaintiffs here fail

to meet their burden with respect to any of these elements.

## I.    PLAINTIFFS FAIL TO DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Court Lacks Jurisdiction.

#### 1.    Plaintiffs' Claim is Not Ripe For Review.

Plaintiffs seek to challenge a proposed rule that is not yet effective and will not become

effective, if at all, for months. That challenge is manifestly unripe. The ripeness doctrine is a

component of the requirement imposed by Article III of the Constitution that federal courts hear

only actual "cases and controversies" When injunctive or declaratory relief is sought, the

doctrine of ripeness serves "to prevent the courts, through avoidance of premature adjudication,

from entangling themselves in abstract disagreements over administrative policies, and also to

protect agencies from judicial interference until an administrative decision has been formalized and

its effects felt in a concrete way by the challenging parties." Aulenback, Inc. v. Federal Highway Admin., 103 F.3d 156, 166 (D.C. Cir. 1997) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967)).

The test for determining whether a challenge to agency action is ripe is twofold, requiring the courts to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Aulenback, Inc., 103 F.3d at 166. "[T]he [fitness variable functions] as a measure of the interests of the court and agency in postponing review and the [hardship variable functions] as a measure of the challenging party's countervailing interest in securing immediate judicial review." Ciba-Geigy Corp. v. United States EPA, 801 F.2d 430, 434 (D.C. Cir. 1986). A case is ripe if "the interests of the court and agency in postponing review until the question arises in some more concrete and final form [are] outweighed by the interest of those who seek relief from the challenged action's immediate and practical impact upon them." Aulenback, Inc., 103 F.3d at 167 (quoting Continental Air Lines, Inc. v. Civil Aeronautics Bd., 522 F.2d 107, 125 (D.C. Cir. 1975) (en banc) (internal quotes omitted)). The Court lacks jurisdiction to consider a claim that is not ripe. See Federal Express Corp. v. Airline Pilots Ass'n, 67 F.3d 961, 963 (D.C. Cir. 1995) ("The federal courts are powerless to decide any matter unless it involves a case or controversy").

The Proposed Rule that plaintiffs seek to challenge in this proceeding will not become effective – it at all – until following a referendum of producers that is still being conducted. As described in the declaration of John R. Mengel, ballots have been mailed to producers but are not required to be returned to USDA until January 12, 2005. Mengle Decl. ¶¶ 6-7. To allow sufficient time for mail to be received, USDA intends to wait five days to count the ballots and thus, it will be at least January 17 or 18 before the results of the referendum are known. Id. ¶ 8.

Depending on the results of that referendum, USDA will then prepare a Final Rule for publication, which, if producers approve the changes set forth in the Proposed Rule, will be published in the Federal Register and made effective 30 days from publication.  Id. ¶ 10.  Thus, no Final Rule relating to this matter can become effective earlier than March 1, 2006, and perhaps not until several weeks thereafter dependent on the time necessary for USDA to complete the various bureaucratic steps necessary before Federal Register publication.  Id.  Until and unless that Final Rule is published and made effective, the amendments to the Pacfic Northwest marketing order proposed in the Proposed Rule have no force and effect of law on any regulated entity.  Id. ¶ 11.

    In such circumstances, plaintiffs' challenge to the proposed rule does not meet the first prong of the ripeness test; i.e., it is simply not fit for judicial review.  See Action on Smoking and Health v. Dept. of Labor, 28 F.3d 162, 165 (D.C. Cir. 1994) (dismissing challenge to proposed rule because "no legal consequences presently attach to . . . the proposed omnibus rulemaking [and, thus,] it is premature for us to consider petitioner's challenge to the omnibus nature of OSHA's proposed rulemaking.  Petitioner may renew its challenge if and when OSHA's rulemaking generates concrete, legal ramifications for petitioner"); Center for Highway Safety v. Nat'l Highway Traffic Safety Admin., 710 F.2d 842, 846 (D.C. Cir. 1983) ("issuance of a notice of proposed rulemaking, or other preliminary proceedings undertaken to promote a proposed rule, often will not be ripe for review because the rule may or may not be adopted or enforced"); Blackfeet Nat'l Bank v. Rubin, 890 F. Supp. 48, 54 (D.D.C.) (Friedman, J.) ("Based on the fact that the proposed regulations are just that – proposed – the Court finds that . . . the issues in this case are not fit for judicial review"), aff'd, 67 F.3d 972 (D.C. Cir. 1995).

