# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EDALEEN DAIRY, LLC                )        CIVIL NO.: 05-CV-2442 PLF
MALLORIE'S DAIRY, INC. and        )
SMITH BROTHERS FARMS, INC.        )
                                  )
              Plaintiffs,         )
       vs.                        )
                                  )
MIKE JOHANNS,                     )
SECRETARY OF AGRICULTURE,         )
UNITED STATES DEPARTMENT OF       )
AGRICULTURE, ET AL.               )
                                  )
              Defendants.         )


**OPPOSITION OF DEFENDANT-INTERVENORS UNITED DAIRYMEN OF ARIZONA
ET AL TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ ii

INTRODUCTION ......................................................................................................1

SUMMARY OF ARGUMENT…………………………………………………..……….3

ARGUMENT…………………………………...…………………………………………3

I.  Plaintiffs meet no factor of the four factor test ...................................................3

II.  The court cannot reach the underlying merits of Plaintiffs' claims because this action is not ripe for judicial review. ...................................................................4

    A.  The court does not have jurisdiction to review non-final agency action. .....................4

    B.  Plaintiffs have not exhausted the required administrative remedies............................6

        1.  Plaintiffs must comply with § (15)(A)......................................................................6

        2.  Plaintiffs' attempts to bypass § (15)(A) should be rejected....................................6

        3.  As handlers, Plaintiffs must comply with § (15)(A)................................................8

    C.  Plaintiffs cannot avoid exhaustion of administrative remedies on any other grounds……………………………...............................................................10

III.  Plaintiffs base their likelihood of success on the merits solely on their assertion that Congress has not granted the Secretary authority to enact the Proposed Rule and on a vague implication that the Secretary acted in an arbitrary and capricious manner.......................................................................12

    A.  The Secretary did not overstep the authority granted by Congress through the passage of the AMAA...........................................................................12

        1.  The plain meaning of the statute supports the Secretary's regulation of producer-handlers. ..............................................................................13

        2.  Although he has not exercised it fully, the Secretary has acknowledged his authority to regulate producer-handlers for decades. ......................................14

        3.  Even Plaintiffs recognize the Secretary's authority to regulate producer-handlers ..................................................................................16

        4.  Plaintiffs cannot avoid regulation by ignoring established case law. ....................17

**5.** Plaintiffs' only citation to Congressional intent provides no support for the proposition that the Proposed Rule exceeds the Secretary's authority. ..................................................................................................17

**6.** Plaintiffs' provide no statutory support for the purported "exemption" of producer-handlers from regulation. .................................................................19

**7.** If the Court were to adopt Plaintiffs' interpretation of 608c(5)(C) it would violate long-standing doctrines of statutory interpretation. ........................19

**B.** The Court should reject Plaintiffs' implications that the Secretary acted arbitrarily and capriciously in fashioning the Proposed Rule to apply only to large commercial producer-handlers who process over 3 million pounds of fluid milk per month. ................................................................................20

**IV.** Plaintiffs will not suffer irreparable harm.......................................................................21

**A.** Plaintiffs allege only economic harm. .........................................................21

**B.** Plaintiffs fail to demonstrate that harm is imminent....................................22

**V.** Intervenors will suffer substantial injury if the Court grants the requested relief. .........................................................................................................................23

**VI.** Plaintiffs fail to demonstrate that an injunction serves the public interest. .......................25

CONCLUSION........................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                    **Page(s)**

\* <u>American Dairy of Evansville, Inc. v. Bergland</u>, 627 F.2d 1252 (D.C. Cir. 1980) ..................6, 10

<u>Augusta News Co. v. News America Publishing Inc.</u>, 750 F. Supp. 28 (D. Me. 1990) ...............21

<u>Bennett v. Spear</u>, 520 U.S. 154 (1997) .........................................................................................4

\* <u>Benson v. Schofield</u>, 236 F.2d 719 (D.C. Cir. 1956) ................................................................5, 13

\* <u>Block v. Community Nutrition Institute</u>, 467 U.S. 340 (1984) ............................................7, 9, 10

<u>Burlington Industries v. Ellerth</u>, 524 U.S. 742 (1998) .................................................................18

<u>CSX Transportation, Inc. v. Williams</u>, 406 F.3d 667 (D.C. Cir. 2005)...........................................4

<u>Calderon v. Jefferson-Pilot Communications Co.</u>, Civil Action No. 96-551 (GK),
    1996 WL 440549 (D.D.C. July 26, 1996).........................................................................21

<u>Center for Auto Safety v. National Highway Traffic Safety Administration</u>,
    710  F.2d 842 (D.C. Cir. 1983) ...........................................................................................5

\* <u>In re England</u>, 375 F.3d 1169 (D.C. Cir. 2004) .........................................................................13

<u>Florida Power & Light Co. v. EPA</u>, 145 F.3d 1414 (D.C. Cir. 1998) ............................................4

<u>Freeman v. Vance</u>, 319 F.2d 841 (5th Cir. 1963), <u>cert. denied</u>, 377 U.S. 930 (1964)..................18

<u>Guam Industrial Services v. Rumsfeld</u>, 383 F. Supp. 2d 112 (D.D.C. 2005).........................21, 22

\* <u>Hershey Foods Corp. v. Department of Agriculture</u>, 293 F.3d 520 (D.C. Cir. 2002) ..............6, 10

<u>Housing Study Group v. Kemp</u>, 732 F. Supp. 180 (D.D.C. 1990) .................................................25

\* <u>Ideal Farms, Inc. v. Benson</u>, 288 F.2d 608 (3d Cir. 1961) ................................................... *passim*

<u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977).......................................................................18

<u>Lamie v. United States Trustee</u>, 540 U.S. 526 (2004) ..................................................................13

\* <u>Milk Industry Foundation v. Glickman</u>, 949 F. Supp. 882 (D.D.C. 1996)...................4, 22, 23, 24

\* <u>Mova Pharmaceutical Corp. v. Shalala</u>, 140 F.3d 1060 (D.C. Cir. 1998) .......................................4

<u>Neal v. United States</u>, 516 U.S. 284 (1996)..................................................................................18

Northwest Independent Milk Producers Ass'n v. Veneman,
    No. 03-CV-700 (RCL) slip op. (D.D.C. Apr. 6, 2004) ...................................................9

Patriot, Inc. v. U.S. Department of Housing & Urban Development,
    963 F. Supp. 1 (D.D.C. 1997) ......................................................................................21

Public Citizen Health Research Group v. Commissioner FDA,
    740 F.2d 21 (D.C. Cir. 1984) ...............................................................................4, 11, 12

Shalala v. Illinois Council on Long Term Care, 529 U.S. 1 (2000) ...............................11

Stark v. Wickard, 321 U.S. 288 (1944)......................................................................6, 7, 9

Switchmen's Union of North America v. National Mediation Board,
    320 U.S. 297 (1943)........................................................................................................7

United States v. Erika, Inc., 456 U.S. 201 (1982)..............................................................7

United States v. Ideal Farms, Inc., 262 F.2d 334 (3d Cir. 1958) ......................................8

United States v. Menasche, 348 U.S. 528 (1955) .............................................................19

United States v. Menlenyzer, 390 F. Supp. 960 (W.D. Pa. 1975) ......................................8

* United States v. Rock Royal Cooperative, Inc., 307 U.S. 533 (1939).............................17

United States v. Ruzicka, 329 U.S. 287 (1946) ..................................................................6

United States v. United Dairy Farmers Cooperative Ass'n,
    611 F.2d 488 (3d Cir. 1979)............................................................................................8

