USDA
OALJ/OHC

UNITED STATES DEPARTMENT OF AGRICULTURE

BEFORE THE SECRETARY OF AGRICULTURE

2005 OCT 27  AM 11: 40

RECEIVED

In re:                                              )     2004 Docket No. AMA-M-4-2
                                                    )
HP Hood, LLC; Crowley Foods, LLC;                   )
Schroeder Milk Co., Inc.; and                       )
Crystal Cream & Butter, Co.,                        )
                                                    )
                        Petitioners                 )

## Decision

In this decision, I hold that the Agricultural Marketing Service's determination

that Carb Countdown is a Class I milk product under the regulations is inconsistent with

the plain and unambiguous language of the pertinent regulations.  I hold that the

Agency's determination that Carb Countdown is subject to the Federal Milk Marketing

Orders as a Class I milk product is incorrect, and find that Carb Countdown is not a fluid

milk product as defined by the Agency, but is rather a Class II milk product.  I further

hold that Petitioners are entitled to a refund of the differential between Class I and Class

II products that they have paid as a result of the Agency's determination.

## Procedural Background

On June 24, 2004, a Petition Challenging the Interpretation and Application of

Federal Milk Marketing Orders was filed by HP Hood, LLC, Crowley Foods, LLC,

Schroeder Milk Co., Inc., and Crystal Cream & Butter Co.  The Petition, filed pursuant to

section 15(a) of the Agricultural Marketing Act of 1937, 7 U.S.C. § 608(c), challenged

the interpretation of the Dairy Programs Division of USDA's Agricultural Marketing

Service (AMS) that Carb Countdown was a fluid milk product as defined in 7 C.F.R. § 1000.15, and was therefore a Class I product. Respondent AMS filed its answer on July 22, 2004. A Motion to Intervene opposing the Petition was filed on behalf of Select Milk Producer, Inc. on December 13, 2004.

I conducted a hearing in this matter on December 14-15, 2004 in Washington, D.C. Petitioners were represented by Steven Rosenbaum, Esq., and Respondent was represented by Sharlene Deskins, Esq. Petitioners called three witnesses, and two witnesses were called on behalf of Respondent. At the close of the hearing, I granted Select Milk Producer's Motion to Intervene, which according to the rules of procedure gave them the right to file a post-hearing brief in this matter, and I set a briefing schedule for the parties. Subsequent to the hearing, I received briefs with proposed findings of fact and conclusions of law from both parties and the Intervenor, and a reply brief on behalf of Petitioners.

### Findings of Fact

1. Petitioners manufacture and market Carb Countdown, a drink that looks like milk and tastes like milk but, because it contains fewer than 8.25 percent nonfat milk solids, cannot be marketed as milk.[1] Tr. 83. Petitioner Hood markets Carb Countdown as a "dairy beverage" rather than as milk, and it can generally be found in the dairy section of the grocery store. RX 6D, 6E, 6F, 6G, Tr. 348-351. Carb Countdown comes in four varieties—homogenized, reduced fat, chocolate and fat-free. It is only marketed under the Hood name. Tr. 34. The other petitioners are companies which have contracts with Hood to manufacture the Carb Countdown products. Tr. 34, 190.

---

[1] "Milk that is in final form for beverage use . . . shall contain not less than 8 ¼ percent milk solids not fat. . . " 21 C.F.R. § 131.110(a).

2. Carb Countdown is a strictly designed milk product, manufactured according to a series of formulas devised by Peter Zoltai. Tr. 31-32, 36. The main purpose of Carb Countdown, as indicated by its name, is the reduction of the carbohydrate content that is typically found in milk. Thus, while a glass of whole milk normally contains twelve grams of carbohydrates, a glass of Carb Countdown contains only three grams.[2] The reduction is largely accomplished by removing the lactose, which is a carbohydrate, from the milk. Tr. 64-66.