    Plaintiffs, however, argue that they are immediately and irreparably harmed by the mere existence of the proposed rule because plaintiffs may be required to change their business

practices in anticipation of potential adoption of the Proposed Rule and because the market will

respond to the anticipated potential adoption of the Proposed Rule, and that, therefore, the

hardship component of the ripeness doctrine supports immediate review.  See Pltfs' TRO/PI Brief

at 2, 11-14.  As this Court has previously held, such complaints are insufficient to meet the

hardship prong of the ripeness inquiry when a challenge is made to a proposal which has no force

and effect of law:

> Despite plaintiffs' arguments, this is not a unique or unusual case.  It is common
> for business and industry to be affected by the publication of proposed rules that, if
> made final, would hurt the business or industry.  It is also common for such
> businesses and industries to be adversely and immediately affected by the mere
> publication of the proposal.  The courts almost invariably conclude, however, that
> such adverse repercussions are outweighed by a notice procedure that permits the
> public to know what sorts of regulations are being contemplated by an agency,
> what rationale the agency employs to justify its proposed rules and how the
> agency's proposals can be challenged. . . . As plaintiffs themselves note, it would
> be virtually unprecedented for a court to set aside proposed regulations . . . .

Blackfeet Nat'l Bank, 890 F. Supp. at 54; see also id. ("Although concededly there has been a

reaction by the consuming public to the Secretary's preliminary views regarding that subject. this

reaction is different in kind and in legal effect from the burden attending what heretofore has been

considered a final agency action") (citing cases); see also Keystone Shipping Co. v. United States,

729 F. Supp. 136, 139 (D.D.C. 1990) (Harris, J.) (finding "tenuous at best" plaintiffs' claims that

they suffered hardship because "they are losing [contracts] based on anticipated approval" of a

preliminary Coast Guard decision).

　　　　Instead, in a case like this one, where "the proposed regulations . . . do not have the status

of law or require anyone to comply with them in any manner," Blackfeet Nat'l Bank, 890 F. Supp.

at 54, this Court has previously denied review under the ripeness doctrine, finding that "the

impact of judicial review at this early stage of an agency's rulemaking process is likely to interfere

the proper functioning of the agency, and, if it becomes commonplace, would impose a heavy

burden on the courts."  Id.; see also Keystone Shipping Co., 729 F. Supp. at 139 ("the preliminary

decisions made by the Coast Guard are not sufficiently final to demand compliance, nor are they

ripe for review").  Those holdings are fully applicable here and, as a result, this Court lacks

jurisdiction over plaintiffs' claim.

> **2.  Plaintiffs are Required to Exhaust Administrative Remedies
> before Commencing Litigation under the AMAA.**

Even putting aside jurisdictional objections stemming from plaintiffs' effort to challenge a

proposed rule that cannot be made effective until several procedural steps are completed, plaintiffs

cannot challenge that rule in federal district court without first exhausting the administrative

remedies provided for in the AMAA.  In order to ensure that the complex regulatory scheme

created by the AMAA was not subject to the disruption and delays that could be the result of

litigation, Congress specifically included within the AMAA a requirement that "handlers first

exhaust the administrative remedies made available by the Secretary" before obtaining judicial

review.  See Comm. Nutrition Inst., 467 U.S. at 346.  Thus, the AMAA provides that:

> Any handler subject to an order may file a written petition with the Secretary of
> Agriculture, stating that any such order or any provision of such order or any
> obligation imposed in connection therewith is not in accordance with law and
> praying for a modification thereof or to be exempted therefrom.  He shall
> thereupon be given an opportunity for a hearing upon such a petition, in
> accordance with regulations made by the Secretary of Agriculture . . . .  After such
> hearing, the Secretary shall make a ruling upon the prayer of such petition which
> shall be final, if in accordance with law.

7 U.S.C. § 608c(15)(A).

It is only once such a petition is presented to the Secretary of Agriculture and ruled upon

that "the District Courts of the United States in any district in which such handler is an inhabitant,

or has his principal place of business, are vested with jurisdiction in equity to review such ruling,

provided a bill in equity for that purpose is filed within twenty days from the date of the entry of

such ruling." 7 U.S.C. § 608(c)(15)(B). As the Supreme Court has acknowledged, "[t]he regulation of agricultural products is a complex, technical undertaking." Comm. Nutrition Inst., 467 U.S. at 347. Thus, "Congress channelled [sic] disputes concerning marketing orders to the Secretary in the first instance because it believed that only he has the expertise necessary to illuminate and resolve questions about them." Id.