WMATA v. Holiday Tours, Inc., 559 F.2d 841 (D.C. Cir. 1977) ......................................4

Willow Farms Dairy, Inc. v. Benson, 181 F. Supp. 798 (D. Md. 1960).........................10

Wisconsin Gas Co. v. FERC, 758 F.2d 669 (D.C. Cir. 1985) ...........................21, 22, 23

**STATUTES, RULES & REGULATIONS**

7 C.F.R. § 1000.8 .............................................................................................................8

7 C.F.R. § 1000.9(a).........................................................................................................8

7 C.F.R. § 1124.10(c)(2)..................................................................................................16

7 U.S.C. § 601, et seq.......................................................................................................1

7 U.S.C. § 608c(15) .............................................................................................6, 7, 9, 10, 11

7 U.S.C. § 608c(18) ..................................................................................................1

7 U.S.C. § 608c(5) ............................................................................................. *passim*

7 U.S.C. § 608c(9) ...............................................................................................3, 5

5 U.S.C. § 704 .........................................................................................................4

30 Fed. Reg. 15,152 (Dec. 9, 1965) ...............................................................14, 15

**OTHER AUTHORITIES**

In re HP Hood, LLC, 2004 Docket No. AMA-M-4-2,
        slip op. (Oct. 27, 2005) ...............................................................................9

In re Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas, Docket
        No. AO-368-A32 (Aug. 2, 2004).............................................................16

Milk in the Texas and Southwest Plains Marketing Areas Recommended Decision, 54
        Fed. Reg. 27,179 (June 28, 1989) .............................................................15

Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final
        Decision on Proposed Amendments to Marketing Agreement and to Orders,
        70 Fed. Reg. 74,166 (Dec. 14, 2005) ................................................. *passim*

## INTRODUCTION

Dairy processors who are also farmers ("producer-handlers") in Washington and Oregon brought this suit to enjoin a proposed amendment to the federal rules regulating the price of milk. The proposed amendment, which must first be approved by a referendum of affected dairy farmers, and which is subject to some further determinations by the Secretary of Agriculture, was announced by the Secretary during the process of a formal rulemaking proceeding, and is published and explained at In Re Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas, 70 Fed. Reg. 74,166 (Dec. 14, 2005) ("Proposed Rule").  These rules, when final, are called "milk marketing orders," and so the proposed amendment is also a proposed amendment to two milk marketing orders – Arizona-Las Vegas (Order 131) and the Pacific-Northwest (Order 124).  7 C.F.R. pts. 1131& 1124 (2005).

In response to the disruption of agriculture product pricing during the Great Depression that had an injurious effect on farmers, including a severe drop in milk prices, Congress passed the Agricultural Marketing Agreement Act ("AMAA") in 1937.  7 U.S.C. § 601, et seq.  By this Act, Congress, inter alia, initiated the federal program for the regulation of minimum milk prices that milk processors must pay to dairy farmers, and it delegated to the Secretary of Agriculture the authority to set minimum milk prices nationwide.   These national prices are to reflect:

> The price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area . . . [the need to] insure a sufficient quantity of pure and wholesome milk to meet current needs and . . . [the need to] assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest.

7 U.S.C. § 608c(18).

The federal program for regulating the price of milk is based on the fact that milk is highly perishable and is more highly valued by the market when it is sold for fluid consumption than when it is sold as an input into the manufacture of cheese or other dairy products.  However, if milk has a higher value for fluid use, dairy farmers who might otherwise sell to manufacturers

of other dairy products could chase the fluid market depressing prices to all dairy farmers.  The federal regulatory program is thus premised on long-cherished and repeated conclusions of Congress that without milk marketing orders, dairy farmers would engage in destructive competition for the higher end fluid milk market.  In order to avoid this destructive competition, after the Secretary classifies and prices raw milk based upon its end use, the proceeds of milk sales by all processors subject to the Secretary's regulations are pooled and later distributed in accordance with a weighted average to all dairy farmers who have provided milk at the federally set price.  7 U.S.C. § 608c(5)(B)(ii).[1]

But upsetting the long-standing policy of Congress and the regulatory program are the plaintiffs, who are large scale commercial producer-handlers, as large and larger than their regulated processor competitors and their dairy farmer counterparts.  The basic premise of the program is that the benefits of the fluid market will be shared by all dairy farmers and yet these large scale commercial operators have absorbed 10% of the fluid milk market in the Pacific-Northwest (and while there is not yet an Arizona plaintiff, 20% of that market) without contributing to the uniformity of pricing contemplated by the statute.  In fact, their actions destroy uniformity.  Uniformity of treatment for both the processors paying for the milk and of the dairy farmers producing the milk is a fundamental statutory requirement that expressly requires adjustments in accounts in order to achieve uniform payments even as to producers who are also handlers.  7 U.S.C. § 608c(5)(C).   These commercial producer-handlers have largely, but not completely, been less regulated than their competitors, although limitations on the provision and loss of exemption provisions have long existed.  However, the Secretary has consistently ruled that when these entities became disruptive to his ability to administer the program fairly and uniformly, full regulation would result.  Such is about to happen if the affected dairy farmers vote to approve the new rules, but the large commercial producer-handlers, with their built-in advantage over both other dairy farmers and other processors seek to stop the

---

[1] See "Blend Price" in <u>Glossary of Dairy Marketing Terms</u>, a neutral Cornell University publication that many courts have found useful in understanding this complex program, included as Attachment A hereto.

formal rulemaking before it is even concluded and prevent further action as to both the Arizona-Las Vegas and the Pacific-Northwest milk marketing orders.

## SUMMARY OF ARGUMENT

After 3 ½ years of formal rulemaking before the United States Department of Agriculture's Agricultural Marketing Service (the "Secretary"), including 11 days of hearings with over 3,000 pages of transcript, 69 exhibits and 14 officially noticed documents, and multiple filings of briefs, Plaintiffs seek what amounts to an Advisory Opinion at the 11th Hour in the form of a Temporary Restraining Order stopping the still ongoing proceeding. As will be shown below, this proceeding is simply not ripe for judicial review, and indeed this Court will still lack jurisdiction if and when the agency action becomes final as the Plaintiffs have clearly failed to exhaust their administrative remedies authorized and required to be followed by Congress for nearly 70 years. The Proposed Rule is merely that, and "unless and until" the votes are counted <u>and</u> the Secretary makes the determinations required by 7 U.S.C. § 608c(9) (determinations required under both paragraphs A and B), the agency action is not final. Moreover, the record evidence relied upon by the Secretary is certainly substantial and hardly merits a finding that the Secretary has acted arbitrarily and capriciously. Finally, plaintiffs demonstrate no irreparable harm as that term has been defined by the D.C. Circuit and this Court; to the contrary, imposing an injunction will result in immediate and permanent harm to both the dairy farmers and fluid milk bottlers who have intervened as defendants as well as to the public interest. The relief should be denied and the case dismissed for want of jurisdiction.

## ARGUMENT

### I.    Plaintiffs meet no factor of the four-factor test

To obtain a temporary restraining order, Plaintiffs must show: (1) substantial likelihood of success on the merits of the case; (2) that they will suffer irreparable harm absent an

injunction; (3) that an injunction would not substantially harm other interested parties; and (4) that an injunction would be in the public interest.  Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998); WMATA v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977). "The test is a flexible one. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" CSX Transp., Inc. v. Williams, 406 F.3d 667, 670 (D.C. Cir. 2005) (citation omitted); see also Milk Indus. Found. v. Glickman, 949 F. Supp. 882, 888 (D.D.C. 1996) ("M.I.F."). Here, however, Plaintiffs have failed to make a sufficient showing on any factor.  In fact, as a preliminary matter, the Court does not have jurisdiction to review these issues at this time.