The non-Hood petitioners manufacture the products for Hood as per specifications and instructions provided by Hood. Tr. 34. The key raw ingredients to make Carb Countdown are supplied by Hood to the other petitioners, and Hood, particularly Mr. Zoltai, has taken a variety of measures, included factory visits and testing of products both by Hood and by independent companies, to assure that the products are made as designed by Hood. Tr. 34-36.

3. Each of the four varieties of Carb Countdown contain by weight less than 6.5% milk solids, although if the skim equivalent method of determining milk solids were used, the results would be different. PX 15, Tr. 37-73. The skim equivalent method, which Respondent contends is the method which should apply in this matter, calculates the percentage of milk solids not by the weight of milk solids that are actually in the finished product, but factors in the milk solids that were removed from the product as if they were still in the product. Tr. 177-179, 290-291, 370-371, RX 12. There is no question that the use of the skim equivalent method does not lead to a percentage value of milk solids by weight in the product as actually constituted. Id.

---

[2] The induction phase of the Atkins diet limits carbohydrate intake to 20 grams per day, so one glass of whole milk would account for more than half of the Atkins limit. Tr. 33.

4.  Both Petitioners' and Respondent's calculations support a finding that all four Carb Countdown products contain by weight less than 6.5% milk solids, and there is likewise no dispute that if the skim equivalent method is the proper one for determining the percentage of milk solids in a product, then Carb Countdown would contain more than 6.5% milk solids.  PX 15, RX 12, Tr. 101-102, 338, 381-383.

5.  Because AMS insisted that Carb Countdown was a Class I product under the regulations, they required Petitioners to pay the Class I price into the pool.  RX 12.  It is undisputed that this was significantly more than Petitioners would have to pay than if the product was classified as a Class II product.  PX 16, PX 17.  Paul Blehar, an accounting manager at Hood, testified that by the end of November, 2004, Hood will have paid into the pool over $2,000,000 more than they would have had Carb Countdown been classified as Class II, and that they would be asking for a refund of the excess payments. Tr. 168.  Nancy Erkenbrack, an accountant for Schroeder, testified that as of the date of the hearing they would have paid into the pool over $225,000 in excess charges as a result of the Carb Countdown they manufactured being classified as Class I rather than Class II.  Tr. 201.  Todd Wilson, an Assistant Market Administrator for AMS in the Texas and New Mexico order, testified on behalf of Respondent, but indicated that, while his exact calculations yielded somewhat different results than Blehar and Erkenbrack, that the calculated differences between Class I and Class II were in the same ballpark as his calculations.  Tr. 361-362.

Toward the close of the hearing, I indicated that I would hold supplemental proceedings if I ruled for Petitioners, to account for the additional time period between the date of the hearing and my decision.  Tr. 397-400.

## Statutory and Regulatory Background

The federal government has been regulating the production and pricing of milk for decades. The primary authority for USDA's regulation of milk, along with other agricultural commodities, is the Agricultural Marketing Adjustment Act of 1937. 7 U.S.C. §601 et seq. That Act gave the Secretary of Agriculture broad powers "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish . . . parity prices." 7 U.S.C. § 602 (1).

Section 608c of the Act gave the Secretary broad powers to issue orders applicable to entities "engaged in the handling of any agricultural commodity." 7 U.S.C. § 608c(1). With respect to "milk and its products," Congress stated that orders should classify milk "in accordance with the form in which or the purpose for which it is used" as a basis for fixing the price that handlers of the milk would pay the producers of the milk. 7 U.S.C. § 608c(5)(A). Thus, the price that handlers of milk must pay producers is directly affected by which class of product the milk falls under.

While there presently exist a number of Federal Milk Marketing Orders, they are all codified in Volume 7 of the Code of Federal Regulations. Part 1000 of Volume 7 defines and delineates the four classes of utilization of milk. For the two classes of milk at issue here:

> (a) Class I milk shall be all skim milk and butterfat:
>
> (1) Disposed of in the form of fluid milk products, except as otherwise provided in this section;
>
> (2) In packaged fluid milk products in inventory at the end of the month; and
>
> (3) In shrinkage assigned pursuant to Sec. 1000.43(b).