Plaintiffs, who allege that they fall within the current regulatory definition of "producer-handler," see 7 C.F.R. § 1124.10, are "handlers" subject to this exhaustion requirement. As described above, the AMAA defines handlers as "processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section," including milk. 7 U.S.C. § 608c(1). USDA regulations further clarify that a "handler" is, inter alia, "any person who operates a pool or a nonpool plant." 7 C.F.R. § 1000.9 (which is incorporated into 7 C.F.R. § 1124.9). A non-pool plant means "any milk receiving, manufacturing, or processing plant, other than a pool plant." 7 C.F.R. § 1000.8 (which is incorporated into 7 C.F.R. § 1124.8). The definition of "pool plant" specifically excludes "a producer-handler as defined under any Federal order." 7 C.F.R. § 1124.7(h)(1).

Plaintiffs identify themselves as "milk producers who process and market milk directly from their own farms." Compl. ¶ 1; see also id. ¶ 16 ("Edaleen Dairy is a Washington State limited liability company that produces milk on its farm and processes its raw milk into bottled milk, ice cream, and other dairy products for sale direct to consumers, milk dealers or retailers"; ¶ 17 ("Mallorie's Dairy, Inc. . . . is an Oregon corporation that produces milk on its own farm and processes milk into bottled milk and other dairy products for sale direct to consumers, milk dealers or retailers"; ¶ 18 ("Smith Brothers Farm, Inc. is a Washington state corporation that produces milk on its farms and processes milk into bottled milk and other dairy products for sale

direct to consumers, to milk dealers or retailers") (all emphases added).  Thus, plaintiffs are

"processors" who operate "non-pool plants" and thus, they fall within both the statutory and

regulatory definitions of "handler."  Cf. 7 C.F.R. § 1124.12(b)(1) (excluding "producer-handlers"

from the regulatory definition of "producer" under the Northwest Pacific Marketing Order).

Because plaintiffs are "handlers" for purposes of the regulation contemplated by the

amendment to the marketing order proposed in the Proposed Rule, and not producers, they are

subject to the statutory exhaustion requirements set forth at 7 U.S.C. § 608c(15).  Plaintiffs have

not undertaken to satisfy those requirements and thus cannot maintain this suit.  See Rasmussin v.

Hardin, 461 F.2d 595 (9th Cir. 1972) (dismissing challenge to milk marketing order brought by

producer-handler for failure to exhaust ); United Dairymen of Arizona, 279 F.3d at 1166

("Allowing the plaintiffs in this case to seek judicial review when they are also handlers . . . .

allows handlers to evade the statutory requirement that they first exhaust their administrative

remedies. Such a result would undermine 'Congress' intent to establish an equitable and

expeditious procedure for testing the validity of orders.'") (quoting Community Nutrition Inst.,

467 U.S. at 348); see also Gore, Inc. v. Glickman, 137 F.3d 863, 865 (5th Cir. 1998) (describing

history of litigation where producer-handler sought "as required by law . . . administrative review

by the Secretary of Agriculture" prior to seeking judicial review); Kreider Dairy Farms, Inc., 142

Fed Appx. at 583-84 (finding that the district court had jurisdiction pursuant to 7 U.S.C.

§ 608c(15) where producer-handler exhausted administrative remedies prior to seeking judicial

relief related to USDA's decision concerning its eligibility to maintain producer-handler status).[6]

---

[6]  Should this Court find that plaintiffs are not subject to the exhaustion requirements of
the AMAA, plaintiffs still fail to demonstrate an adequate jurisdictional basis for their suit.  In
such an event, plaintiffs would be required to proceed under the Administrative Procedure Act
("APA"), see Alto Dairy, 336 F.3d at 565-69, which they cannot now do.  As already described,
the rule plaintiffs seek to challenge is merely proposed and, pending a determination as to its

Moreover, although plaintiffs contend that they should be excused from the statutory

exhaustion requirement because it ordinarily provides no avenue for interim relief, see Pltfs'

TRO/PI Br. at 18, this is an argument equally applicable to every case in which handlers are

required to exhaust their administrative remedies and provides no basis for disregarding

Congress's considered decision that review of milk marketing orders should be considered, in the

first instance, by the Secretary.  See United States v. Ruzicka, 329 U.S. 287, 294 (1946)

("Congress has provided a special procedure for ascertaining whether [a milk marketing] order is

or is not in accordance with law. . . . Congress has provided that the remedy in the first instance

must be sought from the Secretary of Agriculture"); Community Nutrition Inst., 467 U.S. at 347

("The regulation of agricultural commodities is a complex, technical undertaking.  Congress

channeled disputes concerning marketing orders to the Secretary in the first instance because it

believed that only he had has the expertise necessary to illuminate and resolve questions about

them"); Gallo Cattle Co. v. U.S. Dept. of Agriculture, 159 F.3d 1194, 1197 n. 3 (9th Cir. 1998)