II.    **The court cannot reach the underlying merits of Plaintiffs' claims because this action is not ripe for judicial review.**

A.    **The court does not have jurisdiction to review non-final agency action.**

Plaintiffs challenge a proposed rule of the Secretary, which is not a "final agency action." As such the Plaintiffs' claims are not ripe, and they cannot prevail on the merits, because the Court cannot reach the merits.  Injunctive relief, therefore, cannot issue.

In the absence of a "final agency action," courts are prevented from reviewing administrative action.  Public Citizen Health Research Group v. Commissioner FDA, 740 F.2d 21, 30 (D.C. Cir. 1984).  The Administrative Procedure Act limits judicial review of agency rulemakings to final agency actions.  5 U.S.C. § 704.  In order to be considered a "final agency action," the action must mark the "consummation" of the decisionmaking process and not be of a "merely tentative or interlocutory nature." Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

Put simply, the Proposed Rule is not a "consummation" of this rulemaking, but merely a tentative, intermediate step, subject to several contingencies, any one of which could upset the enactment of the Proposed Rule.  See Florida Power & Light Co. v. EPA, 145 F.3d 1414, 1420-21 (D.C. Cir. 1998) (holding a challenge to a proposed rule is not ripe, noting both the uncertainty surrounding the implementation of any rule and that the proposed rule had no direct

and immediate impact); <u>Center for Auto Safety v. National Highway Traffic Safety Admin.</u>, 710 F.2d 842, 855 (D.C. Cir. 1983) (agency's preliminary decision not to amend future fuel efficiency standard not yet ripe for review as the decision is not yet final).

The Plaintiffs essentially concede that the Proposed Rule is not a final agency action, inasmuch as they affirmatively allege that the Proposed Rule has not gone into effect and is still subject to a two-thirds vote by producers. (Compl. at ¶ 56, 57); 7 U.S.C. § 608c(9). That vote will not conclude until January 13, 2006. (Compl. at ¶ 56). Even if two-thirds of voting producers support the Proposed Rule, other hurdles must be overcome before the Proposed Rule goes in effect: The Secretary must determine (1) that marketing agreements, as opposed to marketing orders, have been refused by 50 percent of the handlers in the marketing area, and (2) that the order is "the only practical means of advancing the interests of the producers of such commodity." 7 U.S.C. §§ 608c(9)(A) & (B). The Secretary must then publish these findings to the Final Rule in the Federal Register  None of these steps, necessary for the Proposed Rule to become final, have occurred.

Indeed, the D.C. Circuit has stated that a challenge to an unissued order of the Secretary is premature. <u>Benson v. Schofield</u>, 236 F.2d 719, 721 (D.C. Cir. 1956). In <u>Schofield</u>, the D.C. Circuit addressed a district court's grant of a preliminary injunction, which injunction restrained the Secretary from promulgating a proposed milk marketing order. <u>Id.</u> There, similar to the present case, the Secretary had held hearings and conducted a referendum but had not yet promulgated his findings and issued the order before the plaintiffs commenced their court action. <u>Id</u>. at 720. The <u>Schofield</u> court, relying on the fact that the Secretary had not issued an order, held that the plaintiffs' challenges to the proposed rule were premature. <u>Id.</u> Here, the challenge mounted by the Plaintiffs concerns a proposed rule which is at an even earlier stage in the rulemaking –, the voting on the Proposed Rule has not yet concluded.[2] Thus, the Proposed Rule

---

[2] The <u>Schofield</u> court reversed the district court's grant of the preliminary injunction, finding that the plaintiffs were bound by the administrative remedies set forth in the Act and lacked standing because they were claiming a mere loss of income due to the Secretary's actions. <u>Id</u>. at 723.

is not a "final agency action," the Plaintiffs' claims are not ripe for review and the Court cannot reach the merits.

**B.     Plaintiffs have not exhausted the required administrative remedies.**

**1.     Plaintiffs must comply with §(15)(A).**

Plaintiffs blithely pass over the critical element of standing to bring this action.  This is understandable because they lack standing.  In a variation on the final agency action problem, plaintiffs have failed to exhaust their administrative remedies under 7 U.S.C. § 608c(15)(A).  All courts who have considered the myriad of "milk litigation" filed under the AMAA have concluded absolutely and conclusively that fluid milk bottlers such as Plaintiffs ("handlers" in the parlance of the AMAA) must first file what the industry calls a "15-A Petition" before coming to any court.  See, e.g., Hershey Foods Corp. v. Dep't of Agric., 293 F.3d 520, 526-27 (D.C. Cir. 2002) (holding that Hershey was a handler and must therefore exhaust the AMAA's administrative remedies before filing suit); American Dairy of Evansville, Inc. v. Bergland, 627 F.2d 1252, 1259 (D.C. Cir. 1980) (holding that appellants properly seek judicial review as they have exhausted their administrative remedies as statutorily required by 7 U.S.C. § 608c(15)(A)). Having failed to exhaust their administrative remedies (of course there is no final agency action to review), this Court should deny the relief requested by Plaintiffs and dismiss the pending case. United States v. Ruzicka, 329 U.S. 287, 294 (1946).

**2.     Plaintiffs' attempts to bypass § (15)(A) should be rejected.**

Plaintiffs assert jurisdiction under Stark v. Wickard, 321 U.S. 288, 307-08 (1944) and argue that they do not have comply with the administrative exhaustion procedure set forth in (15)(A).  Plaintiffs offer no explanation as to why they may skirt the requirements of (15)(A). The statute plainly requires handlers to follow (15)(A) and Plaintiffs clearly qualify as handlers.

Stark is inapposite as that case on its face concerned a challenge by dairy farmers who were permitted to bring a limited court action when the Secretary made purportedly ultra vires

deductions from the pool equalization fund.   321 U.S. at 289-90.  Unlike the case at bar, the Stark case did not involve handlers and indeed handlers could not question the uses to which the fund were put as they had no financial interest in it.

The finding in Stark must be read in context of the more recent holding in Block v. Community Nutrition Institute, 467 U.S. 340 (1984) (denying consumers standing to challenge market orders because they are not handlers).  In rejecting consumers' claims, the Community Nutrition Institute court concluded: "Congress unequivocally directed handlers first to complain to the Secretary" and again stated that "we think it clear that Congress intended that judicial review of market orders issued under the Act ordinarily be confined to suits brought by handlers in accordance with 7 U.S.C. § 608c(15)."  467 U.S. at 347-48.  This case presents exactly the same circumstance as the Community Nutrition Institute court contemplated when explaining the judicial review process.  Plaintiffs must act in accordance with 7 U.S.C. § 608c(15) but have failed to do so.

The Community Nutrition Institute decision took great pains to outline the purposes of the AMAA and the roles of consumers, producers and handlers.  467 U.S. at 346-48.  The court said that producers are entitled to participate in the adoption and retention of orders.  Id. at 346.  And handlers have specific rights in the administrative process defined by Section 15.  Id. at 348.  In such a complex scheme (and perhaps everyone today can agree the scheme is complex), Congress' omission of consumer relief meant that Congress intended to "foreclose consumer participation in the regulatory process." Id. at 347 (citing Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 305-06 (1943) and United States v. Erika, Inc., 456 U.S. 201, 208 (1982)).  Similarly consumers were denied judicial review rights.  The court thus concluded that consumers had no standing.  Courts have also concluded that producers' standing is limited to the facts of Stark.   In construing Stark, the court in Community Nutrition Institute, concluded that limited "[j]udicial review of the producer's complaint was therefore necessary to ensure achievement of the Act's most fundamental objectives."   467 U.S. at 352.  But where as here, handlers can vindicate the rights, producers do not require a remedy.