(b) Class II milk shall be all skim milk and butterfat:

(1) In fluid milk products in containers larger than 1 gallon and fluid cream products disposed of or diverted to a commercial food processing establishment if the market administrator is permitted to audit the records of the commercial food processing establishment for the purpose of verification. Otherwise, such uses shall be Class I;

(2) Used to produce:
(i) Cottage cheese, lowfat cottage cheese, dry curd cottage cheese, ricotta cheese, pot cheese, Creole cheese, and any similar soft, high-moisture cheese resembling cottage cheese in form or use;
(ii) Milkshake and ice milk mixes (or bases), frozen desserts, and frozen dessert mixes distributed in half-gallon containers or larger and intended to be used in soft or semi-solid form;
(iii) Aerated cream, frozen cream, sour cream, sour half-and-half, sour cream mixtures containing nonmilk items, yogurt, and any other semi-solid product resembling a Class II product;
(iv) Custards, puddings, pancake mixes, coatings, batter, and similar products;
(v) Buttermilk biscuit mixes and other buttermilk for baking that contain food starch in excess of 2% of the total solids, provided that the product is labeled to indicate the food starch content;
(vi) Formulas especially prepared for infant feeding or dietary use (meal replacement) that are packaged in hermetically-sealed containers;
(vii) Candy, soup, bakery products and other prepared foods which are processed for general distribution to the public, and intermediate products, including sweetened condensed milk, to be used in processing such prepared food products;
(viii) A fluid cream product or any product containing artificial fat or fat substitutes that resembles a fluid cream product, except as otherwise provided in paragraph (c) of this section; and
(ix) Any product not otherwise specified in this section; and

(3) In shrinkage assigned pursuant to Sec. 1000.43(b).

Thus, whether a product is sold or distributed as a fluid milk product is a pivotal element is determining whether it is Class I or Class II.  The regulations include the following definition of "fluid milk product:"

Sec. 1000.15  Fluid milk product.

(a) Except as provided in paragraph (b) of this section, fluid milk

6

product means any milk products in fluid or frozen form containing less than 9 percent butterfat that are intended to be used as beverages. . .

(b) The term fluid milk product shall not include:

(1)  . . . any product that contains by weight less than 6.5 percent nonfat milk solids . . .

This regulation has been in effect since 1974.    When the regulation was promulgated in 1974, the Secretary of Agriculture explained the exclusion of products with less than 6.5% milk solids as being justified, at least in part, by their not "being in the competitive sphere of the traditional milk beverages." PX 3, 39 Fed. Reg. at 8715. The Secretary emphasized the importance of the fluid milk product definition "clearly defining the products or types of products that are intended to be included" and expressed confidence that the definition in the regulation was clear. Id. He went on to state that "In determining whether or not a milk product in fluid form falls within the composition standards of the fluid milk product definition, such standards should be applied to the composition of the product in its finished form, not to the composition of the product on a skim equivalent basis." Id. He further recognized that if the classification of a new product appeared "to be incongruous with the intended use of the product, the hearing process remains as an avenue through which a different classification may be considered." Id., at 8716.

The 6.5% exclusion remains in the regulations today.  In the late 1990's, elimination of the exclusion was specifically considered, and even recommended by the Agency's own Classification Committee as part of the large scale review of Federal Milk Order mandated by Congress in the Federal Agriculture Improvement and Reform Act of 1996, 7 U.S.C. § 7523.  The Secretary explicitly rejected the notion of changing the 6.5%

exclusion, even though it was well understood that this would exclude certain dairy products from being categorized as fluid milk solely "because their nonfat solids content falls slightly below the 6.5% standard." PX 7, 63 Fed. Reg. 4802, 4924 (Jan. 30, 1998).