("Sound policy reasons underlie the requirement that all challenges, including constitutional ones,

be presented first to the Secretary; it prevents circumvention of the exhaustion requirement, gives

the district court the benefit of the Secretary's experience and understanding of the milk industry,

---

approval by two-thirds of producers, cannot be made be final, if at all, for months.  See 7 U.S.C.
§ 608c(9)(B).  Under such circumstances, there is no final agency action for the Court to review,
a jurisdictional prerequisite for suit under the APA.  See, e.g., 5 U.S.C. § 704 (allowing judicial
review of "final agency action"); DRG Funding Corp. v. Sec'y of HUD, 76 F.3d 1212, 1214
(D.C. Cir. 1996) ("requirement of a final agency action has been considered jurisdictional.  If the
agency action is not final, the court therefore cannot reach the merits of the dispute") (citations
omitted); see also Center for Law and Educ. v. U.S. Dept. of Education, 209 F. Supp. 2d 102,
111 (D.D.C. 2002) (Bates, J.) (interpreting "final agency action" requirement of APA and holding
that "[i]t is the final rule that will 'mark the consummation of the agency's decisionmaking
process' and set forth the agency's 'definitive' position. . . . At the present time, plaintiffs cannot
even be sure that their interests will be adversely affected by the final rules that will be
promulgated."), aff'd 396 F.3d 1152 (D.C. Cir. 2005) (citations omitted).

and allows for the possibility of resolution of the challenge without reaching [any] constitutional question."); see also Northwest Independent Producers Ass'n v. Veneman, 312 F. Supp. 2d 23, 24-25 (D.D.C. 2004) (Lamberth, J.) (dismissing, for failure to exhaust, claims by "cooperatives of dairy farmers who also act as 'handlers'" and finding "devoid of merit" plaintiffs' claims that exhaustion of administrative remedies would be futile). Indeed, plaintiffs' challenge to the proposed amendments to the Pacific Northwest Marketing Order is fundamentally a challenge to USDA proposed action relating to handlers, since plaintiffs challenge USDA's proposal to subject them to full regulation and USDA lacks authority to regulate producers. See 7 U.S.C. § 608c(13)(B). The very purpose of the exhaustion requirement is to ensure that regulation of handlers is subject to review in the first instance by USDA, see Ruzicka, 329 U.S. at 294; Community Nutrition Inst., 467 U.S. at 347, and, thus, it is fully applicable here.

Plaintiffs' failure to exhaust deprives this Court of jurisdiction over plaintiffs' claims. See Northwest Independent Producers Ass'n, 312 F. Supp. 2d at 25 ("The Court finds the handlers' failure to exhaust fatal and because Congress precluded judicial review in these circumstances, the handler plaintiffs' claims must be dismissed for lack of subject matter jurisdiction") (citing Fed. R. Civ. P. 12(b)(1)). This lack of jurisdiction precludes a finding that plaintiffs have any likelihood of success on the merits of their claims for purposes of awarding preliminary injunctive relief.

**B.    Plaintiffs' Statutory Interpretation Claims are Unfounded Because the AMAA Allows USDA to Fully Regulate Producer-Handlers.**

Plaintiffs' fundamental challenge to the amendatory language proposed in the Proposed Rule is focused on their argument that USDA lacks the authority under AMAA to regulate producer-handlers. Plaintiffs' argument in this regard is two-pronged. First, they argue that Congress in enacting, renewing and amending the AMAA has repeatedly and specifically

prohibited USDA from regulating producer-handlers.  Second, they argue that the plain language

of the AMAA precludes USDA from regulating producer-handlers because the AMAA allows

regulation only of those handlers that "purchase" milk from producers and producer-handlers, by

definition, do not purchase milk, but rather process their own milk.  See Compl. ¶ 8.[7]  Both of

these arguments are invalid.

> 1.    Congress's Ratification of USDA's Current Treatment of Producer-Handlers Does Not Prohibit USDA From Altering That Treatment in the Future When Consistent with the Purposes of the Act.

Nothing in the AMAA, or Congress's subsequent renewals and amendments thereof,

precludes USDA from fully regulating producer-handlers in the same manner as he is authorized

to regulate handlers.  Indeed, as described above, producer-handlers fall squarely within the

AMAA's definition of "handler," which the Act defines as "processors, associations of producers,

and others engaged in the handling of any agricultural commodity or product thereof [including

milk]," 7 U.S.C. § 608c(1), and which are squarely subject to regulation.  Compare 7 U.S.C.

§ 608c(13)(B) ("No order issued under this chapter shall be applicable to any producer in his

capacity as a producer").