7

### 3.    As handlers, Plaintiffs must comply with § (15)(A).

Moreover, while Plaintiffs hint that their claim is brought as a producer, such cannot seriously be the case.  Their complaint is that as handlers they do not want to "pay the assessment" that is imposed on handlers.  Beyond that the long-standing rules of the Secretary contradict Plaintiffs' assertion.  A "handler" is defined at 7 C.F.R. § 1000.9(a) as being any person "who operates a pool plant or a nonpool plant."  There are five categories of "nonpool" plants defined at 7 C.F.R. § 1000.8, and producer-handlers are expressly and clearly defined as a handler in paragraph (b):  "Producer-handler plant means a plant operated by a producer-handler as defined under any Federal order" (emphasis added). A producer-handler is quite simply a handler.

Such a conclusion is reinforced by the dismissal in United States v. United Dairy Farmers Cooperative Ass'n, 611 F.2d 488 (3d Cir. 1979).  See also United States v. Menlenyzer, 390 F. Supp. 960, 961-62 (W.D. Pa. 1975) (finding that as the AMAA provided a complete administrative remedy that had not been exhausted, the court could not rule on the underlying merits); United States v. Ideal Farms, Inc., 262 F.2d 334 (3d Cir. 1958) ("Ideal Farms I") (producer-handlers challenging ability of the Secretary to regulate certain producer-handlers have to exhaust § (15)(A) before court can address the validity of an order).  In United Dairy Farmers, a dairy farmer-owned cooperative alleged that it was not a handler and thus was not required to exhaust administrative remedies under Section 15 of the AMAA.  611 F.2d at 490.  In holding that United Dairy Farmers was indeed a handler, the court performed the same analysis as to cooperatives (Id. at 490-91) that leads to the conclusion in this case that a producer-handler is a handler. The Court concluded that as a handler United Dairy Farmers was first required to exhaust its administrative remedies and since it had not done so, the case was dismissed.  Id. at 491.  These Plaintiffs, just like the plaintiffs in Ideal Farms I and United Dairy Farmers, are handlers complaining about their treatment as handles, which have not exhausted their remedies, and the Court should therefore deny their request for TRO and dismiss the case.

Just last year, this Court dismissed a claim arising under the AMAA brought by three of today's defendant intervenors (Northwest Dairy Association, Farmers Cooperative Creamery and Tillamook) on the basis of their failure to exhaust the administrative remedies provided for in § (15)(A). Northwest Independent Milk Producers Ass'n v. Veneman, No. 03-CV-700 (RCL), slip op. (D.D.C. Apr. 6, 2004) (Attachment 2 hereto). In that action, plaintiffs sought an injunction against the Secretary's Final Rule regarding the pricing formula for milk used to produce certain manufactured products. Upon a motion to dismiss filed by the Secretary, this Court, relying on the Supreme Court's narrowed construction and application of Stark as found in Community Nutrition Institute, dismissed the action as to the dairy farmers, because they did not have standing, and as to dairy farmer cooperatives that happened to operate manufacturing plants (in reality both producers and handlers for AMAA purposes) because they had not exhausted their administrative remedies under 7 U.S.C. § 608c(15). Northwest Independent Milk Producers, slip op. at 4-5. The producer cooperative without plant operations (and thus without any handler characteristics) was also dismissed on the grounds that handler interests could vindicate the producers' rights and thus a suit by producers in that instance, unlike in Community Nutrition Institute, was not necessary to "ensure the statute's objectives will not be frustrated." Northwest Independent Milk Producers, slip op. at 5 (citing Community Nutrition Institute, 467 U.S. at 352).

Northwest Independent Milk Producers was of critical importance to those plaintiffs; indeed they attempted to make the claim, hinted at by Plaintiffs today, that administrative remedies were futile. The Court rejected the futility argument and sent those plaintiffs away empty-handed.[3] Northwest Independent Milk Producers, slip op. at 3 ("The Court finds the handlers' failure to exhaust fatal and because Congress precluded judicial review in these

---

[3]     The "futility argument" must be considered in light of this year's successful handler challenge in a 15(A) proceeding by HP Hood, LLC. In re HP Hood, LLC, 2004 Docket No. AMA-M-4-2, slip op. (Dep't of Agric. Oct. 27, 2005) (final admin. review) (Attachment 3 hereto). The apparently independent minded Administrative Law Judge issued a decision in favor of HP Hood on a matter involving the proper declassification of products. It was not appealed and is now final. Beyond that the words of a former Judicial Officer denying interim relief 24 years ago have little meaning beyond the concept that monetary relief is always available after a successful 15-A petition (Judge in HP Hood ordered a full refund). The next judicial officer can easily change his mind. Moreover, despite urging that the Rules of Practice drop interim relief, to this day those rules remain in place.

circumstances, the handler plaintiffs' claims must be dismissed for lack of subject matter jurisdiction.").  It would be incongruous for this Court to hold in one case that those plaintiffs, now defendant-intervenors, lacked standing because they had not complied with § (15)(A) and then to turn around and grant the requested Temporary Restraining Order without requiring Plaintiffs here to fulfill the exhaustion requirement— again affirming injury to defendant intervenors in favor of Plaintiffs who fail the same standing analysis.

**C.    Plaintiffs cannot avoid exhaustion of administrative remedies on any other grounds.**

"The AMAA contains an exhaustion requirement."  Hershey Foods, 293 F.3d at 526.  Thus, Plaintiffs must first seek a remedy from the Secretary of Agriculture.  Id.  Where, as here, Congress chooses to create by statute a requirement that parties exhaust administrative remedies before proceeding to court, the court and parties are bound to follow this dictate.  Willow Farms Dairy, Inc. v. Benson, 181 F. Supp. 798 (D. Md. 1960) (holding that the court lacked subject matter jurisdiction because the action was brought under 7 U.S.C. § 608c(15)(B) without first exhausting the requirements of § (15)(A)).  Indeed the D.C. Circuit has held in American Dairy of Evansville, Inc. v. Bergland, 627 F.2d 1252 (D.C. Cir. 1980) that § (15)(A) imposes a "statutorily required administrative remedy" and that "exhaustion of certain administrative remedies is required by the Act."  Id. at 1259.  The U.S. Supreme Court is obviously in accord: "Congress unequivocally directed handlers first to complain to the Secretary."  Community Nutrition Institute, 467 U.S. at 347.  While the court may impose its own discretion on applying judicially developed principles of exhaustion, if Congress mandates the exhaustion procedures to be followed as it has in § (15)(A), it precludes the courts from acting until the legislative mandate has been met as Congress has not granted them jurisdiction to do so.  Willow Farms, 181 F. Supp. 798.  Because § (15)(A) provides for Congressionally imposed exhaustion, neither

10

Plaintiffs nor this Court may override the requirement that Plaintiffs' exhaust their remedies under § (15)(A).