### Conclusions of Law and Discussion

I find that the USDA's regulation clearly and unambiguously categorizes Petitioners' four Carb Countdown products as non-fluid milk products. I further find, to the extent that there is a need to examine the regulatory background and the Agency's long-standing interpretation of this rule, that the Agency's explanations for its adoption of the rule unequivocally support the position advanced by Petitioners. Any change to the rule must be made by additional rulemaking, i.e., formal amendment of the Federal Milk Mark Orders as per the statutory process, and not by simple edict of the Agency. Finally, I find that Petitioners are entitled to refunds for the differentials they paid as a result of Carb Countdown being misclassified as Class I rather than Class II. Rather than rule on the amount of the refunds in this decision, I am scheduling an additional hearing just on the issue of refund amount unless the parties agree on this issue.

1. **The language of the regulation clearly and unambiguously exempts Carb Countdown from being categorized as a fluid milk product.** The regulation specifies, on its face, that if a product "contains by weight less than 6.5 percent nonfat milk solids" then it is not a fluid milk product. Under the interpretation urged by Respondent, the dispositive factor is not what the product actually contains, but what the product would have contained had not the nonfat milk solids been removed. Almost by definition, the method that USDA is requiring Petitioners to use—calculating the skim milk equivalent—is precisely the opposite of what the regulations require. Rather than

focusing on what the product contains, the calculation method espoused by the Agency requires the adding back in the equivalent weight of the very lactose that was removed to create the low carbohydrate product in the first place.   Thus USDA is requiring Petitioners to include what Petitioners' appropriately describe as "phantom ingredients" in order to determine whether a product is a fluid milk product.

Raw milk contains approximately nine percent non fat milk solids.  Over half of these non fat milk solids consist of lactose.  These lactose solids make up approximately 5.1% of the weight of raw milk.  The lactose is removed at either of two facilities by a process of filtration resulting in a product variously known as skim milk retentate, or ultra filtered skim retentate or UF skim.  It is this product, with all or most of the lactose removed, which is used in the creation of Carb Countdown.

USDA's own witnesses admitted the obvious—that the language of the regulation was clear.  Thus Richard Fleming, the Milk Market Administrator for the Southwest Order, stated that the Agency, in interpreting the regulation, was "questioning and challenging the strict wording of the 6.5.  Now, the fallacy in this whole thing really charged Class I for a normal weight, not the skim equivalent weight."  Tr. 245.  Todd Wilson, another USDA employee with sixteen years experience in the Milk Market Administrator's office, testified that in his calculations finding that Carb Countdown was a Class I product, he included lactose in the product's composition even though he knew that that lactose was not included in the product's actual composition.  Tr. 371.

2. **Respondent's interpretation is not entitled to deference.**  Respondent argues that its interpretation of the regulations, which would require Petitioners to include substances removed from Carb Countdown in calculations to determine whether Carb

Countdown must be classified as a fluid milk product, is entitled to deference.  Petitioner

is incorrect.  <u>Chevron</u> deference is called for when an agency has attempted to implement

a regulatory scheme to carry out the expressed intent of Congress, and sets the standard

for determining when an agency's promulgation of regulations in the furtherance of the

aims of a statute is permissible under a statute.  <u>Chevron, USA v. Natural Resources</u>

<u>Defense Council</u>, 467 U.S. 837 (1984).  Here, the Agency has interpreted the statute by

issuing a regulation that is clear on its face, and has been consistently interpreted and

remained unchanged, for three decades.  There has never been any suggestion that the

Agency's promulgation of this regulation is not consistent with the statute.  The <u>Chevron</u>

decision considered whether EPA even had the authority under the statute to promulgate

the regulations in question—a matter not at issue here.

    That is not to say that the courts do not grant agencies deference to interpret

their regulations.  "Agency interpretations of their own regulations have been offered

deference by federal reviewing courts for a very long time and are sustained unless

'plainly erroneous or inconsistent' with the regulation."  <u>Paralyzed Veterans of America</u>

<u>v. D.C. Arena</u>, 117 F. 3d 579, 584 (CADC 1997).  However, such deference is generally

accorded to a reasonable interpretation of an ambiguity in a regulation.  <u>Id</u>.  In the

absence of ambiguity, there is nothing to which a reviewing court must defer.