As a matter of regulatory policy, but not because required by statute, the marketing orders

regulating each region exempt certain handlers, namely, producer-handlers, from the ordinary

pooling and pricing provisions applicable to fully-regulated handlers.  See, e.g., 7 C.F.R.

---

[7]  Plaintiffs also contend, without further elaboration, that the promulgation of the Proposed Rule is "otherwise arbitrary, capricious and not in accordance with longstanding and accepted law."  Compl. ¶ 8.  Other than the two arguments addressed herein relating to the extent of USDA's authority under the AMAA, however, plaintiffs make no effort to demonstrate that any additional arbitrariness so infected the lengthy rulemaking proceeding at issue here as to require the immediate entry of emergency relief.  As it is plaintiffs' burden to demonstrate their likelihood of success on the merits, see Cobell, 391 F.3d at 258, and they have failed to do so with respect to their catch-all allegations of arbitrariness, defendants do not here further address this nonspecific – and unsubstantiated – complaint.

§§ 1124.60 &1124.70. As a general matter, USDA incorporated this exemption into the various regional marketing orders because full regulation of such entities was not considered necessary because they are "so small that they have little or no effect on the pool." See Stew's Leonard, 199 F.R.D. at 50 (citation omitted). Clearly demonstrating that this excepted status for producer-handlers is the creature of regulation, the definition of producer-handler differs from marketing order to marketing order. Compare, e.g., 7 C.F.R. § 1124.10 with 7 C.F.R. § 1131.10.

In renewing and amending the AMAA, Congress has repeatedly inserted language to ensure that the regulatory exemptions for producer-handlers are not inadvertently repealed or otherwise affected by periodic changes made to the AMAA, a caution that is required because, as discussed, absent the regulatory carve-out, producer-handlers otherwise fall within the statutory definition of handler and thus within the aegis of the Act. Thus, for example, Section 115 of Pub. L. No. 101-624, 104 Stat. 3359 (November 28, 1990), provides that "[t]he legal status of producer handlers of milk under the Agricultural Adjustment Act (7 U.S.C. 601 et seq.), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937, shall be the same after the amendments made by this title take effect as it was before the effective date of the amendments." 104 Stat. at 3381. Similar provisions were contained in the Pub. L. No. 99-198, § 134, 99 Stat. 1354 (December 23, 1985); Pub. L. No. 97-98, § 102, 95 Stat. 1213 (December 22, 1981); Pub. L. No. 95-113, § 202, 91 Stat. 913 (Sept. 29, 1977); Pub. L. No. 93-86, § 206, 87 Stat. 221 (August 10, 1973); Pub. L. No. 91-524, § 201(b); and Pub. L. No. 90-559, § 1(3), 82 Stat. 996 (Oct. 11, 1968). See 7 U.S.C. § 608c Note (setting forth the text of each of these provisions). In each case, however, the ratifying language only provide that producer-handler status was unaffected by the statutory provision at issue; none of these provisions prohibited prospective alteration of producer-handler status by USDA.

Other than this ratifying language, which ratifies only past actions and has no bearing on USDA's prospective regulation, plaintiffs can point to no part of the AMAA that explicitly prohibits the regulation of producer-handlers. Indeed, to the contrary, courts have recognized that "from the very beginning the Department of Agriculture has construed the Act so as to permit regulation of producer-handlers in their capacity as handlers." Ideal Farms, Inc. v. Benson, 288 F.2d 608, 615 (3rd Cir. 1961); see also id. (recounting provisions of various marketing orders that imposed regulatory requirements on producer-handlers); United States v. United Dairy Farmers Cooperative Ass'n, 611 F.2d 488, 491, n.7 (3d Cir. 1979) ("This Court long ago held that producers who also function as handlers, even those who deal partially in milk produced at their own facilities, are subject to regulation under [the AMAA]") (citing Ideal Farms, supra); Dairylea Cooperative, Inc., 504 F.2d at 83 n.7 ("by 7 U.S.C. § 608c(13)(B), . . . producers are exempt from regulation only in their capacity as producers. When a producer acts as a handler he is not so exempted"). Thus, when necessary to fulfill the purposes of the Act, USDA has the statutory authority to fully regulate producer-handlers as it does any other handler.

<blockquote>
2.    The Plain Terms of the AMAA Do not Preclude Regulation of Producer-Handlers Simply Because They are not "Purchasers" of Milk.
</blockquote>

Failing to find any specific prohibition on the regulation of producer-handlers in the AMAA, plaintiffs argue that USDA lacks the authority to regulate producer-handlers because the Act by its terms only allows regulation of handlers who "purchase" milk from other producers. Specifically, plaintiffs point to the provision which authorizes USDA's creation of the producer settlement fund, 7 U.S.C. § 608c(5)(C), which provides that "In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection," orders regulating milk marketing may provide "a method for making adjustments in payments, as among handlers (including producers

who are handlers), to the end that the total sums paid by each handler shall equal the value of the milk <u>purchased by him</u> at the prices fixed in accordance with paragraph (A) of this subsection." Id. (emphasis added).