Even if this Court determines that § (15)(A) is not a Congressionally mandated exhaustion requirement unassailable by the judiciary, Plaintiffs still must comply with the general judicial doctrine of exhaustion of administrative remedies. Plaintiffs provide no hint of the basis for their assertion that they do not have to exhaust administrative remedies leaving defendant-intervenors at a distinct disadvantage in responding, particularly as Plaintiffs bear the burden of proof in this case. Regardless, courts only allow for limited exceptions to the general principle that parties must exhaust their administrative remedies prior to filing suit in federal court. These exceptions include when the moving party has shown either a hardship resulting from a delay in judicial review or futility. Shalala v. Illinois Council on Long Term Care, 529 U.S. 1, 13 (2000). Plaintiffs have not and cannot demonstrate either hardship if they pursue their administrative remedies or that exhaustion would prove futile.[4]

The standard of hardship is extremely difficult to prove particularly when addressing a non-final rule, such as the one before this Court. In Public Citizen Health Research Group v. Commissioner, 740 F.2d 21, 31 (D.C. Cir. 1984), the D.C. Circuit carefully distinguished the hardships flowing from a final rule from those resulting from a tentative decision and explained that delaying review of tentative decisions is consistent with the basic tenets of administrative law regardless of the hardships alleged by plaintiffs. In Public Citizen, an advocacy group sought an order compelling the Food and Drug Administration to finalize a rulemaking it had earlier initiated concerning the labeling of aspirin. The D.C. Circuit refused on ripeness and

---

[4] Judge Lamberth recently held that a § (15)(A) procedure would not be futile and this Court should follow the path set by Judge Lamberth. See Northwest Independent Milk Producers, slip op. (Attachment 2 hereto).

other grounds to entertain the substantive claim, finding that hardships will rarely overcome the

problems inherent in reviewing tentative administrative decisions:

> When a petitioner seeks a review of a tentative agency position, a different
> calculus of interests arises.  The claimed hardship results not from delay in
> enforcement of an established standard, but from delay in establishment of a
> standard.  Without a doubt the harm that such delay causes can in a particular case
> be grave, especially when the agency is charged with protection of the public
> health.  But in general judicial review of the substantive merits of a tentative
> agency position is not an appropriate means to remedy the harm.  A tentative
> agency position will not generally be in a form susceptible of review under
> Section 10 of the APA, and, perhaps more importantly, as we have stressed
> review is at odds with fundamental notions of administrative law that generally
> require the agency to resolve substantive issues in the first instance.

Id. at 31.  Similarly, the Court here should not undertake review of a tentative rule.  Instead, it

should wait to see if the Proposed Rule actually becomes final before even considering judicial

intervention.  Of course, Intervenors continue to urge this Court to hold like every court before it,

that handlers must first exhaust their administrative remedies under the AMAA.


**III.     Plaintiffs base their likelihood of success on the merits solely on their
assertion that Congress has not granted the Secretary authority to enact the
Proposed Rule and on a vague implication that the Secretary acted in an
arbitrary and capricious manner.**


**A.     The Secretary did not overstep the authority granted by Congress
through the passage of the AMAA.**

Plaintiffs argue that in drafting the Proposed Rule USDA exceeded the authority

Congress granted to it.  Plaintiffs' argument rests on a single irrelevant statement by Congress

and various pronouncements by the Secretary of Agriculture.  See generally Memo at 6-11.

Plaintiffs conveniently ignore the plain meaning of the statute and the case law, both of which

illustrate the error in Plaintiffs' argument.

1.     **The plain meaning of the statute supports the Secretary's regulation of producer-handlers.**

The most obvious place to start when attempting to discern the meaning of a statute or intent of Congress is with the plain language of the statute itself.  In re England, 375 F.3d 1169, 1178 (D.C. Cir. 2004) (holding that "when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms" (quoting Lamie v. United States Trustee, 540 U.S. 526, 534 (2004))).  Section 608c(5)(C) indicates the clearest possible intention to allow the Secretary to regulate producer-handlers:  "[i]n order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection, provid[e] a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) of this subsection." 7 U.S.C. § 608c(5)(C) (emphasis added).  The statute clearly and unambiguously provides the Secretary the authority to implement this section in order to accomplish the purposes set forth in paragraphs (A) and (B).  Paragraphs (A) and (B) aim to create a level playing field for producers and handlers by allowing the Secretary to set uniform prices for handlers and to pool the proceeds for equitable distribution among producers.  7 U.S.C. §§ 608c(5)(A) & (B).[5]  Although the Secretary may not have found it necessary to include producer-handlers in all prior regulations, the statute grants him sufficient discretion to regulate whatever entities he sees fit, including producer-handlers.

Case law supports this analysis, as well as the regulation of producer-handlers by the Secretary.  The Third Circuit addressed a similar issue over 40 years ago and the decision remains good law.  In Ideal Farms, Inc. v. Benson, 288 F.2d 608 (3d Cir. 1961) ("Ideal Farms II"), the court determined that the Secretary of Agriculture did not exceed the authority granted him by Congress when he regulated producer-handlers.  See also Benson v. Schofield, 236 F.2d

---

[5] The Supreme Court has recognized the Secretary's authority since 1939 when it stated in its decision in United States v. Rock Royal Cooperative, Inc., that "the Secretary of Agriculture is directed to issue orders, whenever he has reason to believe the issuance of an order will tend to effectuate the declared policy of the act."  307 U.S. 533, 575 (1939).  The Court explained that the policy of the act was to maintain an orderly market, the same goal the Secretary aims to achieve through the Proposed Rule.  Id. at 574-75; Proposed Rule, 70 Fed. Reg. 74,166 generally.

719, 721 (D.C. Cir. 1956) ( "To effectuate the purposes of the Act, including an equitable distribution of the burden of surplus milk, the Secretary of Agriculture has been given power in certain circumstances to issue orders which are applicable, not to producers or retailers, but to producers as handlers."). The dispute in Ideal Farms II focused on the Secretary's promulgation of an order that made a producer-handler accountable to the producer settlement fund for milk he produces on his own farms from his own herds. 288 F.2d at 610. The Ideal Farms II court looked to the language of section 608c(5)(C) which refers specifically to producer-handlers and which "is the statutory basis for the producer-settlement fund" finding that the provision indicated that "producers who are handlers are subject to regulation." Ideal Farms II, 288 F.2d at 614. The court concluded that based on the plain meaning of the statute, and the absence of anything contrary in the legislative history the statute provided the Secretary with authority to regulate handlers, including producer-handlers. Id. at 617-18.

The same reasoning employed by the Court in Ideal Farms II applies equally to this case. The plain meaning of the statute clearly allows the Secretary to regulate producer-handlers and to compel them to contribute to the producer-settlement fund.

> **2.    Although he has not exercised it fully, the Secretary has acknowledged his authority to regulate producer-handlers for decades.**

At least as early as the 1960's the Secretary recognized that he had the discretion to regulate producer-handlers if necessary to achieve the purposes of the statute.[6] In 1965, the Secretary stated:

> The need for regulating producer-handlers in this [Puget-Sound] market has been considered at a public hearing on previous occasions. At those times, it was not found necessary to pool and price the milk of such persons to achieve the purposes of the statute authorizing Federal orders. It should be made clear at this point, however, that the Secretary is empowered by the Act to impose through an order regulation of producer-

---

[6] In fact, USDA's attempted regulation of producer-handlers in 1935 was abandoned only on the basis of administrative inconvenience. Declaration of Roger Cryan at ¶ 10 (Attachment 9 hereto).

handlers in their capacity as handlers, if justified by prevailing market
conditions.

30 Fed. Reg. 15,152, 15,154, cmt. 2-3 (Dec. 9, 1965); see also Milk in the Texas and Southwest

Plains Marketing Areas Recommended Decision, 54 Fed. Reg. 27,179 (June 28, 1989)

(concluding that the producer-handlers should be subject to pooling and pricing provisions if the

producer-handlers cause market disruption to the market's dairy farmers or regulated handlers).