Respondent contends that there are multiple possible interpretations to the 6.5% content

regulation, and that I must defer to its interpretation that the skim milk equivalent

approach is reasonable and appropriate.  However, by its own terms the skim milk

equivalent analysis does not determine what a product contains, but only what it would

have contained had the lactose not been removed.  The use of the word "contains" would

appear to bar the use of skim milk equivalent analysis, since by its very terms the equivalent analysis does not measure what a product contains, but what it would have contained had not certain ingredients been removed.   The Agency is particularly not entitled to its deference where its interpretation appears to be directly contrary to the requirement that a product's nature be determined by its actual content by weight, rather than by a hypothetical content that is simply not based on the actual weight of the product.

       3. **Even if there was some ambiguity in the regulation, which I hold there is not, the Agency's long-standing interpretation of the regulation is consistent with Petitioners' claim and confirms the inherent clarity of the regulatory language.** Indeed, when the very regulation at issue was adopted, the Secretary stated that the language used in the regulation meant what it said, that "In determining whether or not a milk product in fluid form falls within the composition standards of the fluid milk product definition, such standards should be applied to the composition of the product in its finished form, not to the composition of the product on a skim equivalent basis." PX 3, 39 Fed. Reg. at 8715.  When the Agency chose to keep the same definition in the course of its Congressionally mandated and extensive Milk Order review, even over the recommendations of its Classification Committee, it reaffirmed its understanding of the plain language of the regulation.  In so doing, the Secretary found that there was no need for a change to the standard ". . . and that no change in the standard is warranted at this time." PX 7, 63 Fed. Reg. 4924.  It is clear from this language that the Secretary was confirming that he was not changing any aspect of the definition of fluid milk product, including the manner it which it was to be calculated.  Implicit in this statement is that the

11

only way to change the definition would be to change the standard—i.e., through the regulatory process.

4. **The provisions that apply to "Farm-Separated milk" do not apply to Carb Countdown.** The parties also dispute the application of requirements pertaining to "Farm Separated" milk. In a discussion in a section of the 1999 decision under a section captioned "Farm-Separated Milk," the Secretary indicated that where Ultrafiltration or reverse osmosis was being used **on the farm by the producer**, that milk would "be priced according to the skim-equivalent pounds of such milk." PX 18, 64 Fed. Reg. 16131. The discussion makes it a point of emphasis that the product must be processed in this fashion on the farm by the producer of the milk in order to be subject to this pricing methodology. The two USDA witnesses indicated that even though this discussion was contained in a discussion of how the decision implicated "Farm-Separated milk," it was the intention of the Agency to apply this methodology to any product subjected to ultrafiltration or reverse osmosis. Unfortunately for the Agency's position, the cited discussion contains not a word that would lead any regulated party to conceive that ultrafiltration or reverse osmosis conducted **at a milk plant by a handler** would be subject to the skim-equivalent methodology. If anything, the discussion makes it overwhelmingly clear that usage of the skim-equivalent approach was restricted to this very limited class of milk. Indeed, the discussion takes pains to point out that it applies to "a farm and a producer, as opposed to a plant and a handler." Id.

5. **The practices of the Southwest Order Administrator are not a valid precedent for the Agency's treatment of Carb Countdown.** The fact that the Southwest Order Administrator apparently used the skim milk equivalent methodology

for products marketed in his area does not alter the result here. The incorrect, and apparently unchallenged, implementation of skim milk equivalent for low carbohydrate dairy beverages in the southwest is not a legitimate justification for its use in the northeast, particularly where the language is clear and unambiguous. Certainly, the failure of the low carbohydrate beverage manufacturer subject to the Southwest Order to challenge the imposition of skim milk equivalence is not binding on Petitioners in this case, who apparently have challenged this interpretation as soon as it was applied to them.