As a preliminary matter, the plain terms of this provision make it clear that USDA has the authority to extend marketing orders which contain such terms to "handlers (including producers who are handlers)," thus making clear that USDA has authority to regulate producer-handlers under this subsection. Plaintiff argues that such regulation is unauthorized, however, because the parenthetical clause "modifies not just 'handlers'" but is limited by the context of the paragraph which allows regulation only to the extent that it reaches "the value of the milk purchased by him at the prices fixed . . . ." See Pltfs' TRO/PI Br. at 7-8 (emphasis added). Thus, according, to plaintiffs' theory, USDA is precluded under this subsection from regulating producer-handlers which process their own milk and do not purchase it.

The construction of the AMAA advanced by plaintiffs has been repeatedly rejected by courts for decades as inconsistent with the purposes of the Act. In Ideal Farms, Inc. v. Benson, 288 F.2d 608 (3rd Cir. 1961), the Court of Appeals for the Third Circuit confronted a claim made by a plaintiff who argued, as plaintiffs do here, that "in purporting to regulate a handler's 'own-produced' milk . . . the Secretary of Agriculture had exceeded the authority conferred upon him by the Act." Id. at 609. Plaintiffs there, as here, argued that, in light of the language of sections 608c(5)(A) and 608c(5)(C) of the Act, "only milk 'purchased' is subject to regulation and that the word 'purchased' cannot be construed to cover milk which they obtain from their own farms." Id. at 610.

The Ideal Farms Court rejected these arguments. Instead, relying on an unbroken line of cases dating back to the earliest litigation challenges to the Secretary's authority under the

AMAA, the Court found that "the word 'purchased'" had consistently been interpreted to mean "acquired for marketing." Id. at 611-12 (citing United States v. Rock Royal Cooperative, 307 U.S. 533 (1937); Elm Spring Farm v. United States, 127 F.2d 920 (1st Cir. 1942); and Shawangunk Cooperative Dairies v. Jones, 153 F.2d 700 (2d Cir. 1946)). These three cases, according to the Court of Appeals, "make clear that the word 'purchased' is to be liberally construed so as to achieve the purpose of the Act and strongly buttress the position of the Secretary that 'own-produced' milk of a handler is subject to regulation. . . . Were we to accept appellants' construction of the word 'purchased' they would avoid the intent of the Act to achieve a fair division of the more profitable fluid milk market among all producers and they would avoid the necessity of sharing the burden of surplus milk." Id. at 613. The Court of Appeals, accordingly, upheld, as fully consistent with the AMAA, the challenged regulation.

Two years later, in addressing an identical claim, the Court of Appeals for the Fifth Circuit followed suit, explicitly adopting the reasoning and conclusions of the Ideal Farms Court. Freeman v. Vance, 319 F.2d 841 (5th Cir. 1963); see Acme Breweries v. Brannan, 109 F. Supp. 116 (N.D. Cal. 1952) (reviewing similar claim under the AMAA relating to a different commodity and finding that AMAA allowed USDA to regulate producers who processed their own products); Dairylea Cooperative, Inc., 504 F.2d at 83 n.7 (citing 7 U.S.C. § 608c(5)(C) for principle that "When a producer acts as a handler he is not so exempted [from regulation under the AMAA").

These decisions have withstood the test of time and have not been overturned by Congress notwithstanding the frequent amendments to the AMAA to which plaintiffs themselves cite and in which Congress gave specific consideration to the status of producer-handlers. See, e.g., pp. 20-21, supra. These decisions, accordingly, squarely demonstrate that plaintiffs' interpretation of the

language of the AMAA is off the mark.  Instead, as these decisions have long-since established –

and it should be noted that plaintiffs cite no judicial authority to the contrary – USDA has full

statutory authority to regulate producer-handlers as handlers when it would serve the purposes of

the Act to do so.  Plaintiffs, accordingly, cannot succeed on their statutory arguments, and thus,

fail to demonstrate any likelihood of success on the merits of their claim that the Proposed Rule, if

adopted and made effective, exceeds USDA's statutory authority.

## II.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM SUFFICIENT TO OUTWEIGH THE HARM TO OTHERS AND TO THE PUBLIC INTEREST.

"The basis of injunctive relief in the federal courts has always been irreparable harm."