The time has come when prevailing market conditions justify the regulation of large

commercial producer-handlers and the Secretary has decided to exercise the authority granted to

him.

The Proposed Rule recognizes the fact that producer-handlers have not always been fully

regulated but that the Secretary has always had the authority to regulate producer-handlers if

"they are so large as to disrupt the market for producers."  Proposed Rule, 70 Fed. Reg. at

74,185.[7]  The Secretary has always based the exclusion of producer-handlers from complete

regulation on the premise that the aims of the AMAA could be fulfilled without regulating

producer-handlers.  Proposed Rule, 70 Fed. Reg. at 74,185.  As a result of information gathered

through the hearings, comments and briefings, the Secretary finds that because of changes in

marketing conditions and in the overall dairy industry's marketing structure, large producer-

handlers now cause market disorder as "evidenced by significantly inequitable minimum prices

that handlers pay and reduced blend prices that dairy farmers receive under the terms of each

area's marketing order."  Id. at 74,186.  The Secretary found that the "source of the disorder is

directly attributable to the operations of large producer-handlers and their exemption from the

pooling and pricing provisions of the orders."  Id. at 74,188.  Because of these changes to the

market, full regulation of large producer-handlers is required in order to "ensure equitable

minimum prices to similarly situated handlers."  Id. at 74,187.  This Court should allow the

---

[7] The Secretary also notes that although producer-handlers have not been fully regulated in the past, they have
always been subject to some regulation by USDA.  Id. at 74,168.

Secretary to act in the manner he determines will best meet the goal of ensuring equitable prices and deny the TRO.[8]

>    **3.    Even Plaintiffs recognize the Secretary's authority to regulate producer-handlers.**

Plaintiffs unwittingly concede that the Secretary has legitimately regulated producer-handlers for decades.[9] Plaintiffs admit that under the terms of one of the predecessor orders to Order 124 producer-handlers had to use only milk produced on their farms except they could purchase up to 5,000 pounds per month without becoming subject to the pooling and pricing provisions. Memo at 9. Plaintiffs also recognize the current regulation when they explain that it allows producer-handlers to purchase 150,000 pounds of milk per month without becoming subject to pooling and pricing provisions. Memo at 8. These admissions, completely undermine Plaintiffs' argument that the Secretary cannot regulate producer-handlers. Once a producer-handler exceeds this threshold, it can become fully subject to minimum pricing and pooling regulations. The Secretary, pursuant to orders such as the one referred to by Plaintiffs, has thus regulated producer-handlers for decades and has required them to participate fully in the pricing and pooling provisions if they exceeded certain purchase limits. See, e.g., 7 C.F.R. § 1124.10(c)(2) (canceling designation as a producer-handler if it acquires fluid milk products from fully regulated plants and handlers in excess of 150,000 pounds monthly.) Plaintiffs do not and cannot offer any explanation as to why the Secretary may (and has) regulate(d) producer-handlers through this regulation but may not implement the Proposed Rule.

---

[8] In fact, Counsel for Plaintiffs, on behalf of other parties in the underlying rule-making proceeding asserted the need to regulate producer-handlers in Arizona based on the changed retail environment. See Statement of Interest Submitted by Select Milk Producers, Inc. and Continental Dairy Products, Inc. in In re Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas, Docket No. AO-368-A32 (Aug. 2, 2004), Attachment 4 hereto.

[9] For a discussion of the history of USDA regulation of producer-handlers see Ideal Farms II, 288 F.2d at 615-16.

**4.      Plaintiffs cannot avoid regulation by ignoring established case law.**

Plaintiffs attempt to wiggle out of regulation by resurrecting an argument that courts have consistently rejected since 1939 in following the Supreme Court decision in <u>United States v. Rock Royal Cooperative, Inc.</u>, 307 U.S. 533, 580 (1939) (holding that "purchased" means "acquired for marketing"). In an effort to avoid regulation, Plaintiffs assert that because they do not actually purchase milk, they cannot be regulated. Memo at 7. The Supreme Court held in <u>Rock Royal</u>, that "purchase" as used in 608c(5) includes acquiring for marketing.[10]

<u>Ideal Farms II</u> further endorsed this holding. The court in <u>Ideal Farms II</u> recognized and relied upon several cases in which the word "purchased" was interpreted as "acquired for marketing." <u>Ideal Farms II</u>, 288 F.2d at 612-13 ("[T]he three cited cases make clear that the word 'purchased' is to be liberally construed so as to achieve the purpose of the Act and strongly buttress the position of the Secretary that 'own-produced' milk of a handler is subject to regulation."). The <u>Ideal Farms II</u> court further held that if it were to accept the position that purchase only included an exchange of money between two parties, it "would avoid the intent of the Act to achieve a fair division of the more profitable fluid milk market among all producers and they would avoid the necessity of sharing the burden of surplus milk." <u>Id.</u> at 613. Plaintiffs' attack on the Proposed Rule attempts to achieve the same result that the court in <u>Ideal Farms II</u> rejected. This Court should follow the <u>Ideal Farms II</u> court and reject Plaintiffs' motion.

**5.      Plaintiffs' only citation to Congressional intent provides no support for the proposition that the Proposed Rule exceeds the Secretary's authority.**

Plaintiffs misplace their reliance on a 1990 statement by Congress that "the legal status of Producer-handlers of milk under the Agricultural Adjustment Act . . . shall be the same after the amendments made by this title." Memo at 9. This statement does not have the meaning ascribed to it by Plaintiffs. As far as Congress is concerned, the legal status of producer-handlers is that

---

[10] Given the prominence of this case in dairy regulation jurisprudence, plaintiffs are certainly familiar with this case, yet fail to acknowledge or distinguish it.

they may be regulated as the Secretary sees fit.  7 U.S.C. § 608c(5)(C).  Plaintiffs provide no other indications of what the "legal status" of producer-handlers should be.

Plaintiffs' attempts to turn this statement into something more meaningful than an effort to continue the existing congressional authority should fail.  First, the most recent example of this pronouncement occurred in 1990.  Congress has passed two farm bills since that time and has omitted the statement regarding the legal status of producer-handlers.  Second, even if Congress had included this statement in recent pronouncements relevant to the AMAA, the statement as described above, simply continues the existing congressional authority.  All it indicates is that Congress, in enacting a particular Farm Bill, has not amended the AMAA with respect to producer-handlers and that the language in 608c(5)(C) remains intact and enforceable.

As discussed above, courts have interpreted 7 U.S.C. § 608c(5)(C) to "reach a producer-handler who handles or distributes milk which he himself produces."  Ideal Farms II, 288 F.2d at 615; accord Freeman v. Vance, 319 F.2d 841, 842 (5th Cir. 1963), cert. denied, 377 U.S. 930 (1964).  Congress has therefore known for 40-50 years that USDA's interpretation (and the courts') was that producer-handlers could (and in many cases should) be regulated.  Given Congress' interest in the overall subject of the dairy industry and given the presence of language regarding producer-handlers in the statute, if this interpretation were incorrect or the courts' conclusions wrong, Congress has had plenty of opportunity to fix it.  It hasn't, and thus the courts' construction must stand.  Burlington Indus. v. Ellerth, 524 U.S. 742, 763-64 (1998) (Congress' failure to alter legislation interpreted by earlier judicial decision, binds court to follow such previous judicial interpretation); Neal v. United States, 516 U.S. 284, 295 (1996) ("we give great weight to stare decisis in the area of statutory construction [because] 'Congress is free to change this Court's interpretation of its legislation'" (quoting Illinois Brick Co. v. Illinois, 431 U.S. 720, 736 (1977))).