6. **The only way to achieve the interpretation that the Agency, and Intervenor, desires here, is for the Agency to amend the regulation.** While it is true, as mentioned by Petitioner and implied by Intervenor, that the market for Carb Countdown is essentially a milk market—i.e., Carb Countdown looks like milk, is packaged like milk, and presumably tastes a lot like milk—the simple fact is that it is not milk under these regulations. Any perceived injustice can easily be corrected through the carefully crafted regulatory process that controls this heavily-regulated commodity. This was clearly recognized by the Secretary in that this very situation was considered for regulation in the late 1990's rulemaking process, and was specifically rejected by him, with the recognition that if circumstances changed, the fluid milk definition could be changed at a later date. Certainly, the Secretary's authority to classify by regulation Carb Countdown type products as fluid milk products is not an issue before me. My holding is simply that under the current regulation, Carb Countdown is not a fluid milk product, and the Secretary cannot make it so unless the regulation is changed.

While Intervenor points out (brief, p. 13) that "the fractionation of milk is the result of technological innovations and poses a new situation for the Department," such circumstances, if correct, might be a justification for amending the current regulation, but cannot be a legitimate justification for interpreting the regulation in a manner inconsistent with its plain meaning. Indeed, the Secretary's conclusions, in rejecting the recommendations of the Classification Committee to abolish the 6.5% standard, are based on the lack of perceived competitive problems, with the proviso that "no change in the standard is warranted at this time." PX 7, 63 Fed. Reg. at 4924. Implicit in this justification is the recognition that a change in the definition of fluid milk would necessitate a change in the standard, i.e., a formal amendment to the milk marketing orders.

There is no question that Petitioners would pay significantly less for the milk used in the manufacture of Carb Countdown if Carb Countdown is a Class II product, as Petitioners' maintain, rather than a Class I product, as insisted by Respondent and Intervenor. Paying for milk according to how it is used is one of the central aspects of the federal milk marketing order system, and the system provides an orderly methodology for changing milk marketing orders. If the Agency wants to change the orders as to the definition of fluid milk it must follow its own procedures as mandated by Congress. Changing its long-standing interpretation of a clear and unambiguous regulation by administrative fiat is not the procedure provided by Congress.

7. **Petitioners are entitled to a refund.** Since I am ruling in favor of Petitioners, and find that Carb Countdown was improperly classified as a Class I product, it is clear that Petitioners are entitled to a refund of the sums that were paid to the pool as

a result of the misclassification. While I heard substantial testimony as to the amounts that were overpaid, and while there were some disagreements as to methodology, the estimates of the payments made by Petitioners in excess of what they would have paid if the Category II price was paid were reasonably close to the estimates made by Respondent. However, in the months since the hearing, additional payments have been made. I announced at the hearing that if I ruled in favor of Petitioners, I would briefly reopen the hearing to take additional testimony solely to determine the appropriate amount of the refund. Tr. 398-400. Thus, while this is my final decision on the merits of the case, I will give the parties 30 days to attempt to reach agreement on the refund amount. If the parties are unable to reach agreement, I will set a hearing date as soon as possible.

## CONCLUSION AND ORDER

I grant the Petition challenging the Agency's interpretation and application of the Federal Milk Marketing Orders as they apply to Carb Countdown, and hold that the four Carb Countdown products do not meet the definition of fluid milk product as provided in the regulations. I hold that the Agency improperly classified Carb Countdown as a Class I product and that Petitioners are entitled to a refund for the differential between Class I and Class II payments to the pool, with the amount of the refund to be determined at a supplemental hearing unless the parties agree on the appropriate amount.

The provisions of this order shall become effective on the first day after this decision becomes final. This is my final decision on the merits of this case. Unless appealed pursuant to the Rules of Practice at 7 C.F.R. § 1.145(a), this decision becomes

15

final without further proceedings 35 days after service as provided in the Rules of

Practice, 7 C.F.R. 1.142(c)(4).

Copies of this decision shall be served upon the parties.

Done at Washington, D.C.
this 26th day of October, 2005

**MARC R. HILLSON**
Chief Administrative Law Judge