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C.Cir.1995) (citing

Sampson v. Murray, 415 U.S. 61, 88 (1974)).  In order for a plaintiff to meet its burden of

demonstrating irreparable harm sufficient to warrant the entry of preliminary injunctive relief, the

injury complained of must be both certain and great; it must be actual and not theoretical.

Injunctive relief "will not be granted against something merely feared as liable to occur at some

indefinite time."  Wisconsin Gas. Co. v. FERC, 758 F.2d 669, 764 (D.C. Cir. 1985) (citation

omitted).  Instead, the "movant must provide proof that the harm has occurred in the past and is

likely to occur again, or proof indicating that the harm is certain to occur in the near future."  Id.

Moreover, the party seeking injunctive relief must show that "[t]he injury complained of [is] of

such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable

harm."  Id. (citations and internal quotations omitted).  It is also "well settled that economic loss

does not, in and of itself, constitute irreparable harm."  Id.  As the Court of Appeals has noted,

"the key word in this consideration is irreparable. Mere injuries, however substantial, in terms of

money, time and energy necessarily expended in the absence of a stay are not enough."  Id. (citing

Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business.  See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 n. 2 (D.C.Cir.1977).  Finally, the movant must show that "the alleged harm will directly result from the action which the movant seeks to enjoin."  Wisconsin Gas, 758 F.2d at 674.  A plaintiff's failure to meet its burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief.  CityFed Fin. Corp., 58 F.3d 738 at 747.

　　　　Plaintiffs here fail to meet these stringent standards for demonstrating irreparable harm. First, plaintiffs fail to identify anything other than their speculative belief that they will be harmed if USDA is allowed to publish and implement a Final Rule that incorporates the amendatory language contained in the Proposed Rule.  This is because until the producer referendum currently underway is completed and the votes are counted, there is no way to determine whether the Proposed Rule will actually become a Final Rule.  As this Court noted in a prior case involving a different attempt by USDA to amend a marketing order issued under the authority of the AMAA, "[u]nless the Court is to assume that the procedural steps – including notice, public comment, referenda and super-majority voting requirements – are mere charades, there is as yet no assurance that [the agency] will in fact [take the steps outlined in the Proposed Rule], or when, and thus there is no irreparable harm at this time."  Milk Indus. Found. v. Glickman, 949 F. Supp. 882, 897 (D.D.C. 1996) (Friedman, J.); see also Center for Law and Educ., 209 F. Supp. 2d at 117 (denying preliminary injunctive relief related to proposed rule because "the extent of any adverse effect of any final rule . . . remains at this time wholly speculative.  Hence, it is not the type of concrete, immediate harm warranting extraordinary injunctive relief"); Time Warner Entertainment Co. v. Fed. Comm. Comm'n, 810 F. Supp. 1302, 1306 n. 8 (D.D.C. 1992) (Jackson, J.) ("The Court has doubts whether, in advance of regulation, there is current

irreparable injury"), <u>aff'd in part</u>, 93 F.3d 957 (D.C. Cir. 1996).

Second, time, energy and even money expended in anticipation of a proposed rule are insufficient to constitute irreparable harm for purposes of allowing the extraordinary relief of a preliminary injunction.  <u>See</u> <u>Virginia Petroleum Jobbers Ass'n</u>, 259 F.2d at 925.  Indeed, as this Court has held in another context, it is not at all unusual for businesses and industries which might be affected by a proposed rule if it is made final in the same form to take steps in anticipation of such finalization.  <u>See</u> <u>Blackfeet Nat'l Bank</u>, 890 F. Supp. at 54.  Such "adverse repercussions" in response to a proposed rule, however, are far outweighed by the public interest in ensuring that federal government agencies provide notice of their proposals, explanations of the rationales justifying those proposals and adequate time in which those who might be affected can comment or otherwise respond to the agencies' proposals.  <u>Id.</u>  Acceptance of plaintiffs' theory of irreparable harm stemming from the economic consequences they claim to confront in anticipation of the Proposed Rule becoming final – an event which, as described above, is currently no more than speculative as it depends on a producer referendum that has yet to be completed – would trammel these overwhelming considerations of public notice of agency action in a wide variety of cases.[8]

Third, plaintiffs have failed to meet their burden of demonstrating that the harm they