Plaintiffs also rely heavily on the completely unsupported statement that beginning in the 1960's "Congress ratified the Secretary's treatment of producer-handlers and made it clear that the Secretary had no such authority to change the producer-handler regulations."  Memo at 9.

18

Not only does this statement lack any support, it runs counter to the arguments above from <u>Ideal Farms II</u>. It also counters the rules of administrative law and delegation of authority. Plaintiffs' statement addresses regulations. Regulations are agency-made, not legislated. It defies logic to suggest that Congress somehow granted the Secretary the power to implement a regulation but not the power to remove or revise that same regulation. The Court should not accept Plaintiffs' unsupported and illogical statement.

> **6.     Plaintiffs' provide no statutory support for the purported "exemption" of producer-handlers from regulation.**

Nothing in the statute provides any kind of "exemption" for producer handlers and Plaintiffs fail to provide any statutory authority for this "exemption." The statute clearly provides that prices shall be "uniform" as to "all handlers." 7 U.S.C. § 608c(5)(A). Nowhere does the statute indicate that a producer-handler is not also a handler and that it would therefore somehow be exempt from the broad regulation of all handlers.

> **7.     If the Court were to adopt Plaintiffs' interpretation of 608c(5)(C) it would violate long-standing doctrines of statutory interpretation.**

Plaintiffs' reading of section 608c(5)(C) violates yet another principle of statutory construction. Each word must be given its plain effect and meaning. <u>United States v. Menasche</u>, 348 U.S. 528, 538-39 (1955). Plaintiffs wish to read the words in the parenthetical in 608c(5)(C) ("including producers who are also handlers") out of existence. Memo at 7-8. Were the Court to accept Plaintiffs' somewhat convoluted explanation of how the statute should be read, it would completely undermine the plain language of the statute and leave the parenthetical phrase without any meaning whatsoever.

      **B.    The Court should reject Plaintiffs' implications that the Secretary acted arbitrarily and capriciously in fashioning the Proposed Rule to apply only to large commercial producer-handlers who process over 3 million pounds of fluid milk per month.**

Based solely on one paragraph in the declaration of Dr. Knutson, Plaintiffs suggest that the Secretary' proposal to adopt a 3,000,000 pound limit was arbitrary and capricious. Memo at 13-14, citing Knutson Dec. at ¶ 11. This statement is made notwithstanding the fact that virtually every proponent witness who participated in the rule-making process discussed the limitation and a number of financial and economic experts testified in favor of that limitation. See, e.g., Declaration of Roger Cryan (Attachment 9 hereto); Declaration of Carl Herbein (Attachment 10 hereto).

The Secretary in fact concluded that the evidence supported both a limit lower than 3,000,000 pounds and even an elimination of the exemption for all producer-handlers that exceed the current 150,000 pound small business route disposition exemption; however, over the objections of many who are now intervenors, the Secretary concluded that the Hearing Notice proposal for a 3,000,000 limit precluded him from going lower at the present time. See Declaration of Roger Cryan at ¶¶ 16 and 17; Proposed Rule, 70 Fed. Reg. at 74,186. For instance the Secretary agreed with the testimony offered by experts for Dean Foods and Dairy Farmers of America that a one cent per cwt impact on the equalization fund was sufficient to constitute "disorderly marketing." Id. at 74,173, 74,177, 74, 186.

Lowering the limit to at least 3,000,000 pounds achieves the goal of reducing the impact to below this one cent per cwt impact. The existing producer-handlers exceed this one cent per cwt impact by 5 to 7 cents per cwt in the Arizona market and 1 to 3 cents per cwt in the Pacific Northwest. Beyond that, and especially at this stage of the proceeding, the Plaintiffs can hardly assert that they have a substantial likelihood of success on the merits on this point.

### IV.    Plaintiffs will not suffer irreparable harm

#### A.    Plaintiffs allege only economic harm.

Plaintiffs fail to show that they will be irreparably harmed by implementation of the Proposed Rule. In this Circuit, "economic loss does not, in and of itself, constitute irreparable harm." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). Economic loss rises to the level of harm warranting the extraordinary relief of a TRO only where the loss "threatens the very existence of the movant's business." Id.; see also Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev., 963 F. Supp. 1, 5 (D.D.C. 1997) ("plaintiffs will be barred from the [ ] market"); Calderon v. Jefferson-Pilot Commc'ns Co., Civil Action No. 96-551 (GK), 1996 WL 440549, at *2 (D.D.C. July 26, 1996) (business must be bankrupted, obliterated, or existence threatened); Augusta News Co. v. News America Publ'g Inc., 750 F. Supp. 28, 33 (D. Me. 1990) (finding even 50 percent loss of business not irreparable harm). This Court recently denied a TRO where the movant alleged it would lose a $14 million contract as a result of government bidding practices. Guam Indus. Servs. v. Rumsfeld, 383 F. Supp. 2d 112, 121 (D.D.C. 2005). In that case the Court observed "it seems that the defendants' actions are not completely preventing the plaintiff from procuring any work, but rather that the defendants' actions are merely adding market competitors the plaintiff would rather not face." Id. at 122. Plaintiffs have likewise moved the Court for relief from their hypothetical loss of exemption from the AMAA pricing scheme merely because they would rather not face market competitors on a level playing field.

Plaintiffs do not allege implementation of the Proposed Rule would put them out of business. Even granting, which we do not, that they may face monetary costs reaching "into the hundreds of thousands of dollars per month and millions of dollars per year." Memo. at 12. Plaintiffs might even have to cease being producer-handlers of a size exceeding the threshold of the Proposed Rule, or reorganize their operations. Id. But Plaintiffs' existence as a business is not threatened such as to constitute irreparable harm.

**B.    Plaintiffs fail to demonstrate that harm is imminent.**

In order for a harm to meet the test for a temporary injunction, it must be imminent. M.I.F., 949 F. Supp. at 897; Wisconsin Gas, 758 F.2d at 674. Plaintiffs fail to demonstrate any imminent harm in two ways. First, Plaintiffs allege the harm "is already starting to happen," (Memo. at 5) and that the Proposed Rule is already creating a detrimental market response. Memo at 14. This "ongoing nature of the [Plaintiffs'] alleged economic harm undercuts any claim that irreparable harm would occur without immediate intervention of the court." Guam Indus. Servs., 383 F. Supp. 2d at 121. Simple logic dictates that a harm cannot be both ongoing and imminent. A temporary restraining order only issues in the most dire circumstances in order to prevent a harm from occurring. One of the plaintiffs, Mallorie's Dairy has already lost its biggest customer (before the Secretary announced the Proposed Rule). Declaration of Richard W. Mallorie at ¶ 23. All of the other harms Mallorie's Dairy asserts flow directly from this loss. See generally Declaration of Richard W. Mallorie, Declaration of Charles Flanagan, and Declaration of Teresa Kilgus. Nothing the Court can do could reverse the loss. If the harm has already occurred, as it has with respect to Mallorie's Dairy, a temporary restraining order is not appropriate because the harm can no longer be prevented.