---

[8]  In any event, plaintiffs' claims of irreparable harm largely stem from actions they contend it will be necessary for them to take to avoid the <u>consequences</u> of regulation, which is the result of plaintiffs' choices and not a direct effect of regulation.  The direct effect of the regulation, if adopted and implemented, is for the plaintiffs to make payments into the producer-settlement fund.  Those payments are recoverable if it ultimately comes to pass – either in administrative proceedings or in subsequent judicial proceedings – that the requirement of payment by these plaintiffs was unlawful.  <u>See</u> <u>Gore, Inc. v. Espy</u>, 87 F.3d 767 (5th Cir. 1996) (finding that producer-handler plaintiff was entitled to refund of money it was unlawfully required to pay into producer-settlement fund).  As discussed above, recoverable monetary loss does not ordinarily constitute irreparable harm.

currently complain of is a direct result of the action they seek to enjoin.  See Wisconsin Gas, 758 F.2d at 674.  Plaintiffs seek an order enjoining USDA from "implementing, enforcing or otherwise administering provisions for repealing the exemption of producer-handlers from minimum pricing and pooling obligations . . . and from repealing the exemption of producer-handlers to minimum pricing and pooling obligations. . . ."  Pltfs' TRO/PI Mot. at 4.  Yet, it is not at all clear that enjoining USDA's implementation of the "provisions for repealing the exemption," by which we assume plaintiffs mean to indicate the currently underway referendum procedure, would alleviate any of plaintiffs' asserted harm; indeed, the referendum procedure itself causes no harm, and delaying the referendum – which is required before it can be determined whether the Proposed Rule will be made effective – will, if anything, only increase the economic uncertainty of which plaintiffs complain.

Similarly, although plaintiffs complain that other actors in the market are making decisions regarding their continued relationships with plaintiffs in anticipation that the Proposed Rule will be made final, "any present negative effects felt by plaintiffs are the result of voluntary activities by nonpart[ies] . . . speculating as to the outcome of [the rulemaking proceeding] and are not attributable to any direct activity by the federal defendants."  Time Warner Entertainment Co., 810 F. Supp. at 1306 n. 8.  Such third-party activity cannot be the basis for the issuance of a preliminary injunction because it has no direct connection to the activities of the defendants who are to be enjoined.  See Wisconsin Gas, 758 F.2d at 674.[9]

---

[9]  In any event, in light of plaintiffs' slim chances of success on the merits of their claim, as described in Part I, it is not at all clear that the issuance of a temporary injunction by this Court will alter the behavior of third-parties who might be taking actions in anticipation of the potential finalization of the Proposed Rule, and thus, plaintiffs fail to demonstrate that the issuance of an injunction will have any immediate effect in terms of alleviating their purported injuries.  "This doubtfulness of redressability further counsels against entry of a preliminary injunction."  Time Warner Entertainment Co., 810 F. Supp. at 1306 n. 8 (citing Allen v. Wright, 468 U.S. 737

Moreover, the Secretary's current activities with respect to the Proposed Rule amount to not much more than accepting mail delivery; as stated in the Proposed Rule, its implementation depends on a favorable vote of producers in a referendum and, until those referendum votes are received and counted, the Secretary can take no steps intended to "repeal[] the exemption of the producer-handlers." Issuing an injunction at this time to enjoin the Secretary from implementing a Rule when it is not yet determined when, or even whether, it will ultimately go into effect is manifestly unwarranted.

Finally, the interest of the public and other interested parties in the orderly conclusion of agency rulemaking proceedings far outweighs the plaintiffs' interests in obtaining a preliminary injunction at this stage of the proceedings. See Blackfeet Nat'l Bank, 890 F. Supp. at 54 ("the impact of judicial review at this early stage of an agency's rulemaking process is likely to interfere with the proper functioning of the agency and, if it becomes commonplace, would impose a heavy burden on the courts"); Chamber of Commerce of U.S. v. U.S. Dept. of Agriculture, 459 F. Supp. 216, 223 (D.D.C. 1978) (Flannery, J.) (denying preliminary injunction because, inter alia, "the court looks with disfavor on interlocutory attempts to challenge federal agency action, because of the disruption such efforts cause to agency proceedings"); cf. F.T.C. v. Standard Oil Co. of Calif., 449 U.S. 232, 242 (1980) ("Judicial intervention into the agency process denies the agency an opportunity to correct its own mistakes and to apply its expertise. . . . Intervention also leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary"). Because plaintiffs' challenge to the Proposed Rule is decidedly premature, their requests for preliminary relief must be denied.

---

(1984)).

## <u>CONCLUSION</u>

Wherefore, for the reasons stated herein, plaintiffs' motion for a temporary restraining order and/or for a preliminary injunction should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH G. WAINSTEIN
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch

JAMES J. GILLIGAN
Assistant Director, Federal Programs Branch


____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA #38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, DC 20044
Tel:  (202) 514-3146
Fax:  (202) 318-7593
Email:  rupa.bhattacharyya@usdoj.gov

Dated:  December 28, 2005