Second, it is undisputed that the Secretary has yet to implement the Proposed Rule which serves as the alleged source of harm to the Plaintiffs. In order to obtain a temporary restraining order, the movants must provide "proof indicating that the harm is certain to occur in the near future." Wisconsin Gas, 758 F.2d at 674. Until the rule is officially implemented, Plaintiffs have no certainty of the potential harms alleged. The rulemaking process is ongoing, and voting must occur under the AAMA framework before the Secretary may publish a final rule. Implementation of the Proposed Rule is by no means assured. The dairy farmers have until January 12, 2006 to submit their votes, and we are advised that USDA will not begin the count until January 17, 2006 in order to allow time for mail delivery of all timely votes. If the votes support implementation of the Proposed Rule, the USDA may publish the Proposed Rule in the

Federal Register no earlier than February 1, 2006.  It will not become effective until at least March 1, 2006.[11]

Just like the Proposed Rule, all harms complained of by Plaintiffs in their supporting declarations are speculative at best.  With the exception of the loss of Mallorie's Dairy's largest customer discussed above, not one of the harms alleged by Plaintiffs has yet to materialize.  In fact, Plaintiffs conveniently ignore the potential that they could continue to operate their farms while pursuing administrative remedies.  Thus the potential harm complained of lacks the necessary imminence to warrant a TRO.  In other words, "plaintiff has failed to show that 'the injury complained of is of such imminence that there is a "clear and present" need for equitable relief to prevent irreparable harm.'"  M.I.F., 949 F. Supp. at 896 (citations omitted); see also Wisconsin Gas, 758 F.2d at 674.

## V.    Intervenors will suffer substantial injury if the Court grants the requested relief.

Plaintiffs argue that issuance of an injunction "will simply maintain the status quo." Memo. at 15.  To the contrary, Plaintiffs are asking the Court to turn back the clock on the rulemaking process, and the resulting injury to Intervenors will be substantial and, unlike the potential pool assessments to plaintiffs, unrecoverable.  Plaintiffs attempt to minimize the impact of delayed or non-implementation of the Proposed Rule on pooled producers and fully regulated handlers as "a few cents per hundredweight . . ." Id.  The loss to regulated handlers, however, must be measured by the lost competitive opportunity that exists not on the "few cents per hundredweight" on the pool blend, but on the difference between the fluid milk price and the blend price – a far more substantial difference that can and has reached $3.91 per cwt or $0.336 per gallon in January 2005 in the Arizona market.  Declaration of Michael Krueger ¶ 5 and

---

[11] This is the earliest possible date the Proposed Rule could become Final and effective.  It becomes effective 30 days after publication.  If USDA does not publish until after February 1, 2006, it will become effective later than March 1, 2006.  The Secretary normally makes Final Rules of this type effective on the first day of a month for administrative and industry convenience.

attached Excel spreadsheet (Attachment 11 hereto). Shamrock Foods thus speaks of its inability
to compete against an entity with at least a $3.7 million annual cost advantage. Id.

Furthermore, the total annual loss to dairy farmer Intervenors has been in the range of $5
to $7 million annually. See Declarations of Krueger at ¶¶ 4 and 5; Norman McClelland at ¶ 5
(Attachment 13 hereto); Keith Murfield at ¶ 8 (Attachment 15 hereto); Daniel McBride at ¶ 8
(Attachment 12 hereto); Michael Anderson at ¶ 8 (Attachment 6 hereto); and James McMullen at
¶ 8 (Attachment 14 hereto). Moreover, the losses to the small farm businesses (fewer than
500,000 pounds of milk production per month) must be weighed against these commercial
producer-handlers operating at levels more than 7 times the size of these small family farms.
The impact on them is substantial and irreversible if an injunction should be improvidently
granted. See generally Declarations of Bruce Anderson (Attachment 5 hereto); Jacob Atsma
(Attachment 7 hereto); Albert Deboer (Attachment 8 hereto); Paul Olsen (Attachment 16 hereto);
Richard Twigg (Attachment 17 hereto); Murfield at ¶ 7; McBride at ¶ 7; Michael Anderson at ¶
7; and McMullen at ¶ 7. If the Court enjoins the Proposed Rule, the annual loss to Intervenors
would be at least $5 to $7 million going forward. Id. And once lost, none of the Intervenors can
ever recoup this income. See McClelland at ¶¶ 4 and 6; Murfield at ¶¶ 4 and 6; McBride at ¶ 7,
Michael Anderson at ¶ 7 and McMullen at ¶ 7. Balancing the substantial injuries of Intervenors
against the speculative harm to Plaintiffs thus weighs against issuance of a TRO.

Any loss to Plaintiffs serves as a gain for the farmer Intervenors and vice versa. However,
the processor side of the equation for Shamrock, West Farm Foods, Dean Foods and other
regulated processors remains untenable and irreparable should the injunction be granted. See
generally Declaration of Michael Krueger. Thus while the position of farmer Intervenors
represents the flip side of Plaintiffs' injury argument – "implementation of the [Proposed Rule]
would cause economic harm to [Plaintiffs], while failure to implement would cause economic
injury to [Intervenors]," M.I.F., 949 F. Supp. at 896, the processor intervenors injury cannot be
"balanced" by plaintiffs (unless the plaintiffs would like to have their so-called injury double-

counted).  Plaintiffs, however, have a means to counter the potential harms, while none of the Intervenors can recover anything should the injunction be improvidently granted.

>  Potential harm to Plaintiffs is mitigated by the availability of an administrative remedy which they have yet to exhaust despite the requirement that they must do so before proceeding to federal court.

See § IIB infra.

If Plaintiffs exhaust their administrative remedies as required and avail themselves of the (15)(A) process and prevail, they will obtain a full refund of any assessments paid pursuant to the Proposed Rule.  Thus, if Plaintiffs were to pursue the 15(A) process, rather than pursue an unripe lawsuit before this court and were Plaintiffs to prevail, they would suffer no harm.  In contrast, even if the Court ultimately rules for Intervenors in the underlying action, Intervenors face the severe prospect of permanently losing revenue and customers for which they have long waited should the Court enjoin the Proposed Rule now.  Therefore, the severe harm to Intervenors if the Court issues a TRO outweighs any speculative and compensable harm to Plaintiffs if the Court leaves the rulemaking process undisturbed.  In the interest of judicial efficiency the Court should refrain from enjoining the Proposed Rule.

**VI.    Plaintiffs fail to demonstrate that an injunction serves the public interest.**

Plaintiffs cite no reason why the issuance of an injunction in this case would be in the public interest other than simply stating that a lot of people commented negatively during the rule-making process and that "following the law is always in the public's best interest."  Memo at 16.  Defendant-Intervenors agree that the public interest is best served by complying with the requirements of federal law, particularly the requirements of the APA, and the agency's own stated polices.  Housing Study Group v. Kemp, 732 F. Supp. 180, 187 (D.D.C. 1990).  Here the AMAA requires exhaustion of administrative remedies prior to judicial review.  Plaintiffs provide absolutely no reason why it is not in the public interest to follow the AMAA exhaustion requirement.  Furthermore, Plaintiffs offer only a circular argument when they claim that the under-regulation of producer-handlers is the law that must be followed as this issue lies at the

crux of the dispute.  Plaintiffs provide no meaningful reason why their requested injunction would serve the public interest when the AMAA clearly states otherwise.

## CONCLUSION

For all of the foregoing reasons, Defendant-Intervenors respectfully urge this court to deny the motion for temporary restraining order and/or preliminary injunction.

Respectfully submitted,

/s/ Charles M. English, Jr.
Charles M. English, Jr.
D.C. Bar No.:  386572
Sara Pikofsky
D.C. Bar No.:  485948
Thelen Reid & Priest LLP
701 8th Street NW
Washington, DC  20001
Telephone:   202.508.4000

December 28, 2005                    *Attorneys for Defendant-Intervenors*
                                     *United Dairymen of Arizona, et al.*